United States District Court
For the District of Columbia

| | | |
|---|---|---|
| Bartool Khaksari,<br>Plaintiff,<br><br>v.<br><br>Kenneth Y. Tomlinson,<br>Chairman, BBG<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CA No. 06 cv 1990 (RJL) |

**Motion for Class Certification**

Plaintiff, Bartool Khaksari, hereby moves for certification of a plaintiff class pursuant to Rule 23, Fed. R. Civ. P. and Local Civil Rule 23.1.

In this action Plaintiff seeks relief for employment discrimination based on age, sex, and national origin, and retaliation.

Plaintiff in this case challenges BBG's explicit written policy that the agency has authority to hire non-citizens for vacancies when there are well qualified US citizen applicants available. Under the organic statute that has governed the Broadcasting Board of Governors ("BBG") and its predecessor agencies, authority to employ aliens within the United States is provided "when suitably qualified United States citizens are not available ….." 22 U.S.C. § 1474(1). The statute was intended to establish a firm preference for employment of US citizens in the sensitive work of the agency. As Representative Mundt, the main sponsor of the bill that created the agency declared in the course of crafting the original act that bears his name, "[i]f we are going to interpret America abroad, it should be done by Americans." Hearings before House Committee on

Foreign Relations on HR 3342, 80th Cong., 1st Session, May 13, 14, 16, 17 and 20, 1947 at page 12.

BBG acknowledges that for years its predecessors interpreted this same authority so as to limit its ability to employ aliens to vacancies in which no minimally qualified citizens were available.

The challenged policy was adopted at the highest levels of the agency apparently in late 1983 and was incorporated in its personnel policies. The change was made after the Administration unsuccessfully sought an amendment to section 1474 to permit greater flexibility in employing aliens. The agency nevertheless changed its interpretation of the provision to permit employment of aliens in the United States based on what it describes as "Congressional Committee reports" after the failed effort to gain the amendment. See Declaration of Batool Khaksari, Attachment B. Specifically, it is BBG's position that "[b]ased on Congressional Committee reports, the Agency has interpreted the term 'suitably qualified' to mean 'equally or better qualified.'" Thus, the firm preference for US citizens envisioned by the statute has been eviscerated by a policy with virtually no preference for US citizen applicants.

Plaintiff is a female US citizen of Persian descent, Persian national origin and Muslim religion over the age of 50. Plaintiff speaks Farsi fluently having grown up in Iran. She successfully competed for a coveted position in the National University of Iran School of Law and, after completing her studies, was awarded a law degree in Iran. She practiced law there for several years and, among other activities, worked on broadcasting issues. After immigrating to the United States in the early 1980's she became a naturalized US citizen in 1995. In October 2004 Plaintiff applied for a GS 12 program

research coordinator position in the Farsi service advertised under vacancy announcement no. M/P 04-107. Plaintiff was the only US citizen determined to be qualified for the position. She was passed over in favor of a male non-citizen applicant. See Declaration of Batool Khaksari at para. 2- 4. Applying the challenged construction of section 1474, BBG determined in a written memorandum that the alien was better qualified than Plaintiff. She was passed over for other vacancies in which aliens were selected too.

The defendant Kenneth Y. Tomlinson, the Chairman of the Broadcasting Board of Governors ("BBG"), an independent Government agency responsible for Government sponsored broadcasting to foreign peoples, is a federal employer governed by the standard general schedule service. BBG is an employer within the meaning of Title VII and 29 U.S.C. Section 623 *et seq*.

In this action Plaintiff challenges as unlawful BBG's construction of its authorities so as to permit it to hire non-citizens even though there are well qualified US citizens available for the vacancy.

Plaintiff respectfully requests the Court to certify Plaintiff as a class representative of a class consisting of US citizens who applied for a vacancy at BBG or its predecessor agencies with a duty station in the United States for which they met the minimum qualifications and were passed over in favor of a non-citizen on or after December 1, 1983, the date that the selection policy seems to have been adopted.

A memorandum of points and authorities supported by a declaration of the Plaintiff and a proposed order are submitted herewith.

Respectfully submitted,

Timothy B. Shea
DC Bar No. 234005
Nemirow Hu & Shea
1629 K Street, NW Suite 500
Washington, DC 20006
Tel. 202 835 0300
Fax 202 835 0306

Attorney for Plaintiff Batool Khaksari

United States District Court
For the District of Columbia

| | | |
|---|---|---|
| Bartool Khaksari,<br>Plaintiff,<br><br>v.<br><br>Kenneth Y. Tomlinson,<br>Chairman, BBG<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CA No. 06 cv 1990 (RJL) |

**Memorandum of Points and Authorities in Support of Motion for Class Certification**

## I. Introduction

### A. Background

This is an action for monetary and equitable relief brought by Plaintiff Bartool Khaksari against defendant Kenneth Y. Tomlinson in his official capacity as Chairman of the Broadcasting Board of Governors ("BBG") to redress discrimination based on age, sex, race, national origin, religion and retaliation in violation of the Age Discrimination in Employment Act, 29 U.S.C. Section 623 *et seq*., Title VII of the Civil Rights Act, 42 U.S.C. section 2000e *et seq.* ("Title VII"), 42 U.S.C. sections 1981 *et seq.*, the BBG governing law and charter, the Administrative Procedure Act, 5 U.S.C. section 706 and the law of the District of Columbia.

Plaintiff hereby moves for class certification pursuant to Local Civil Rule 23.1 and Rule 23, Fed. R. Civ. Proc.

BBG is an independent Government agency responsible for Government sponsored broadcasting to foreign peoples particularly in areas where American interests

are at risk. The roots of the agency began in the World War II period when the nation felt that ideologies hostile to American interests were controlling news outlets so as to shut out exposure to objective news. In the Smith - Mundt Act in 1948 establishing an information agency within the Department of State, Pub. L. 80 – 402, 62 Stat. 6 (January 27, 1948), the agency was given authority to hire aliens on a temporary basis when "suitably qualified" US citizens were unavailable and when an appropriation act so permitted. In 1979, the provision, 22 U.S.C. § 1474(1), was amended to grant BBG authority to employ aliens within the United States indefinitely "when suitably qualified United States citizens are not available …." See 93 Stat. 398, 400. The legislative history of this term confirms that this provision was intended to institutionalize a preference for US citizen employees over aliens. After this provision was enacted in 1979, there is no dispute that the *agency administered this authority to limit the hiring of aliens to vacancies in which no minimally qualified US citizen applicants were available.* See Answer to Complaint at Para. 18. Under that construction, "suitably qualified" meant "minimally qualified" US citizen.

In 1983 BBG's predecessor agency unsuccessfully sought an amendment of section 1474 with expanded authority to hire aliens. Thereafter, the agency revised its interpretation of "suitably qualified" based on later Congressional committee correspondence. Referring to this subsequent correspondence, current BBG guidelines to managers relating to this section declare that "[b]ased on Congressional committee reports, the Agency has interpreted the term 'suitably qualified' to mean 'equally or better qualified.'" Plaintiff in this action challenges that interpretation as unauthorized

and seeks certification of a class of United States citizen applicants eligible for vacancies that were passed over in favor of an alien under this unlawful policy.

The import of BBG policy guidance is that BBG claims authority to hire non-citizens over qualified US citizen applicants unless the US citizen is deemed by BBG to be equally or better qualified than the non-citizen. Hence, according to BBG, “suitab[ility]” of a citizen applicant under the statute has been redefined as a relative term depending not on the qualifications of the applicant standing alone but on the assessment of the comparative qualifications of the US citizen compared with those of an alien applicant. In this manner, the statutorily mandated preference for US citizens under section 1474 has been eviscerated.

BBG relied upon its current construction and guidance relating to section 1474 in the selection of the non-citizen applicants over Plaintiff in three vacancy announcements for positions in the Farsi service. In at least one of these vacancies Plaintiff was the only US citizen determined to be qualified.

Plaintiff challenges BBG’s construction of section 1474 as unlawful and not in accordance with law. Under the terms of the statute, BBG has no authority to hire non-citizens when qualified US citizen applicants, such as Plaintiff, are available to fill the position. BBG’s explicit reliance on post-enactment legislative promptings after it failed to obtain an amendment to the statute, is not only unavailing, but constitutes an admission of unauthorized action.

**B. Parties**

Plaintiff is a female US citizen of Persian descent, Persian national origin and Muslim religion over the age of 50.

The defendant Kenneth Y. Tomlinson, the Chairman of the BBG, an independent Government agency responsible for Government sponsored broadcasting to foreign peoples authorized to do business in the District of Columbia with offices located at 330 Independence Ave., Southwest, Washington, DC. BBG employees are federal employees governed by the standard general schedule service. BBG is an employer within the meaning of Title VII and 29 U.S.C. Section 623 *et seq*.

**C. Matters Complained of**

Briefly, Plaintiff speaks Farsi fluently having grown up in Iran. She successfully competed for a coveted position in the National University of Iran School of Law and, after completing her studies, was awarded a law degree in Iran. She practiced law there for several years and, among other activities, worked on broadcasting issues. She had a television program for a period of time in Iran as well. After immigrating to the United States in the early 1980's she became a naturalized US citizen in 1995. See Declaration of Batool Khaksari, attached hereto, at para. 1-3.

Plaintiff worked under purchase order vendor services contract at the defendant BBG from November 2003 to April 2005. Her duties were primarily web casting news, translating and writing articles for Farsi news and radio announcing for Farsi language news. *Id.* at para. 3

In October 2004 Plaintiff applied for a GS 12 program research coordinator position in the Farsi service advertised under vacancy announcement no. M/P 04-107.

Plaintiff was the only US citizen determined to be qualified for the position. A male, non-citizen, non- Muslim applicant under the age of 40 with knowledges and skills inferior to those of Plaintiff was selected for the position. *Id*. at para. 4.

In late 2005 Plaintiff applied for two other positions in the Farsi service, a GS 11 international broadcaster (Persian Service) position and a GS 12 international broadcaster (Persian Service) position in the Farsi service advertised under vacancy announcement no. M/P 05-59. On the first vacancy, Plaintiff was wrongly termed ineligible when her voice test was failed on initial review; she was passed upon administrative review but the position had been filled by then. One or more non-citizen applicants under 40 years of age with knowledges and skills inferior to those of Plaintiff were selected for the positions. *Id.* at para. 5. On the second vacancy, after she was rated eligible for the position the vacancy was cancelled and readvertised; under the readvertised vacancy she was wrongly excluded from the list of applicants. One or more non-citizen applicants under 40 years of age with knowledges and skills inferior to those of Plaintiff were selected for the GS 12 international broadcaster positions.

Plaintiff duly exhausted her equal employment opportunity remedies by contacting an equal opportunity counselor on January 19, 2005 complaining that her non-selection was discriminatory. Among other things Plaintiff specifically complained that she was passed over for a non-citizen applicant. After she met with the counselor, she filed a formal complaint with the agency. Later, she filed a complaint at the Equal Employment Opportunity Commission. *Id*. at para. 7 – 8.

The EEOC issued a right to sue letter to Plaintiff dated September 26, 2006 advising that she had 90 days from receipt to initiate a civil action in an appropriate

district court. This action was filed on November 21, 2006 and, as such, is timely. Plaintiff has exhausted her remedies as to the actions complained of. *Id.* at para. 8 -9.

## II. Discussion

### A. Policy and Practice as to Which Class Certification is Sought

Under 22 U.S.C. § 1474(1) BBG is granted authority to "employ, without regard to civil service or classification laws, aliens within the United States and abroad for service in the United States relating to the translation or narration of colloquial speech in foreign languages or the preparation and production of foreign language programs when suitably qualified United States citizens are not available when job vacancies occur."

This language was introduced in section 1474 by Pub. L. 96-60, 93 Stat. 398, 400, dated August 15, 1979. The legislative history of the 1979 amendment reinforced the intention that the amendment was to authorize employment of aliens to do the designated work "when Americans are not available." Further, the report accompanying the amendment declared that "[b]y law, should a qualified U.S. citizen apply for a position held by an alien, the American citizen would be given the position."[1]

[1] In the Smith - Mundt Act in 1948 establishing an information agency within the Department of State, Pub. L. 80 – 402, 62 Stat. 6 (January 27, 1948), the agency was given authority to hire aliens on a temporary basis when "suitably qualified" US citizens were unavailable and when an appropriation act so permitted. The 1979 amendment permitted indefinite hiring of aliens without specific yearly appropriations measures. Senate Rept. No. 96-116, 96th Cong., 1st Sess. at 20, reprinted at *1979 US Code Congressional and Administrative News* 982, 1001(July 31, 1979). The Committee report accompanying the 1979 amendment explained the intention of the amendment as follows:

> Subsection 205(b) (1) and (2) amend the Smith – Mundt Act of 1948 by extending the ICA's present authority to permit the employment of aliens not only for narration and translation, as is now authorized, but also for the preparation and production of foreign language programs, by deleting the need for repetitious language in the Agency's annual appropriations act for authority to hire aliens with in the United States….

It is undisputed that BBG's predecessor agency administered the term "suitably qualified" United Sates citizen under this section as meaning "minimally qualified" in the years immediately after enactment of the 1979 amendment. See Answer to Complaint at para. 18.

In 1983 or thereafter, BBG adopted the current construction of "suitably qualified" under section 1474 after an Administration request for amendment of section 1474 to expand authority to hire aliens had failed.

Current BBG guidelines to managers relating to this section declare that "[b]ased on Congressional Committee reports, the Agency has interpreted the term 'suitably qualified' to mean 'equally or better qualified.'" See Declaration of Batool Khaksari, Attachment B. The import of that change of direction is that the preference for US citizen applicants was abandoned. In reliance on the 1983 or later Congressional correspondence, BBG claims authority to hire non-citizens over qualified US citizen applicants unless the citizen is deemed by BBG to be equally or better qualified than the non-citizen. There is no genuine dispute that this has constituted official agency policy

---

> At present, aliens are restricted to doing narration and translation work. It is frequently impossible to find American citizens to do the supervisory-level work of preparation or production of programs in several foreign languages, and *the purpose of these subsections is to obtain permission for aliens to do this work when Americans are not available.* There is a maximum of 40 such personnel slots which should be filled by aliens, most of which are at Voice of America ("VOA"), and most of which will at any time be filled by U.S. citizens. *By law, should a qualified U.S. citizen apply for a position held by an alien, the American citizen would be given the position.*
>
> These subsections will also insert in permanent legislation the authority of ICA to hire aliens within the U.S. The Agency now has the power to hire aliens abroad and then to bring them to the U.S. Authority for domestic hiring of aliens has been repealed for many years in appropriation acts.

*Id.* (emphasis added)

since the mid -1980's. See Declaration of Batool Khaksari, Attachments A and B, VOA Personnel Handbook and Guidelines for Selection, Promotion and Employment of Non – U.S. Citizens in the Presence of Qualified U.S. Citizen Competitors.

The BBG procedure for evaluation of non-citizen applicants is that non-citizens are referred to selecting officials on separate certificates from citizen applicants. If the selecting official proposes to select a non-citizen over a qualified citizen, then a memorandum justifying the selection of the non-citizen must be prepared by the selecting official and approved by a BBG personnel officer. Thus, a record of each selection of a non-citizen candidate is made and preserved in the vacancy announcement file and, presumably, other systems of records. In addition, the form for approval of the employment action, the Standard Form 52, for the alien makes reference to section 1474. The personnel actions referring to these sections presumably are available for selection by the BBG personnel system computer records.

BBG relied upon its current construction and guidance relating to section 1474 in the selection of the non-citizen applicant over Plaintiff in vacancy announcement no. M/P 04-107 and in the selection of the non-citizen applicants in vacancy announcements for GS 11 and GS 12 positions in the Farsi service for which Plaintiff was qualified.

Plaintiff challenges BBG's construction of section 1474 as unlawful. Specifically, Plaintiff contends that BBG has no authority to hire non-citizens when suitably qualified US citizen applicants, such as Plaintiff, are available to fill the position. Plaintiff seeks certification of a class of US citizen applicants who have been adversely affected by this policy. The class shall consist of US citizen applicants to vacancies in the United States who were injured by the policy and practice of BBG and its predecessors of hiring and

promoting non-citizens when qualified US citizen applicants are available to fill the position from the inception of the policy, apparently in late 1983. To the extent that it may be necessary, Plaintiff will fix the date of the inception of the policy after discovery.

Plaintiff is member of the class of US citizens who were injured by the BBG policy and practice of claiming to authority to hire non-citizens when qualified US citizen applicants are available to fill the position. She was “suitable qualified” US citizen within the meaning of section 1474(1) and, accordingly, the employment of aliens for the vacancies was unauthorized. See Declaration of Batool Khaksari at para. 4 – 6.

Based on information and belief, BBG under this policy and practice has hired scores of non-citizens each year notwithstanding the availability of qualified US citizen applicants. BBG has also promoted non-citizens within BBG under the same policy. On information and belief, the number of US citizen applicants victimized by this unlawful policy and practice numbers well in excess of 50 each year. See Declaration of Batool Khaksari at para. 15.

**B. Legal Standards**

“Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples” of class cases. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997) citing Adv. Comm. Notes, 28 U.S.C. App., p. 697. See also *In Re Veneman*, 309 F.3d 789, 792 (D.C. Cir. 2002), (“[class] certification is particularly well-suited for civil rights actions where ‘a party is charged with discriminating unlawfully against a class.’”).

**1. Requirements of Rule 23(a)**

Under Rule 23(a), Fed. R. Civ. Proc., a plaintiff seeking class certification must show that:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Each of the four elements is necessary to class certification. *See In re Lorazepam & Clorazepate Antitrust Litig.,* 289 F.3d 98, 106 (D.C. Cir. 2002). To establish the numerosity prong, a class of over forty is usually required. To establish commonality, a plaintiff must identify at least one question common to all members of the class, e.g., that they all suffered an adverse effect from the same policy. See *Garcia. v. Johanns*, 444 F3d 625, 643 (D.C. Cir. 2006); *Hartman v. Duffey, 19* F.3d 1459, 1470 (D.C. Cir. 1994). Following *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 157, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982) a plaintiff seeking to certify a class under Title VII has been called on make a significant showing to permit the court to infer that members of the class suffered from a common policy of discrimination that pervaded all of the employer's challenged employment decisions. *Hartman v. Duffey, supra* at 1470 (D.C. Cir. 1994).

As for the typicality test of Rule 23(a)(3), plaintiff may show that she suffered from application of the challenged policy on one or more occasions.

The hearing on a motion for certification is not intended to resolve the merits of the claims. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178 (1974).

As for exhaustion, the purpose of EEO counseling with agency counselors is to provide management with notice of the matter and to try to informally resolve the matter.

Normally, it is sufficient that a plaintiff must show that the agency was put on notice of a specific agency wide practice alleged to be discriminatory. See *Artis v. Greenspan,* 158 F.3d 1301, 1307 (D.C. Cir. 1998). Exhaustion is unnecessary when "an agency has articulated a very clear position on the issue which it has demonstrated it would be unwilling to reconsider." *Randolph-Sheppard Vendors of America v. Weinberger,* 795 F.2d 90, 105 (D.C. Cir. 1986).

**2. Requirements of Rule 23(b)**

In accordance with Rule 23(b), certification requires that in addition to the requirements of Rule 23(a), the class be found to satisfy the requirement that

> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or correspondingly declaratory relief with respect to the class as a whole; or (3) the court finds that questions of law or fact common to the members of the class predominate over any questions affecting individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

As the Circuit Court noted in *In Re Veneman*, *supra* at 792, "[class] certification is particularly well-suited for civil rights actions where 'a party is charged with discriminating unlawfully against a class.'*FED. R. CIV. P. 23(b)(2)* advisory committee notes. According to the Advisory Committee Notes, however, (b)(2) certification is not proper where 'the appropriate final relief relates exclusively or predominantly to money damages.'"

Certification under Rule 23(b)(3) usually comes with the procedural requirement that putative class members receive notice and an opportunity to opt out to satisfy due process

requirements. *Id*. citing Fed. R. Civ. P. 23(c)(2); *Robinson v. Metro-North Commuter R.R. Co.,* 267 F.3d 147, 165-66 (2d Cir. 2001). By contrast, Rule 23(b)(2) imposes no similar notice requirement because a class seeking primarily equitable relief for a common injury is assumed to be a more cohesive group with fewer conflicting interests requiring additional procedural protections. *Id.*

**C. Class Certification is Warranted**

The class for which Plaintiff seeks certification is: the class of all United States citizens who applied on or after December 1, 1983 [or such other date is determined after discovery to have been the date that the challenged policy was initiated] for competitive positions or promotions at BBG or its predecessor agencies with a duty station in the United States for which they met the minimum qualifications and were passed over in favor of a non-citizen applicant.

**1. The Challenged Policy was Explicitly Adopted by Top Management**

In this case there is no dispute that the agency has an explicit written policy and practice set out by top management in administrative instructions and guidelines of hiring non-US citizens notwithstanding the presence of qualified citizen applicants. See Declaration of Batool Khaksari, Attachments A and B. By definition, each of the putative class members was US citizens who met the minimum qualifications and who were passed over in favor of alien applicants.

**2. Plaintiff was injured by the Policy**

Nor is there any dispute that Plaintiff was the victim of the challenged policy. She is a US citizen who applied for positions; she was determined to be eligible for M/P 4 –

107, a GS 12 position and one or more other positions as well. She was passed over in favor of one or more non-citizens in each vacancy.

**3. Numerosity is Satisfied**

The class of US citizens who were injured by this policy and practice is so numerous that joinder is impracticable. On information and belief, BBG has made more that 50 selections of non-citizens per year under this authority. To the extent that these numbers may be disputed Plaintiff can ascertain the numbers readily in discovery. For each such selection, there were often several eligible citizen applicants and, hence, hundreds of class members per year.

**4. Commonality is satisfied**

The policy authorizing selection of non-citizens over qualified US citizens is an explicit policy applicable throughout the defendant agency. The class consists of US citizens who were not selected in any competitive announcement in which a non-citizen was selected. This threshold question constitutes a question of law and fact common to the class.

**5. Typicality is Satisfied**

The claims of Plaintiff are typical of the claims of the class. Plaintiff has suffered from a straightforward application of the challenged policy on more than one occasion. In the first vacancy, announcement no. M/P 04-107, she was the only citizen applicant determined to be qualified for the position. See Declaration of Batool Khaksari at para. 4.

**6. Plaintiff is an Excellent Class Representative**

As for the adequacy of representation, Plaintiff is a naturalized US citizen and an attorney duly trained in Iran. Plaintiff is therefore an exceptionally well informed representative who will fairly and adequately represent the interests of the class.

**7. The Requirements of Rule 23(b) are Satisfied**

As for the requirements of Rule 23(b), there is no doubt that BBG has acted or refused to act on the basis of the challenged policy interpretation -- grounds generally applicable to the class of US citizen applicants who were passed over in favor of non-citizens. In addition, resolution of the authority of the agency to hire non-citizens when qualified citizen applicants are available is certainly a question as to which a class determination is superior to other piecemeal approaches. There is no rationale for leaving judicial review of the scope of agency authority to hire aliens to individual decisions.

**8. Temporal Scope of the Class**

Plaintiff applied for the GS 12 program research coordinator position in the Farsi service advertised under vacancy announcement no. M/P 04-107 in October 2004 and filed her informal EEO complaint after her non-selection in January 2005. Another action in this district court raises the same issue as to selection of an alien over a qualified citizen for a vacancy filled in June 2003.[2] Plaintiff noted in her informal complaint that she was considered an outsider by management even though she was a US citizen and the

---

[2] This policy of BBG is being challenged by another BBG applicant in *Nyunt v. BBG*, DDC CA No. 06 – 1152 (JDB) in which the plaintiff, a US citizen, complains of discrimination in connection with his non-selection for a vacancy in which he was passed over for non-citizen in June 2003. Plaintiff Nyunt, a broadcaster in the Burmese service of BBG, was determined to be qualified for the position and the alien was selected under the challenged interpretation of the term "suitably qualified" US citizen.

selectee was an alien who was not even a permanent resident. Declaration of Batool Khaksari at para. 8.

The policy challenged is one instituted by top BBG management in writing after deliberations at the very highest levels of agency management. The agency was fully informed as to the policy and publicly committed to it. [3] The notion that the agency might have been uninformed as to the policy or might revisit or abandon the policy in the course of informal EEO counseling is entirely fanciful. Accordingly, the temporal scope of the class should extend to the very inception of the challenged public policy in December 1983 or such other time as may be determined after discovery.

**9. Notice to Class Members**

Pursuant to Local Civil Rule 23.1 the moving party must specify how, when and by whom notice is to be given, the party responsible for payment and the party to receive responses.

As noted above, agency practice requires preparation of a memorandum justifying the selection of each non-citizen hired over a qualified citizen. In addition, the personnel actions for the employment of such selections, the Standard Form 52's, refer to section 1474 in the authority section. Those justification memoranda, the personnel actions, and the associated vacancy announcement files provide a complete record of the pool of challenged personnel actions including the identity the citizen applicants determined to be less qualified than the alien.

Plaintiff requests that BBG, at its cost, search its manual files and computer records and make available its files of justification memoranda and personnel actions to

---

[3] See *Randolph-Sheppard Vendors of America v. Weinberger,* 795 F.2d 90, 105 (D.C. Cir. 1986*)*.

Plaintiff to develop a list of selections of aliens in vacancies for which there were qualified citizen applicants under section 1474. General notice to class members could be provided via agency wide internal publications, by notices on agency bulletin boards, and other distributions in the BBG buildings in the United States. Verification of the lists and individual notice to US citizen class members should be provided by Plaintiff using the applicant information in the vacancy announcements associated with the selection justification memoranda. Notice to individual class members by mail or such other means as may be approved to the extent that it is determined to be necessary should be provided by Plaintiff.

**Conclusion**

Plaintiff respectfully requests the court to certify her as a class representative under Rule 23 sections (b)(2) and (b)(3) of a class consisting of US citizens who applied for a vacancy at BBG or its predecessor agencies with a duty station in the United States for which they met the minimum qualifications and were passed over in favor of a non-citizen on or after December 1, 1983, the date that the selection policy was adopted. To the extent that another date may be established as the inception of the challenged policy then the date of the beginning of the class may be appropriately revised. The defendant BBG should prepare a list of selections of aliens, the associated vacancy announcements and the personnel actions taken under the challenged policy. Notice of class certification should be provided via agency wide internal publications, by notices on agency bulletin boards, and other distributions in the BBG buildings in the United States. Individual

notice to class members based on the data from the vacancy announcement files and the justification memoranda should be provided by Plaintiff as necessary.

A declaration of Plaintiff Batool Khaksari is attached hereto. A proposed order is submitted herewith.

Respectfully submitted,

Timothy B. Shea
DC Bar No. 234005
Nemirow Hu & Shea
1629 K Street, NW Suite 500
Washington, DC 20006
Tel. 202 835 0300
Fax 202 835 0306

Attorney for Plaintiff Batool Khaksari

United States District Court
For the District of Columbia

| | | |
|---|---|---|
| Bartool Khaksari,<br>Plaintiff,<br><br>v.<br><br>Kenneth Y. Tomlinson,<br>Chairman,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CA No. 06 cv 1990 (RJL) |

**Order**

Upon consideration of plaintiff's motion for class certification under Rule 23, Fed. R. Civ. Proc., and Local Civil Rule 23.1, the opposition thereto, the hearing held on the motion and the entire record herein, it is hereby

Determined that the challenged policy interpretation of 22 U.S.C. section 1474 construing the term "suitably qualified" United States citizen as meaning "equally or better qualified" was publicly adopted by senior officials of the predecessor agency of defendant and has been maintained by the defendant Broadcasting Board of Governors;

that the class satisfies the requirements of Rule 23(b) in so far as: the class includes hundreds of qualified United States citizens passed over for positions at the defendant agency and its predecessors; that there are questions of law and fact common to the class; that the claims of the class members and defenses of the agency are typical of the claims and defenses of the class; and that the plaintiff will fairly and adequately represent interests of the class; that the prosecution of separate actions by individual members would create a risk of inconsistent or

varying adjudications which could establish incompatible standards of conduct for the defendant agency; that the defendant has acted or refused to act on grounds generally applicable to the class thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; that questions of law and fact common to the members of the class predominate over any questions affecting only individual members; and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy;

Ordered that plaintiff's motion shall be granted;

Ordered that a class shall be certified under Rules 23(b)(2) and (3) consisting of all United States citizens who applied on or after December 1, 1983 [or such other date is determined after discovery to have been the date that the challenged policy was initiated] for competitive positions or promotions at BBG or its predecessor agencies with a duty station in the United States for which they met the minimum qualifications and were passed over in favor of a non-citizen applicant.

Ordered that the plaintiff Batool Khaksari shall be the class representative and her counsel shall be class counsel; and it is further

Ordered that the parties shall confer and initiate discovery, as appropriate, to permit them to advise the Court within 40 days of appropriate measures for notice to class members and the terms of a proposed notice.

Richard J. Leon
United States District Judge

Dated:

United States District Court
For the District of Columbia

| | | |
|---|---|---|
| Batool Khaksari,<br>Plaintiff,<br><br>v.<br><br>Kenneth Y. Tomlinson,<br>Chairman,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CA No. 06 cv 1990 (RJL) |

Declaration of Batool Khaksari

I, Batool Khaksari, declare as follows:

1. I am a female US citizen of Persian descent, Persian national origin and Muslim religion over the age of 50.

2. I speak Farsi fluently. I grew up in Iran. After finishing secondary school I successfully competed for a coveted position in the National University of Iran School of Law and after completing my studies, was awarded a law degree in Iran in 1979. I practiced law there for several years as one of a handful of female attorneys in the country. Included among my clients was the National Television of Iran. For a short period I had a television show in Iran geared toward children. After immigrating to the United States in the early 1980's I became a naturalized US citizen in 1995. Throughout my time in the United States I have remained actively involved with other immigrants from Iran and the personal and political issues surrounding my native country and its people.

3. I applied and was accepted for work under a series of purchase order vendor services contracts, which extended from November 2003 to early April 2005, at

the defendant BBG. My duties were primarily web casting news, translating and writing articles for Farsi news and radio announcing for Farsi language news.

4. In October 2004, I applied for a GS 12 program research coordinator position in the Farsi service advertised under vacancy announcement No. M/P 04-107. I was the only US citizen determined to be qualified for the position. A male, non-citizen, non- Muslim applicant under the age of 40 with knowledges and skills inferior to mine was selected for the position.

5. In 2005, I applied for GS 11 international broadcaster (Persian Service) positions in the Farsi service. By 2004 I had already passed at least two voice tests at BBG for a GS 11 international broadcaster position. I decided to retake the test to improve my score in 2005. I was wrongfully excluded from the list of eligible applicants for these GS 11 broadcasting positions when I was wrongfully failed on the voicing portion of my test. The evaluation of the voicing skills tests is left to the unbridled discretion of the panel of evaluators. The testers were encouraged to collaborate to fail my test. When I sought and obtained administrative review of the scoring, I was rated eligible for the position. By then, however, the vacancies had been filled. I was, in fact, fully qualified for the position. One or more non-citizen applicants under 40 years of age with knowledges and skills inferior to mine were selected for these positions.

6. In July 2005, I applied for a GS 12 international broadcaster (Persian Service) position in the Farsi service advertised under vacancy announcement No. M/P 05-59. I was rated eligible for the position. Then, the vacancy was cancelled and promptly readvertised. In the readvertised vacancy I was wrongly excluded from

the list of eligible applicants. I was, in fact, fully qualified for the position. A non-citizen applicant under 40 years of age with knowledges and skills inferior to mine was selected for the position.

7. As a result of my complaint of discrimination, my services contract was terminated by Defendant on or about April 4, 2005.

8. On January 19, 2005 I contacted an equal opportunity counselor complaining that my non-selection under vacancy announcement no. M/P 04-107was discriminatory. After I met with the counselor, I filed a formal complaint with the agency. My memorandum dated January 19, 2005 to the BBG director of Equal Employment Opportunity noted that I was considered an outsider by management even though I was a US citizen and the applicant selected was neither a citizen or a permanent resident. Later, I filed a complaint at the Equal Employment Opportunity Commission.

9. The EEOC issued a right to sue letter to me dated September 26, 2006 advising that I had 90 days from receipt to initiate a civil action in an appropriate district court. I have exhausted my remedies as to these actions of BBG.

10. BBG is granted authority to employ, without regard to civil service or classification laws, aliens within the Untied States and abroad for service in the United States relating to the translation or narration of colloquial speech in foreign languages or the preparation and production of foreign language programs when suitably qualified United States citizens are not available when job vacancies occur in 22 U.S.C. § 1474(1).

11. Current BBG guidelines to managers relating to this section declare that "[b]ased on Congressional committee reports, the Agency has interpreted the term 'suitably qualified' to mean 'equally or better qualified.'" See Attachments A and B hereto. That interpretation was adopted by BBG some time after 1983.

12. The import of that guidance is that BBG claims authority to hire non-citizens over qualified US citizen applicants unless the United States citizen is deemed by BBG to be equally or better qualified than the non-citizen.

13. BBG relied upon its current construction and guidance relating to section 1474 in the selection of the non-citizen applicant over me and perhaps other US citizens in each of the vacancy announcements noted above in which I was not selected.

14. I am a member of the class of US citizens who were injured by the BBG policy and practice of claiming to authority to hire non-citizens when qualified US citizen applicants are available to fill the position.

15. On my information and belief, the number of US citizen applicants victimized by this unlawful policy and practice numbers well in excess of 50 each year.

Sworn and subscribed to under the penalties of perjury this 20th day of March, 2007.

Batool Khaksari

Section 820
EMPLOYING NON-U.S. CITIZENS FOR DUTY IN THE UNITED STATES

ATTACHMENT A

821 Introduction
821.1 Purpose
821.2 Related Information
821.3 Authority

822 Policy
822.1 Employment and Promotion - Limitations
822.2 Termination
822.3 Security

823 Responsibilities
823.1 Office of Personnel
823.2 Non-U. S. Citizen Employees

824 Conditions of Employment
824.1 Conditions Applicable to all Non-U. S. Citizen Employees
824.2 Conditions Applicable to Excepted Appointments (GG)

825 Exchange Visitor Program G-1-120 (J-1 Visa)
825.1 Authority and Reference
825.2 Request for Waiver of the Two-Year Home-Country Physical Presence Requirement
825.3 Review Board Criteria for Requests for Waiver
825.4 Offer of long-term employment
825.5 Change in Visa Status

826 Rotational Assignment (Voice of America)
826.1 Purpose
826.2 Designation of Rotational Positions
826.3 Rotational Assignment - Recruitment
826.4 Rotational Assignment - Expiration of Appointment

## Section 820
## EMPLOYING NON-U.S. CITIZENS FOR DUTY IN THE UNITED STATES

### 821 INTRODUCTION

821.1 Purpose - The following material prescribes Broadcasting's policies, responsibilities, and procedures governing the employment in the United States of non-U.S. citizens in positions which require (1) services related to the translation or narration of colloquial speech in foreign languages; (2) the preparation and production of foreign language programs; or (3) the selection, evaluation, editing, writing and adaptation of source material for use in foreign language programming.



NYUNT - EEOC No. 100-2004-0921X
Interr. #9 Doc. Req #3

821.2 Related Information - MOA V-B 870 prescribes procedures to be followed in overseas recruitment and hiring of non-U.S. citizens for duty in the United States.

821.3 Authority - The United States Information and Educational Exchange Act, P.L. 80-402, as amended, authorizes employment of non-U.S. citizens in the United States for the services described in 821.1 above when equally or better qualified U.S. citizens are not available.

822 POLICY

822.1 Employment and Promotion - Limitations

a. A non-U.S. citizen may be appointed only after reasonable efforts to recruit equally or better qualified U.S. citizens have been made and have been unsuccessful. A non-U.S. citizen may be employed or promoted only if no equally or better qualified U.S. citizen is available to perform the duties of the position. The determination as to whether a non-U.S. citizen is better qualified than a U.S. citizen will be based upon criteria established by Personnel to evaluate the qualifications of both citizens and non-citizens.

b. A non-U.S. citizen applicant will be required to qualify in the appropriate examination(s) and meet all other employment standards that apply to employment of U.S. citizens in such positions.

c. As a matter of Broadcasting policy, non-U.S. citizens will not be employed in or promoted to supervisory positions or positions which involve policy or program decision-making.

(1) Exceptions will be allowed only on an individual basis when the appropriate Office, or Service Head determines, with the concurrence of the Director of Personnel that the unavailability of an equally or better qualified U.S. citizen to perform such supervisory or managerial functions is not only significantly handicapping the ability of the Office, or Service to operate, but also is having an adverse impact on Broadcasting's mission.

(2) It is anticipated that positions for which an exception to the U.S. citizenship requirement would be considered will be graded no higher than the GS-13 grade level.

d. It is the policy of Broadcasting to have the terms of excepted (GG) appointments parallel the conditions of GS employment to the extent possible and practicable.

e. Under no circumstances will non-U.S. citizens be employed in circumvention of Immigration and Naturalization Service (INS), Department of Labor, or Department of State regulations.

f. When a non-U.S. citizen employed by Broadcasting becomes a U.S. citizen, the current excepted appointment will be terminated as soon as practicable and the employee may be offered a competitive service appointment if his/her performance and conduct are satisfactory, if he/she is within reach on the appropriate Office of Personnel Management (OPM) register or another legal basis for competitive appointment exists, and if he/she obtains the appropriate clearance of the Office of Security. If the individual is not selected for a competitive service appointment or other appointment under an authority for hiring

U.S. citizens, he or she will be separated from Broadcasting.

g. When an equally or better qualified U.S. citizen becomes available to fill a position occupied by a non-U.S. citizen, such U.S. citizen shall be employed as soon as practicable. (See 822.1a)

h. If a non-U.S. citizen is subject to displacement because an equally or better qualified U.S. citizen is available, his/her appointment will be terminated. The displaced non-U.S. citizen may be offered a new appointment to another position for which he/she is qualified if another position is available at the same or a lower grade level. If the position is at a lower grade level, and the higher-level position was held for a minimum of 90-days, the non-U.S. citizen will be placed at the salary level equivalent to his/her current salary, not to exceed the maximum range of the grade (i.e., step 10). If the displaced employee did not occupy the higher-level position for 90 days, salary will be set at step 1 of the grade or, if promoted from that grade, the step held immediately prior to the promotion to the higher-level position. The time spent at the higher level will be creditable for determination of WGI due date.

822.2 Termination - Non U.S.-citizen staff employees serve at the discretion of Broadcasting under the authority of P.L. 80-402, as amended. Accordingly, should such an employee's performance or conduct fall below an acceptable level, or if a need no longer exists for the employee's services, the employee's limited excepted appointment may be terminated at any time by the Director of Personnel . The employee will normally be given at least 30 days' advance notice prior to the effective date of termination.

822.3 Security

a. Official employee identification cards for limited access personnel will be issued by the Office of Security to non-U.S. citizen employees.

b. Non-U.S. citizen employees may not have access to classified material. Oral briefing is permitted on Secret, Confidential, and administratively controlled material, but not on material classified Top Secret.

c. Non-U.S. citizen employees may not be given responsibility for the opening or closing of bar-lock cabinets or safes containing classified or administratively controlled materials.

d. Safe combinations may not be made known to non-U.S. citizen employees.

823 RESPONSIBILITIES

823.1 Office of Personnel - is responsible for:

a. Assuring that a non-U.S. citizen is employed in a position covered by 821.1 of this section and only in the absence of available U.S. citizen candidates who are equally or better qualified than the non-citizen to perform the duties of the position.

b. Assuring that pre-employment processing, including approval of the Office of Security, of a non-U.S. citizen candidate is initiated only if the candidate's employment would be in accordance with the applicable regulations of the Departments of State and Labor and the Immigration and Naturalization Service.

c. Taking appropriate action when notified of change in visa or citizenship status of non-U.S. citizen employees.

d. Offering and determining the duration of appointments.

e. Notifying employees of renewal or non-renewal of appointments.

f. Initiating disciplinary action, as necessary.

g. Terminating appointments.

823.2 Non-U.S. Citizen Employees

a. Each non-U.S. citizen employee is responsible for immediately informing the Office of Personnel, of any change in visa or citizenship status.

b. Each non-U.S. citizen employee must consult with Personnel before undertaking any employment outside Broadcasting.

824 CONDITIONS OF EMPLOYMENT

824.1. Conditions applicable to all Non-U.S. Citizen Employees GG)

a. Annual and sick leave, holiday benefits, and premium pay will be accorded to non-U.S. citizen employees (GG appointees) in the same manner as GS employees.

b. Non-U.S. citizen employees are responsible for paying Federal and local taxes as required by law, including Federal, State, District of Columbia or local municipal taxes. Deductions are made from salaries when required by law or executive directive. All non-U.S. citizens on visas other than "J" and "F" will be subject to payroll deductions for Medicare coverage and Social Security taxes when applicable.

824.2 Conditions Applicable to Excepted Appointments (GG)

a. Basic Compensation - The basic compensation of an excepted employee serving in a GG position is the pay rate of the corresponding GS grade and step. Excepted employees serving in GG positions are eligible for within-grade step increases, including Quality Increases.

b. Health Benefits and Life Insurance - A non-citizen employee serving in an excepted (GG) position on an appointment not limited to one year or less, or on an extension of such an appointment, is eligible for coverage under the Federal Employees Health Benefits Program and the Federal Employees Group Life Insurance Program unless the employee is serving on a non-full-time appointment with no pre-arranged work schedule.

c. Retirement Coverage:

(1) A non-citizen employee, who, before January 1, 1984, served on an excepted (GG) appointment not limited to one year or less, or on an extension of such an appointment, is

covered by the Civil Service Retirement System (CSRS), and a seven percent contribution to the CSRS is withheld from the employee's basic pay. All but "J-1" and "F-1" visa holders also will be covered by Part A Medicare.

(2) A non-citizen employee holding a "J-1" or "F-1" visa who, at any time, served on an excepted (GG) appointment not limited to one year or less, or an extension of such an appointment, is covered by the CSRS and will pay seven percent of basic salary to the CSRS. Such employees are excluded from Medicare coverage. If such an employee initially was covered by CSRS on or after January 1, 1984, and later attains a change in visa status to other than "J-1" or "F-1", his or her coverage under CSRS will cease and will be converted to full Social Security and will contribute 1.3% of basic salary to the Federal Employees Retirement System (FERS).

(3) A non-citizen employee holding a visa other than "J-1" or "F-1", hired on or after January 1, 1984, and serving on an excepted (GG) appointment not limited to one year or less, or an extension of such an appointment, is covered by full Social Security and will also contribute 1.3% of basic salary to the Federal Employees Retirement System.

825 EXCHANGE VISITOR PROGRAM G-1-120 (J-1 visa)

825.1 Authority and Reference - Under the authority of the U.S. Information and Educational Exchange Act of 1984, P.L. 80-402, as amended; the Mutual Educational and Cultural Exchange Act of 1961, P.L. 87-256, as amended; and the Immigration and Naturalization Act (66 State. 163), P.L. 414, as amended, the Exchange-Visitor Program G-1-120 (J-1 visa) has been designated by Broadcasting to bring to the United States foreign nationals (and their spouses and dependent children) who are especially qualified to perform as foreign language broadcasters, translators, producers, writers, editors, and for training of foreign broadcasters. Barring special circumstances, such as previous history of Broadcasting employing a non-citizen in a temporary worker's or other non-immigrant visa category, all non-immigrant foreign national employees will be brought to the United States as alien employees of Broadcasting. (8 CFR 214.2 (j); 22 CFR 514.2 and 514.23.)

825.2 Request for Waiver of the Two-Year Home-Country Physical Presence Requirement - A request for a waiver of the two-year home-country physical presence requirement pursuant to Broadcasting's authority as an "interested United States Government Agency" may be submitted to Consular Affairs at the Department of State by the Office of Personnel.

825.3 Criteria for Requests for Waiver

a. After receipt of a request for a waiver of the two-year home-country physical presence requirement, (as described above), GC shall consider the request, along with any other relevant information, and determine the following:

(1) whether the granting of a waiver would be in the public interest; and

(2) whether the exchange visitor's compliance with the two-year home-country physical presence requirement would be clearly detrimental to a program or activity of official interest to Broadcasting.

b. When a decision is made in favor of a request for a waiver of the two-year home-country physical presence requirement, GC will make a recommendation to the Waiver Review Office, Department of State, which will send its recommendation to the Immigration and Naturalization Service (INS). The INS has the final authority to issue a waiver.

OFFER OF LONG TERM EMPLOYMENT

825.4 Within the first two years of employment a determination will be made on whether to offer an employee long-term employment. The Office of Personnel will contact the Service Chief six months prior to the end of the first two years of an individual's employment to initiate the review and decision-making process.

In extraordinary cases, Division Chiefs may elect to initiate the review after one year. In the very rare and exceptional case in which a decision on long-term employment cannot be made within the first two years of employment (e.g., employee absent for a prolonged period of time), an employee may be given a new temporary appointment of up to one additional year during which the decision must be made. Such an appointment must be justified by the Division Chief in writing and must have the approval of the Program Director and the concurrence of the Director of Personnel.

The criteria upon which management will base the determination on whether to offer an employee long-term employment are:

Performance by the employee which demonstrates fully his or her fitness and qualifications for continued employment.
Normally, such performance is characterized as excellent or as having the potential to perform in an excellent manner;

Conduct by the employee which is fully professional;

Personal and/or character traits (e.g., willingness to accept supervision and cooperate with others and attitude towards work), which warrant continued employment;

Suitability and security standards are fully met by the employee;

Needs of the service, which includes consideration of such factors as:

Availability of other candidates and their relative skill levels;

The benefits of hiring new employees who could be expected to enhance the currency of the language usage, provide fresh understanding of the cultural and political environment of the target area, and/or provide fresh programming ideas.

Programming and staffing needs and anticipated future changes (e.g., increase or decrease in staff levels; changes in types of skills needed) the ability of the employee to meet these needs.

Based on these criteria, the Service Chief will make a recommendation as to whether the employee should or should not be offered long-term employment (and therefore,

sponsorship), and forward this recommendation to the Division Chief. The Division Chief will review the recommendation and forward it with his or her own written recommendation and cover sheet to the Visa Coordinator, Office of Personnel, who will forward it to the Director of the Voice of America.

The VOA Director shall determine, with the concurrence of the Director of Personnel, whether to offer an appointment without time limitation and sponsorship. Once a final determination is reached, the employee is notified in writing of the decision. If he/she is not offered an appointment without time limitation, the employee must be advised of his/her opportunity to have the decision reconsidered by the Director of VOA.

825.5 Change in Visa Status

a. After (1) Broadcasting has determined that it is necessary and proper to retain the exchange visitor in its employ for an indeterminate period, a Labor Certification is requested and (2) a favorable recommendation for a waiver has been submitted to the INS, Broadcasting will then petition on behalf of the exchange visitor for the appropriate preference immigrant status. The Office of Personnel is designated to execute such petitions on behalf of Broadcasting.

b. Non-U.S. citizens, regardless of their visa status, are employed under a limited excepted (GG) appointment. Broadcasting's intervention to obtain a change in visa status in no way obligates Broadcasting to employ permanently any non-U.S. citizen.

826 ROTATIONAL ASSIGNMENT (VOICE OF AMERICA ONLY)

826.1 Purpose

a. In order to attract and maintain the optimum overseas audience, VOA must maintain current idiomatic language capability and understanding of the cultural environment of the target areas.

b. In support of the above, broadcasters for selected language services will be assigned to rotational positions within VOA for pre-determined periods in order to:

(1) enhance the currency of the language service;

(2) provide the service with fresh understanding of the cultural, social, and political environment of the target area, and

(3) establish and maintain friendly, mutually beneficial relations with foreign countries and/or radio networks.

826.2 Designation of Rotational Positions

a. VOA Division Chiefs, as appropriate, may recommend to the VOA Program Director, a number of their International Radio Broadcasting (IRB) positions as "rotational," within the existing allotment.

(1) Division Chiefs will recommend designating individual positions as "rotational" as they are vacated.

(2) Positions designated as "rotational" will not be filled by individuals other than on time limited non-renewable appointments.

b. Because of situations which may handicap recruitment in certain overseas areas, rotational assignments will not be appropriate in all VOA language services.

c. "Rotational" positions will be reserved for individuals whose appointments to VOA as IRB's are time limited, with the mutual understanding that at the end of a pre-determined period (of between 13-36 months) their appointment will terminate without renewal.

d. The Office of Personnel will control positions identified by language services as "rotational."

e. In unusual cases, such as where recruitment sources are cut off, the interests of VOA may warrant re-designation of "rotational" positions. In such instances, the Division Chief will submit in writing justification for recommending removal of the "rotational" identifier from the position to the Director of Personnel or designee. Personnel will make a recommendation to the VOA Program Director, whose decision will be final.

826.3 Rotational Assignment - Recruitment

a. Rotational assignments to language service positions will be coordinated through overseas posts as part of agreements with:

(1) foreign governments

(2) foreign commercial networks

(3) individuals

b. The Office of Personnel will work with the VOA Program area divisions in identifying adequate lead time to ensure a "pipeline" recruitment process which supplies a continual flow of candidates for "rotational" positions. Contracts signed in advance will be subject to the successful completion of the required security and medical clearances.

c. Personnel will coordinate all pre-appointment communication with candidates for "rotational" positions regarding conditions of their appointments at VOA. Personnel will secure written acceptance and understanding of the limited nature of the appointment from each candidate before the appointment is effected.

d. Candidates for "rotational" positions must pass the appropriate examinations for civil service employment administered under the auspices of Personnel by examiners and at test sites authorized by Personnel. The exams will be evaluated at VOA before an offer of employment may be made.

e. The Office of Personnel will coordinate with the language services appropriate orientation for individuals at VOA on rotation at least 30 days before their arrival.

826.4 Rotational Assignment - Expiration of Appointment

a. The appointment of a broadcaster in a rotational position may be terminated based on performance, conduct, or needs of the service at any time during the appointment.

b. Approximately 90 days before expiration of a "rotational" appointment, Personnel will remind the incumbent in writing of the impending expiration of the appointment so that he/she may begin preparation for departure.

c. The appointments of employees in the "rotational" program will not be extended. Only in rare circumstances, when the Division Chief has certified in writing that the language service will be seriously impaired by the loss of the employee, will Personnel make a review of the case, and it may recommend to the Program Director that the employee be appointed to a vacant non-rotational position.




GUIDELINES FOR SELECTION, PROMOTION, AND EMPLOYMENT OF NON-U.S. CITIZENS IN THE PRESENCE OF QUALIFIED U.S. CITIZEN COMPETITORS

The Unites States Information and Educational Exchange Act, PL 80-402, as amended, authorizes VOA to employ, without regard to the civil service and classification laws, non-U.S. Citizens in a variety of functions related to non-English language programming. The law provides that such non-U.S. citizens may be employed only when there are no suitability qualified U.S. Citizens available for the position. Based on Congressional Committee reports, the Agency has interpreted the term "suitability qualified" to mean "equally or better qualified."

MOA V-A, Section 820 provides in subsection 822.1 that for positions in VOA these relative qualifications determinations will be based on evaluation criteria established by VOA/P. Evaluations of U.S. citizens and non-U.S. citizens under subsection 822.1 are to determine if, in the presence of a qualified U.S. citizen competitor, (1) a non-U.S. citizen candidate can be appointed, (2) a non-U.S. citizen employee can be promoted, and (3) a non-U.S. citizen employee can be retained. The following guidelines apply to these evaluations.

When Evaluation is Required – Evaluation under these guidelines normally is required at any time when:

1. a non-U.S. citizen is elected for appointment or promotion to a position in the presence of a qualified U.S. citizen competitor; or

2. a qualified U.S. citizen makes known to VOA his or her candidacy for a position either occupied by or equivalent to one occupied by a non-U.S. citizen unless the U.S. citizen is selected for such a position.

However, there is no requirement to evaluate a U.S. citizen:

1. who is an Agency employee serving at the same or higher grade as the position proposed to be filled by a non-U.S. citizen unless the position has known documented promotion potential higher than that of the U.S. citizen's position;

2. who is an Agency or other U.S. Government employee whose most recent performance appraisal in a position with similar duties or with performance elements directly related to the knowledge, skills, abilities, or other characteristics critical to performance in the position proposed to be filled by a non-U.S. citizen indicates an overall rating below the "fully successful" level;

3. who is an Agency or other U.S. Government employee whose most recent performance appraisal indicates a rating below the "fully successful" level in an element which is directly related to knowledge, skill, ability, or other characteristic critical to performance in the position proposed to be filled by a non-U.S. citizen; or

4. who has been separated or resigned after being notified that he or she would be separated from the most recently held related employment for performance or conduct reasons.

Determinations of Relative Qualifications—A non-U.S. citizen may be selected, promoted, or retained in the presence of qualified U.S. citizen competitors if, after full and fair consideration of all candidates against the job requirements, the selecting official determines that the non-U.S. citizen is better qualified than any U.S. citizen competitor and the superior qualifications of the non-U.S. citizen are supported by acceptable written documentation provided by the selecting official. In no case, however, may a non-U.S. citizen (employee and applicant) be selected or promoted under circumstances which would not permit the action for a U.S. citizen.

Consideration and Evaluation of Candidates—In making determinations of relative qualifications, the selecting official should evaluate candidates according to job-related factors having a direct relationship to individuals' qualifications and fitness for the position. Examples of such factors include but are not limited to:

NYUNT - EEOC No. 100-2004-0921X
Interr. #9 Doc. Req #3

- The relatedness of candidates' overall education and experience backgrounds to the work of the position;
- The level of responsibility exercised and quality of work produced in previous jobs;
- Awards and other professional or academic recognition received;
- Specific professional accomplishments or a pattern of overall professional accomplishments and advancement to positions of greater responsibility;
- Recency of experience when current knowledge in a job-related area can be shown to have a bearing on qualifications;
- Traits related to quality of performance and versatility, such as initiative, willingness to take and follow instructions, reliability and dependability and interpersonal communication skills;
- The ability to contribute to the overall operating efficiency and effectiveness of the organization or work unit; and
- Quality of past performance in specific job-related functions.

Sources of information on which evaluations may be based include but are not limited to:

- Application forms;
- Reference checks;
- Examination results;
- Writing samples and voice auditions;
- Performance appraisals; and
- Interviews.

Written Documentation – To be acceptable, written documentation must:

- clearly establish the superior qualifications of the non-U.S. citizen candidate or employee;
- be based solely on job-related criteria; and
- be based on a full and fair evaluation of all candidates. A full and fair evaluation normally includes a complete and objective evaluation of all available, pertinent application and performance documents and a personal interview when appropriate.

Approval of Actions

To obtain approval for selections, promotions, or retentions of non-U.S. citizens in the presence of U.S. citizen competitors, the selecting official will transmit the case file, along with written documentation in support of the proposed action, by memorandum through his or her division chief to the Chief, Operations Division, Office of Personnel (VOA/PO). The Chief, VOA/PO will either (1) approve the proposed action and notify the selecting official and division chief, of (2) recommend disapproval and forward the case to the Director of Personnel (VOA/P). The Director of Personnel may approve the proposed action or, jointly with the Director of Programs (VOA/B), disapprove the proposed action.

John S. Welch
Director of Personnel

Effective Date