United States District Court
For the District of Columbia

| | | |
|---|---|---|
| Batool Khaksari, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CA No. 06 - 1990 (RJL) |
| Kenneth Y. Tomlinson, | ) | |
| Chairman, BBG | ) | |
| Defendant. | ) | |

**Plaintiff's Reply to Defendant's Opposition to Motion for Class Certification**

The Supreme Court has endorsed the class-action device to challenge specific policies to save the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion. *Gratz v. Bollinger,* 539 U.S. 224, 267 (2003). The Court also approved a class action under Title VII brought by a class of United States citizens to challenge employment restrictions imposed by a Japanese owned employer. *Sumitomo Shoji America v. Avagliano*, 457 U.S. 176 (1982). The guidance of these two decisions puts to rest Defendant's primary points in opposition to certification.

The Defendant agency's governing statute, 22 U.S.C. section 1474, prohibits hiring of aliens except when "suitably qualified United States citizens are not available." The Broadcasting Board of Governors ("BBG") has an explicit written policy set out in its Manual of Operations and Administration ("MOA") at section 822 under which it claims authority to hire aliens deemed more qualified than United States citizen

1

applicants. BBG applied that policy in rationalizing its authority to select aliens over Plaintiff in competitive selections.[1]

Now BBG resists Plaintiff's action challenging its rule on hiring of aliens over United States citizens for a claimed lack of notice and the lack of an opportunity to revisit the policy in the course of informal counseling on Plaintiff's complaint. The idea that Plaintiff must put the agency on "notice" of the unlawfulness of its published policies is nothing but empty gamesmanship. Equally vain is the claim that the agency might somehow revisit this policy in response to an informal EEO complaint.

Plaintiff, a United States citizen employed by BBG under a personal services contract from late 2003 to April 2005, complains of unlawful discrimination and unauthorized action in her non-selection for positions posted at the Defendant agency and retaliation against her by terminating her contract after her complaints. Plaintiff contends that as a "suitably qualified United States citizen" within the meaning of section 1474 selection of the alien over her was unlawful and discriminatory.

As for the first vacancy for which she was not selected in late 2004, Plaintiff was a qualified United States citizen applicant for the vacancy: she applied for the position; she was determined to be qualified; her name was referred to the selecting official as the only qualified US citizen applicant; and she was passed over in favor of an alien applicant who BBG determined to be better qualified than Plaintiff pursuant to BBG's interpretation of section 1474 set out in BBG's written policy at section 822 of its Manual of Operations and Administration ("MOA").[2]

---

[1] For some 25 years Defendant's predecessor agency administered section 1474 so as to prohibit hiring of aliens whenever a *qualified* United States citizen was available for the position.

[2] Section 822.1(a) of the Manual of Operations and Administration provides:
   A non-U.S. citizen may be employed or promoted only if no equally or better qualified

Defendant acknowledges that Plaintiff properly initiated a complaint for retaliation and discrimination based on sex, race, age and religion for three non-selections but contends that Plaintiff's failed "to exhaust her administrative remedies with regard to a class complaint predicated upon any Title VII bases." Defendant's Memorandum in Opposition to Plaintiff's Motion for Class Certification and in Support of Defendant's Motion to Strike Class Allegations ("Defendant's Opposition") at 6.

This opposition fails for three reasons. First, Plaintiff has no obligation to put the agency on notice that the written agency policy in MOA section 822 is not authorized by the statute. Second, Plaintiff, in fact, gave BBG ample notice and opportunity to remedy her complaint about BBG's alien selection policy. Third, to the extent that Plaintiff may be said to have failed to exhaust her administrative remedies, exhaustion was clearly futile.

Nor has Defendant made any genuine showing that Plaintiff does not satisfy the terms of Rule 23.

---

US citizen is available to perform the duties of the position. The determination as to whether a non-US citizen is better qualified than a US citizen will be based upon criteria established by Personnel to evaluate the qualifications of both citizens and non-citizens.

**Argument**

**I.    There is No Administrative Remedy Available at EEOC to Challenge the Agency Rule**

Plaintiff's fundamental position with respect to class certification is that the BBG policy permitting it to hire aliens over qualified US citizens is at odds with 22 U.S.C. section 1474, BBG's governing statute.

The construction of section 1474, together with rules applying it, is a matter of law as to which the Equal Employment Opportunity Commission ("EEOC") has no interpretive authority.    If a complainant were to initiate a complaint with EEOC challenging MOA section 822, EEOC would not adjudicate the claim. See, e.g., *Machulas v. Wynne*, 2006 EEOCPUBS LEXIS 4579 (July 13, 2006) ("Complainant is advised that the Commission has no jurisdiction over internal agency regulations ...."); *Darakshani v. Craven*, 1999 EEOPUBS LEXIS 6485 (November 22, 1999) (in rejecting claims of discrimination by Iranian non-citizen EEOC declared "the Commission has no jurisdiction to make determinations regarding the constitutionality of an agency's policies or regulations. In cases such as this, the Commission's role is to determine if the agency has uniformly applied its policies and regulations in a non-discriminatory manner."); 29 C.F.R. § 1630.15(e) (providing a defense to an allegation of discrimination where an employer can demonstrate that another federal law or regulation requires or necessitates conduct inconsistent with the Americans with Disabilities Act); *Vazquez v. Winter,* 2006 EEOPUBS LEXIS 1443 ( April 5, 2006) ["We note specifically that the Commission does not enforce the regulations promulgated by the Office of  Personnel Management (OPM) (regarding the classification appeals process); nor does it enforce the agency's

personnel regulations (conduct or performance standards), except insofar as an EEO complaint may allege discrimination in connection with a personnel action. The AJ is not required to determine whether the agency violated OPM or agency regulations, but whether discrimination occurred."); *Bernstein v. Caldera*, 1999 EEOCPUBS LEXIS 6656 (November 8, 1999) ("we lack the authority to consider appellant's request to enforce the Freedom of Information Act").

Thus, no exhaustion with EEOC is available to Plaintiff as to the interpretation of the statute.

## II. To the Extent Exhaustion may be Applicable, Plaintiff Properly Exhausted as to the Alien Hiring Policy

### A. Notice to BBG that its Alien Hiring Policy was at Issue Satisfied the Terms of the Exhaustion Rules

The purpose of EEO counseling is to put the agency on notice of the claim and try to informally resolve the matter. See 29 C.F.R. section 1614.105 (2007); *Artis v. Greenspan*, 158 F.3d 1301, 1306 (D.C. Cir. 1998) (citing agency published rules).

In actions brought under Title VII, a court has authority over those claims that are contained in the administrative complaint or claims "like or reasonably related to" those claims. *Park v. Howard University*, 71 F.3d 904, 907 (D.C. Cir. 1995). Further,

> [t]he requirement of administrative exhaustion under Title VII is generally understood to serve the following purposes: (1) to place the employer on notice that its actions have been alleged to violate Title VII; (2) to allow the responsible agency to create a factual record; and (3) to afford employer and employee an adequate opportunity to pursue a mutually satisfactory resolution of the dispute.

*Keeley v. Small,* 2003 LEXIS 26649 (D.D.C. 2003) citing *Freeman v. Shultz*, 468 F2d 120, 123 -4 (D.C. Cir 1972). The decision in *Keeley* noted the "well established" rule

that where an initial complaint alleges discrimination and acts or reprisal against the agency, it is unnecessary to refile a new complaint for every new complaint.

Exhaustion is a prudential rule. *In re James,* 444 F.3d 643, 647 (D.C. Cir. 2006) ("Nor is either timeliness or administrative exhaustion jurisdictional.") citing *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89 (1990); *De Medina v. Reinhardt,* 686 F.2d 997, 1012 (D.C. Cir. 1982).

Since failure to exhaust is an affirmative defense, it is the defendant's burden to prove by a preponderance of the evidence that the plaintiff failed to exhaust administrative remedies. *Brown v. Marsh,* 777 F.2d 8, 13 (D.C. Cir. 1985). As the moving party as to the affirmative defense of failure to exhaust, the agency has the burden to set out its efforts to give instruct plaintiff as to her rights, to give plaintiff the opportunity to resolve the matter or, in the alternative, to initiate a class complaint.

In 1981 the Circuit Court insisted that "[t]he only exhaustion requirement expressly made by Title VII is the employee's duty to 'first complain to his employing agency,' and it is the agency that is charged with developing a record of the facts." *Mangiapane v. Adams*, 661 F.2d 1388, 1390 (D.C. Cir. 1981) (per curiam). The court continued that "[i]t is far too late in the day for a federal employer to insist that administrative complaints of Title VII discrimination be phrased with micrometric exactitude." *Id.* at 1392.

The EEOC rules require that "[a]t the *initial counseling session*, Counselors must advise individuals in writing of their rights and responsibilities …. The notice required by (d) or (e) of this section shall include a notice of the right to file a class action." 29 C.F.R. section 1614.105(b)(1) (emphasis added).  The EEOC rules also require that

"[t]he agency or the [EEOC] shall extend the 45-day time limit … when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them … or for other reasons considered sufficient …." 29 C.F.R. section 1614.105(a)((2). The Circuit Court held recently that "[g]iven the subsection (a)(2)'s mandatory language –'the agency  … *shall* extend the 45-day time limit' – we agree with [Plaintiff] the agency must grant an extension [of the filing time] if the employee shows that she was 'not notified' or 'otherwise aware' of the time limit." *Harris v. Gonzales*, 2007 US APP. LEXIS 12199, D.C. Cir. Slip Op. dated May 25, 2007 at 5 (emphasis in original). In that case, dismissal of plaintiff's complaint was reversed and the case was remanded to the District Court to determine whether the complaint, filed over seven months after termination, was timely based on the controversy as to notice to plaintiff of the filing limit for individual claims.

Plaintiff Khaksari complained from the very outset that a well qualified US citizen such as herself should not have been passed over for an alien. This complaint put BBG on notice that the alien selection policy in MOA section 822 was squarely at issue. No separate or further notice to management of its own published administrative policies in section 822 could be required. No agency investigation or record of this legal contention was necessary or appropriate.

Moreover, the EEO counseling process provided by BBG to Plaintiff here could scarcely have been more perfunctory, consisting of two telephone conversations three days apart. Plaintiff made a written complaint to the agency EEO officer on January 19, 2005. She did not hear anything back on the complaint until after she contacted the agency EEO officer again. On June 16, 2005 Plaintiff was contacted by telephone by an

EEO counselor, Debbie Young. On June 19, 2005, Ms. Young reported that she had her last counseling session with Plaintiff and claims to have sent certain materials to Plaintiff. There is no evidence that in these two telephone conversations any serious investigation or reconciliation effort was made or that Plaintiff was advised as to any rights she might have had to file a class complaint in the initial session, as required by section 1614.105(b)(1), or, indeed, the concluding conversation. See Attachment A, Affidavit of Batool Khaksari. Before BBG can seek to foreclose claims from Plaintiff, it must demonstrate that it met its obligation properly to counsel the complainant and to investigate the claim. Having made no demonstration that Plaintiff was informed as to her class actions rights at the initial telephone conversation or that her claims were assessed with care, Defendant is in no position to insist on "micrometric exactitude" from Plaintiff to support a claimed failure to exhaust.

Thus, the requirements of exhaustion, notice to the agency and opportunity to investigate and remedy, has been satisfied fully in this case. The class complaint is "like or reasonably related to" Plaintiff's administrative complaint. *Park v. Howard University, supra* at 907. In any event, Defendant has not carried its burden of the affirmative defense of notice to Plaintiff at the initial counseling in accordance with the EEOC rules. See *Harris v. Gonzales*, *supra.*

**B. Even if Plaintiff were Deemed to have Failed to Exhaust with Respect to the Alien Selection Policy, the Futility Doctrine Governs**

The policy set out in MOA section 822 was determined at the highest levels of the agency and has governed agency decisionmaking for more than a decade. The prospect that the agency would revise that policy in response to an EEO complaint is entirely fanciful.

In a footnote at page 7 of Defendant's Opposition, Defendant notes that in June 2006 the American Federation of Government Employees Local 1812 ("AFGE") filed a grievance with BBG over the legality of BBG's application of 22 U.S.C. section 1474 to permit selection of aliens for vacancies when qualified US citizens are available. Based on this grievance Defendant expansively acknowledges that it "has been on notice since at least June 2006 of the claim that its policy is *unlawful, but not unlawfully discriminatory."(emphasis added).* [3]

The letter that prompted the grievance confirms that BBG considered the alien selection policy inviolate.  By letter of May 31, 2006 to AFGE, a copy of which is Attachment B, the BBG set out its position with respect to the hiring of aliens. In response to the AFGE assertion that aliens may be employed for vacancies only when there are no minimally qualified US citizens, BBG advised that up until 1982, "[t]he agency was interpreting the term 'suitably qualified' to mean 'minimally qualified.'" As

---

[3] Plaintiff was never member of the union. Nevertheless, in Defendant's view, notice to the agency from AFGE that a written policy is claimed to be unlawful is considered legally insufficient to put it on notice that the policy may be discriminatory too. Requiring such exquisite precision from individual unrepresented complainants would be at odds with the informality of the administrative process and would essentially require representation at every stage. Such formality is entirely unsupported by the rules and the case law that the agency has the obligation to advise the complainant of her rights.  See *Mangiapane v. Adams*, 661 F.2d 1388, 1390 (D.C. Cir. 1981) (per curiam); *Harris v. Gonzales*, *supra.*

a result of a failed effort to obtain remedial legislation, certain Congressional committees opined to the agency that it had been adhering to "*an incorrect administrative interpretation of existing law.*"  (emphasis in the original). Based on comments from these committees in 1982, BBG initiated changes to the MOA to reflect a new interpretation that became section 822.  BBG concluded, "[w]e do not agree with your argument that minimally qualified US citizens must be hired instead of better qualified non-US citizens." In conclusion, BBG advised "[w]e do not intend to modify the MOA at this time."

Given that the agency was unwilling to revise the alien selection policy in response to a request from the union representing hundreds of agency employees, the chance that it would revisit it in response to a complaint by an untutored employee in individual EEO counseling is exactly nil. The very fact that that grievance had to be initiated by the union in June 2006 on behalf of all its membership is enough to demonstrate the agency unwillingness to change the written policy in response is a complaint from an individual employee.[4]

Where the issue is one of statutory construction and the administrative agency enjoys no special expertise, exhaustion is particularly inappropriate. As the Court of Appeals has stated, "[w]hen the reasons supporting the [exhaustion] doctrine are found inapplicable, the doctrine should not be blindly applied." *Athlone Indus. v. Consumer Prod. Safety Comm'n,* 707 F.2d 1485, 1488 (D.C. Cir. 1983) citing *Committee for GI*

---

[4] The status of alien applicants, in fact, has been a recurrent issue over time at BBG. For example, in July 2003 another employee, Kyaw Zaw Nyunt, a US citizen broadcaster in the Burmese service, initiated a complaint about the selection of an alien over him for a GS 12 broadcaster position.  In that case, now lodged with another judge in this Court in a matter styled *Nyunt v. Tomlinson*, DDC No. 06 – 1152 (JDB), BBG is resisting Plaintiff Nyunt's individual challenge to the alien selection policy.

*Rights v. Callaway*, 518 F.2d 466, 474 (D.C. Cir. 1975) (internal quotations omitted). The doctrine is intended to preserve the autonomy of the administrative agency, aid judicial review, and promote administrative and judicial efficiency. *Id.* The court concluded, "[n]or will a decision by the court invade the field of agency expertise or discretion. 'Where the only . . . dispute relates to the meaning of the statutory term . . . [the controversy] presents issues on which courts, and not [administrators] are relatively more expert.'"*Athlone Indus. v. Consumer Prod. Safety Comm'n,* at 1489 citing *Barlow v. Collins*, 397 U.S. 159, 166 (1970). Similarly, in *EEOC v. Lutheran Social Services*, 186 F.3d 959, 965 (D.C. Cir. 1999) the court found no duty to exhaust with respect to a claim of privilege noting,"[n]o such benefit would flow from requiring exhaustion in this case, for the EEOC has no expertise with respect to the attorney-client and work product privileges. Indeed, expertise as to those privileges resides in the federal courts."

Statutory construction of the proper interpretation of section 1474 from EEOC would not be available or authoritative. No additional administrative exhaustion of the construction of section 1474 can reasonably be required of Plaintiff.


## II. Plaintiff Fully Satisfies the Requirements of Rule 23


Defendant labors to conjure a parade of horribles to support its contention that the class proposed by Plaintiff is somehow unmanageable given its scope in time and the alleged dissimilarities in the types of positions and the variety of employment actions challenged. Happily, the conjurations are either confined to the dark imagination of the authors or confected from an assumed ignorance of the agency personnel system.

To the extent that factual issues may be raised by some of these objections, such as the ability to identify the aliens selected under the challenged policy, Plaintiff is entitled to discovery on those issues before the Court should be in a position to pass on the claim. See, e.g., *Hubbard v. Potter*, 2007 LEXIS 12016 (D.D.C. 2007) (discussing discovery against postal service on certification issues prior to grant of certification).

### B. The Supreme Court has Endorsed the Use of Class Actions to Challenge an Individual Policy as Supporting Judicial Economy

Plaintiff challenges *one specific policy*. Plaintiff's challenge to the alien selection policy as discriminatory and unauthorized by section 1474 is the polar opposite of a sweeping across-the-board action in which a range of policies and practices are challenged.[5]

As the Supreme court noted in General *Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 159 n. 15 (1982):

> [I]f [an employer] used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a). Significant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination

---

[5] An across-the-board action challenges the full range of employment practices, recruiting, training, testing, qualifications, promotions, discipline and compensation. See, e.g., *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 159 n. 15 (1982) (challenging hiring, transfer, promotions, and seniority). In fact, BBG's predecessor agency, the United States Information Agency, defended an across-the-board action by a class of women applicants and employees for more than 20 years. See *Hartman v. Duffey*, 19 F.3d 1459 (D.C. Cir. 1994); *Hartman v. Duffey*, 88 F.3d 1232 (D.C. Cir. 1996), cert. denied, 1997 US LEXIS 3271 (1997).

> manifested itself in hiring and promotion practices in the
> same fashion ….

The Court has reiterated this statement as "[p]articularly instructive" in endorsing the utility of a class action as a vehicle to challenge a policy of racial preferences used in university selections. *Gratz v. Bollinger,* 539 U.S. 224, 267 (2003) ["a class action on behalf of every applicant or employee who might have been prejudiced by the [racial] test *clearly* would satisfy the … requirements of Rule 23(a)." (emphasis in the original)]. The *Gratz* court noted that "as the litigation history of this case demonstrates, the class-action device saved the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion." *Id.* at 268 n. 17 citing *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979).

Defendant acknowledges that challenges to specific policies are well-recognized basis for class actions. See Defendant's Opposition at 15. The suggestion that some highly individualized factual inquiry will be required to identify relevant employment decisions is altogether undemonstrated. As set out in the discussion below, BBG maintains numerous systems to identify alien employees (separate grade designations), the applications of the MOA section 822 policy (specific justification memoranda to the personnel officer setting out the qualifications of the alien) and exercise of the authority under section 1474 on the standard form personnel actions.

The *Gratz* rationale applies *a fortiori* in the case of a written policy which is challenged as facially unlawful because the liability decision is, in the first instance, a legal inquiry. This is precisely the case with Plaintiff's challenge to BBG's written policy in MOA section 822 as unlawful.

**C. The United States Citizens Injured by the BBG Alien Selection Policy Constitutes a Readily Discernable Class Entitled to Protection under Rule 23**

The set of applicants injured by the unlawful alien selection policy constitutes a very identifiable class of United States citizen applicants who were passed over for aliens. The Supreme Court has endorsed use of an action under Title VII brought by a class of United States citizens to challenge restrictions imposed on the citizens in hiring only Japanese citizens to fill executive positions with their Japanese owned employer. *Sumitomo Shoji America v. Avagliano*, 457 U.S. 176 (1982). The Court permitted a challenge by a class of citizens under Title VII to proceed without any discussion of *Espinoza v. Farah, Mfg., Co.*, 414 U.S. 86 (1973), the decision upon which the Government relies. See *Sumitomo Shoji America v. Avagiano*, at 180 n. 4. On remand, a class of citizens was certified. *Avagliano v. Somito Shoji America, Inc.*, 614 F. Supp. 1397 (SDNY 1985).

In section 1474 Congress established a priority for US citizens in employment at BBG as it has throughout federal workforce generally through various longstanding executive orders and appropriations restrictions. Title VII has long been held to assure opportunity of US citizen employees in employment. *Sumitomo Shoji America v. Avagiano*, *supra.* The assertion that Title VII prevents only adverse action based on status but does not confer an advantage, Defendant's Opposition at 5 n. 2, misstates the claim and the law. [6]

_____

[6] The decision in *Espinoza v. Farah, Mfg., Co.*, 414 U.S. 86 (1973) and other cases set out at Defendant's Opposition at 4 - 5, dealt only with restrictions *against alien applicants in employment* in the United States. The question presented in *Espinoza* was whether requiring United States citizenship, as a condition of employment, standing alone, was facially illegal. The Court noted that "Certainly Title VII prohibits discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin." *Id.* at 92.

Certification of the class does not necessarily mean that even upon a finding of class liability each and every member of the class is necessarily entitled to relief. Individual class members upon a finding of class liability may be required to make a demonstration at a "Teamsters" hearing to show that they have fulfilled the liability as determined by the court and the extent of their damages. See *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 372 (1977); *Hartman v. Duffey*, 88 F.3d 1232 (D.C. Cir. 1996) cert. denied 1997 US LEXIS 3271. A finding of liability may form a basis for not only monetary relief but equitable relief to class members as well. See *Keepseagle v Johanns*, 2006 LEXIS 12035 (DDC 2006).

**C. Defendant has Offered No Basis to Deny Certification for Lack of Manageability and, to the Extend that it may have Sought to Raise Legitimate Issues, Plaintiff is Entitled to Discovery on the Matters**

Defendant's main contention under Rule 23, the claimed difficulty in identifying the specific actions in which aliens were selected, is premature because at this point, Plaintiff has not have the benefit of any discovery as to the systems in place to identify the selections in the actions challenged. Conspicuously absent from the agency's

---

In rejecting that claim of facial illegality, the Court acknowledged that "a citizenship requirement might be but one part of a wider scheme of unlawful national-origin discrimination" and cited with approval the EEOC rules to that effect, 29 C.F.R. section 1606.1(d). *Id*. The Court described the various citizenship requirements used by the federal government as a condition of entering the federal service through various rules and executive orders; in addition, appropriations acts have barred employment of aliens. Challenges to policies of preferences are certainly permissible under Title VII. See *Gratz v. Bollinger, supra.*

Opposition is any description of the systems in place to identify decisions in which the alien selection policy was applied at the agency.

At a minimum, however, the BBG maintains at least four systems that identify aliens and decisions based on the challenged policy. First, and most definitively, aliens employed by BBG are not classified with GS designations; rather, they are assigned a designation as "GG" employees and are so identified on all personnel rosters and records. In addition, the citizenship of employees is endorsed on the standard forms used for all personnel actions. Thus, aliens are readily identifiable for each employee on virtually every personnel record.

Second, as Plaintiff noted in her memorandum in support of class certification, MOA section 822 requires each selection of an alien be backed up with a memorandum setting out the alleged qualifications of the alien selected over competing US citizens. The memorandum must be approved by the personnel office, which maintains copies of the records in the vacancy announcement file and, perhaps, in other systems such as the personnel officer's files.

Third, in box 5-D of the standard personnel action form 52, the BBG computer system permits the legal authority for the action to be identified and that box has a code for selections of aliens. In the remarks section of the standard form 52, references to "MOA 822" and the visa status of the individual are routinely made in cases in which the alien selection policy is applied.

Fourth, aliens have restricted assess to classified material so the agency must keep track of those individuals with restrictions.

Given that section 1474 limits the authority to employ aliens to "services related to the translation or narration of colloquial speech in foreign languages," Defendant's suggestion that this authority might have been applied to a wide range of employees such as studio technicians, Defendant's Opposition at 15, is seemingly self-defeating.  To the extent that this authority may have been applied to positions outside the statutory terms then, of course, that also might be scrutinized.

The agency has a specific record of aliens employed and when they were employed. The identification specific these hiring decisions do not involve any special expertise or judgment in deciding which are at issue. The claim of some "vast number" of employment decisions potentially at issue together with unspecified, highly individualized factual inquiries if the Court were to adopt Plaintiff's class, Defendant's Opposition at 16, mischaracterizes Plaintiff's complaint and the record systems in place.

### D. Plaintiff and Her Counsel are Adequate Representatives

No genuine demonstration is made that Plaintiff herself does not constitute an adequate class representative.

Defendant suggests irremediable conflicts within the class in the event that more than one US citizen competed for a selection in which an alien was hired. The proposition that two or more members of the same protected class might have sought the same position has never been held to bar an individual or class action for it would constitute a bar in virtually every case that could be brought. Thus, for instance, in *Gratz v. Bollinger, supra,* the Supreme Court specifically approved use of a class action to challenge the racial preference policy even though the plaintiff class was competing for a

limited number of spaces at the defendant university. Similarly, in the class action brought by women applicants to and employees of BBG's predecessor, the United States Information Agency, the certainty that two or more women must have applied to many vacancies at issue did not hinder certification of the class or award of relief. See *Hartman v. Duffey,* 19 F.3d 1459 (D.C. Cir. 1994); *Hartman v. Duffey*, 88 F.3d 1232 (D.C. Cir. 1996) cert. denied 1997 US LEXIS 3271.

Defendant's concerns about the adequacy of Plaintiff's legal representation are misplaced because that is primarily a matter lodged with Plaintiff in the first instance. Plaintiff's counsel has, in fact, acted as agency counsel in a class case that was tried in this District Court before Judge Oberdorfer in the 1980's as well as a number of individual actions in this District Court. See *Harrison v. Lewis*, 559 F. Supp. 943 (D.D.C. 1983); *Harrison v. Lewis*, 630 F. Supp. 212 (D.D.C. 1986).  Counsel also represented a government corporation that encountered personnel issues in this District Court and other fora. See biography of Timothy B. Shea, Attachment C.

**Conclusion**

For the foregoing reasons Defendant has not provided any basis to deny class certification as requested.

Respectfully submitted,

Timothy B. Shea
DC Bar No. 234005
Nemirow Hu & Shea
1629 K Street, NW Suite 500
Washington, DC  20006
Tel. 202 835 0300
Fax 202 835 0306

Attorney for Plaintiff Batool Khaksari

United States District Court
For the District of Columbia

| | |
|---|---|
| Batool Khaksari, | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Kenneth Y. Tomlinson, | ) |
| Chairman, BBG | ) |
|     Defendant. | ) |

CA No. 06 - 1990 (RJL)

**Attachments to Plaintiff's Reply to Defendant's Opposition to Motion for Class Certification**

A.  Affidavit of Batool Khaksari

B.  Letter from Broadcasting Board of Governors Chief of Staff Janice Brambilla to

American Federation of Government Employees Local 1812 dated May 31, 2006

C.  Biography of Timothy B. Shea



United States District Court
For the District of Columbia

| | |
|---|---|
| Batool Khaksari, | ) |
|      Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Kenneth Y. Tomlinson, | ) |
| Chairman, BBG | ) |
|      Defendant. | ) |

CA No. 06 - 1990 (RJL)

**Affidavit of Batool Khaksari**

I, Batool Khaksari, plaintiff in this case, declare based on my personal knowledge:

1. On January 19, 2005, I provided a written complaint of discrimination to the Broadcasting Board of Governors Equal Employment Opportunity officer, Delia Johnson.

2. I heard nothing from the EEO officer or her office on my complaint until June 2005 when I called her and left her a message. Ms. Johnson returned my call to say that she had assigned a counselor, Debbie Young, to my complaint.

3. I had two telephone conversations with Ms. Young, the first on or about June 13, 2005 and the second three days later, on or about June 16, 2005. I never met with her.

4. The counseling conversation was polite but brief. Ms. Young offered very little encouragement that I might obtain relief for my complaints. Ms. Young did not advise me regarding my option to file a class case in these two conversations.

5. I have read that in her EEO counselor's report Ms. Young indicates that she sent me a written notice of my rights and responsibilities on June 19, 2005 by certified mail. I have no recollection of receiving that notice.

6. In any event, June 19, 2005, the last day we spoke, was last day of my counseling with Ms. Young as her report confirms. I do not know how I could have been informed as to my rights to initiate a class action in some written document that was only sent to me, if at all, on the day of the conclusion of my counseling.

Sworn and subscribed to under the penalty of perjury this   1st    day of June, 2007.

/s/

Batool Khaksari

**ATTACHMENT B**

*Broadcasting Board of Governors*

## INTERNATIONAL BROADCASTING BUREAU

May 31, 2006

RECEIVED
5-31-06
3:50 PM

Mr. Tim Shamble
President, AFGE Local 1812
330 Independence Avenue, S.W.
Room 1169
Washington, D.C. 20237

Dear Mr. Shamble:

This is in response to the Formal Level Institutional Grievance you filed on May 3, 2006, concerning policy in the Agency's Manual of Operations and Administration (MOA) Part V-A, Section 820, Employing Non-U.S. Citizens for Duty in the United States. The grievance contests subsections 821.3, 822.1(a), and 823.1(a) which state that non-U.S. citizens may be employed and promoted when no equally or better qualified U.S. citizen is available. The grievance argues that non-U.S. citizens may be employed only when there are no minimally qualified U.S. citizens.

The United States Information and Education Exchange Act of 1948, codified at 22 USC 1474, authorizes the Agency to employ non-U.S. citizens when suitably qualified U.S. citizens are not available. In 1982, the Agency, then the U.S. International Communication Agency (ICA), requested to amend 22 USC § 1474 to enable ICA to employ non-U.S. citizens when equally or better qualified U.S. citizens were not available. At the time of the request, the Agency was interpreting the term "suitably qualified" to mean "minimally qualified." In Report No. 97-480 to accompany H.R. 5998, dated April 2, 1982, the full text of which was provided to you on December 20, 2005 (we are not aware of the source of the typed excerpt you attached as the enclosure to Exhibit C), the House Committee on Foreign Affairs examined the meaning of the term "suitably qualified." The Committee stated, "The term should be interpreted to mean, in effect, that the person who best fulfills the job requirements would be hired, and that only in those cases where the American and the foreign national are equally qualified should preference be given to an American." The Committee further stated, "A suitably qualified person does not mean one who is qualified under minimum standards, but a person whose skills match the demands of the position as well as the demands of the Agency." The Committee determined it was unnecessary to amend the wording if the Agency used these correct interpretations.

In Report No. 97-429, to accompany S. 2581, the Senate Committee on Foreign Relations also examined this issue on legislative day May 25, 1982. The Committee's report, dated May 26, 1982, states "It is the view of the Committee that the phrase 'suitably qualified,' if interpreted in a sensible and intelligent manner, is more than adequate to protect the staffing needs of Voice of America. The problem with respect to the employment of foreign nationals was created *by an incorrect administrative interpretation of existing law* and should be remedied through administrative, not legislative action. The Committee

-2-

views the Administration's requested amendment on this issue as unnecessary and urges the Agency to correct its hiring policy accordingly." (Emphasis added).

The Agency then initiated changes to the MOA to reflect this new interpretation. Mr. Norman Painter, then President of AFGE Local 1812, was informed of the proposed changes and given the opportunity to bargain. He did not request to bargain. The change was adopted in the MOA Part V-A, Section 820 dated August 31, 1984. Since that time, MOA Part V-A, Section 820, has been revised several times but there has been no change in the Agency policy to employ and promote non-U.S. citizens only when no equally or better qualified U.S. citizen is available. Section 820 was last updated on March 1, 1999.

We do not agree with your argument that minimally qualified U.S. citizens must be hired instead of better qualified non-U.S. citizens. However, it is unnecessary to debate this matter further because Article 6, Section 1 of the Negotiated Labor-Management Agreement (NLMA) states:

> SECTION 1. LAWS AND REGULATIONS – *In the administration of all matters covered by the Agreement, officials and employees are governed by* existing or future laws and the regulations of appropriate authorities; *by published BBG policies and regulations in existence at the time the Agreement was approved;* and by subsequently published BBG policies and regulations required by law or by the regulations of appropriate authorities. (Emphasis added)

The current Agreement was approved on September 22, 2005. MOA Part V-A, Section 820, is a published BBG policy and was in existence at the time the Agreement was approved. Therefore, the parties have agreed to be governed by this MOA.

Furthermore, the preceding NLMA, which was approved on January 1, 1993, contained similar language in Article 6, Section 1. Thus, the parties agreed to be governed by the then-existing MOA Part V-A, Section 820, dated October 24, 1986, which is the version you have enclosed as Exhibit B of your grievance. I point this out because the example you have given to illustrate an alleged violation occurred under the 1993 NLMA.

A portion of this grievance concerns the selection of a non-U.S. citizen for a supervisory position. Although the text of the grievance states you have included this event as an example of an alleged violation, you have requested a specific remedy for this example, thereby transforming it to a subject of this grievance.

The filling of a supervisory position is not grievable.

The position of Supervisory International Broadcaster (Indonesian) was advertised by vacancy announcement number M/P 05-14. This position is not in the AFGE Local 1812 bargaining unit and filling this position is not subject to the negotiated Merit Promotion

-3-

and Staffing procedures (See Article 14, Section 1.b). Mr. Jimmy Manan, a non-U.S. citizen, was selected for the position.

This selection cannot be grieved under the negotiated grievance procedure. Article 21, Section 2.b.9, specifically excludes the filling of non-bargaining unit positions from the negotiated grievance procedure.

Further, such a grievance is untimely. Our negotiated grievance procedure states at Article 21, Section 4, that a grievance under this procedure is forever barred unless it is presented at Step 1 within 30 workdays after the event or incident giving rise to the grievance. The event giving rise to the grievance is the selection of Mr. Manan for the supervisory position. Mr. Manan was appointed to this position effective August 7, 2005.

Remedy/Relief Sought

1.  You have requested that the Agency rewrite its policy so that "suitably qualified" does not mean equally or better qualified.

This remedy is a request, in effect, to open this policy for negotiations. We do not intend to modify the MOA at this time; however, if we make any modifications in the future, we will advise the Union and provide the opportunity to bargain to the extent required by the Statute. This remedy is denied.

2.  You have requested that Mr. Manan be removed from the supervisory position and that Mr. Isa Ismail, or the best qualified U.S. citizen who applied, be appointed.

The selection of Mr. Manan for the supervisory position is not grievable. This remedy is denied.

3.  You have requested that non-U.S. citizens who have been hired in the past 7 years be removed and minimally qualified U.S. citizens who have applied for the position be employed.

You are seeking a retroactive change in Agency policy and regulation. This remedy is contrary to the Agreements reached in Article 6, Section 1, of the current and the preceding NLMA. This remedy is denied.

Sincerely,

Janice Brambilla
Chief of Staff



# TIMOTHY B. SHEA

1629 K Street, NW, Suite 500
Washington, DC 20006
(202) 835-0300

EXPERIENCE

1991 – Present    Partner, Nemirow, Hu & Shea, Washington, DC
Commercial practice with emphasis on contracting, administrative advocacy before
federal agencies and judicial litigation in federal trial and appellate courts. Advise
U.S. and foreign investors, owners, charterers, brokers and shippers on all aspects of
the maritime transportation industry, e.g., the financing, construction, acquisition,
documentation, marketing and operation of U.S.-flag and foreign-flag vessels.

1987 – 1991    Vice President and General Counsel, Legal Services Corporation,
Washington, DC
The Legal Services Corporation is a publicly funded entity organized as a District of
Columbia corporation under a mandate from Congress to provide grants for civil legal
services to the poor throughout the United States. See 42 U.S.C. §2996.

1975 – 1987    Trial Attorney; Special Assistant to Chief Counsel; Senior Litigation
Counsel; and Assistant Chief Counsel for Maritime Assistance in the
Office of Chief Counsel, Maritime Administration
Advised and defended the Maritime Administration in major litigation in the areas of
maritime law, administrative decisionmaking, fair employment and contracts. Sole
agency counsel defending complex class action discrimination complaint with
voluminous discovery. As chief of maritime assistance division, directed legal staff
activities covering vessel operating assistance contracts, construction assistance
contracts, cargo preference and tax programs for United States-flag vessels.

1973 – 1975    General practice, Springfield, Massachusetts

EDUCATION
College of the Holy Cross, Worcester, MA          B.A., Mathematics
Notre Dame Law School, Notre Dame, IN          Juris Doctor

PROFESSIONAL MEMBERSHIPS
Admitted to Massachusetts Bar, the District of Columbia Bar, and the Maryland Bar.
Admitted to practice before the United States District Court for the District of
Columbia, the United States Circuit Court of Appeals for the District of Columbia,
the United States District Court of Maryland, and the United States Court of Appeals
for the Federal Circuit.

PROFESSIONAL RECOGNITION

Awarded Department of Transportation Silver Medal for professional excellence in October 1985.

Served on Board of advisors for Catholic Charities Archdiocesan Legal Network from 1991 to 2004; represented a number of indigent clients in a variety of matters.

Recognized in 1997 as Annual Outstanding Individual Attorney for Pro Bono Legal Services by Catholic Charities Archdiocesan Legal Network for Washington Metropolitan Area.