## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **BATOOL KHAKSARI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 06-1990 (RJL)** |
| | ) | |
| **Chair, Broadcasting Board of Governors,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

### DEFENDANT'S MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

Defendant, the Chair of the Broadcasting Board of Governors (a position formerly occupied by James K. Glassman but which is vacant as of the filing of these motions), respectfully moves the Court to dismiss or enter judgment in favor of Defendant on all remaining claims in this case pursuant to Rules 12(b)(1), 12(b)(6) and 56(c) of the Federal Rules of Civil Procedure.  The grounds for these motions are set forth in the accompanying Memorandum and the Defendant's Statement of Undisputed Material Facts.

Dated: March 31, 2009.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

/s/_____
JANE M. LYONS, D.C. Bar # 451737
Assistant United States Attorney
555 4th Street, N.W. - Room E4822
Washington, D.C. 20530
(202) 514-7161 (phone)
(202) 514-8780 (fax)
jane.lyons@usdoj.gov

Of Counsel:
Elizabeth A. Parish, Esq.
Kataryna Baldwin, Esq.
Office of General Counsel
Broadcasting Board of Governors

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BATOOL KHAKSARI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 06-1990 (RJL)** |
| | ) | |
| **Chair, Broadcasting Board of Governors,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## DEFENDANT'S MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Plaintiff, who provided translation services to the Voice of America's Persian Service, a component of the Broadcasting Board of Governors ("BBG" or "Agency"), under the terms of a purchase order between 2003 and 2005 and unsuccessfully applied for three positions with the Persian Service, brings this action alleging unlawful discrimination based on her age, sex, race, national origin and religion, as well as retaliation.  *See* First Amended Complaint [Docket Entry No. 17].  She presents a wide assortment of claims based on both federal and state law, including, among other things, that she was subjected to a hostile work environment while performing her contract, that BBG declined to renew her contract in retaliation for her having raised complaints, and that BBG violated the Administrative Procedure Act ("APA") by misapplying its statutory authority to hire non-U.S. citizens and by declining to accept Plaintiff's hostile work environment allegations for investigation as part of her equal employment opportunity ("EEO") complaint.  *See id.*[1]

---

[1]  The APA claims based on alleged violations of BBG's hiring authority, 22 U.S.C. § 1474(1) are the subject of Plaintiff's motion for partial summary judgment [Docket Entry No. 28] and Defendant's cross-motion to dismiss that claim [Docket Entry No. 31].

The Court plainly lacks jurisdiction over several of Plaintiff's claims because there is no waiver of sovereign immunity for claims based on District of Columbia law or 42 U.S.C. §§ 1981 or 1983.  Furthermore, the D.C. Circuit has already summarily affirmed this Court's decision that purchase order vendors ("POVs") providing translation services at BBG are not covered by Title VII and may not assert claims based on a hostile work environment.  *Zhengxing v. Nathanson*, 215 F.Supp. 114 (D.D.C. 2002), *aff'd*, 2002 WL 31926829 (D.C. Cir. Dec. 31, 2002), *cert. denied*, 539 U.S. 965 (2003).  Thus, even if failure to investigate a hostile work environment claim were a valid claim, which it is not, BBG is not required to expend its resources investigating such allegations when no claim can be brought.   As this Court has recognized explicitly:

> the only "right" Title VII establishes is to be free of discrimination; this right is served even if errors are made in processing the charge, by the right to a trial *de novo*.

*Packer v. Garrett*, 735 F. Supp. 8, 9-10 (D.D.C. 1990), *aff'd*, 959 F.2d 1102 (D.C. Cir.) (table), *cert. denied*, 506 U.S. 918 (1992); *see Anthony v. Bowen*, 848 F.2d 1278 (D.C. Cir. 1988) (denying claim for attorney's fees under Title VII where fees were incurred to challenge processing of EEO complaint), *cert. denied*, 489 U.S. 1011 (1989).

As an applicant for federal employment, some of Plaintiff's three non-selection claims do fall within the scope Title VII or the ADEA, which are the exclusive remedies for claims against federal agencies for unlawful  discrimination based on age, race, national origin and religion.  On these claims, no reasonable inference of any unlawful basis for Plaintiff's non-selection can be drawn for several reasons.  In general, the absence of any formal training in journalism or broadcasting in Plaintiff's background, and only very limited experience at VOA primarily doing only translations and voicing them for broadcast on radio, go a long way toward explaining why Plaintiff would

2

experience difficulty competing for positions requiring journalism and TV broadcasting skills.  For the first position, a Research Coordinator, Plaintiff's qualifications were simply inferior to the individual selected by the Director of the West and South Asia Divisions of VOA, Sheila Gandji.  Apart from the qualifications gap, Ms. Gandji was also aware of disruption or conflict within the Persian Service arising out of Plaintiff's performance of her contract.  With respect to the second position, a GS-11 International Broadcaster position, Plaintiff's name did not appear on the selection list because she had not received a passing grade on the required language test, and Ms. Gandji did not even know that Plaintiff had applied for the job.  Because Plaintiff's complaints about the reasons others were given higher scores on the required language test have nothing to do with Plaintiff's protected characteristics, there was no unlawful discrimination.  Moreover, the people ultimately selected by Ms. Gandji after the position was re-posted were, like Plaintiff, women of Muslim faith who were born in Iran.

For the third position, the initial vacancy announcement was cancelled and replaced with one that solicited broadcast demo tapes, and Plaintiff simply failed to apply for the position when the revised position was advertised.  To the extent Plaintiff argues discriminatory or retaliatory non-selection for a vacancy for which she did not apply, Plaintiff has failed to exhaust her administrative remedies and cannot prevail.

Accordingly, even on the claims which are legally cognizable, Plaintiff cannot show that  a reasonable finder of fact could conclude that she was the victim of any unlawful discrimination, and summary judgment in favor of Defendant is plainly warranted.

## STATEMENT OF FACTS

Plaintiff is a Muslim female born in Tehran, Iran in 1951.  First Amended Complaint at ¶3; Ex. 1 [Khaksari Dep.] at 6.  She earned a bachelor's degree in economics and a law degree in Iran. She came to the United States in 1981 and became a U.S. citizen in 1991.  *Id.* [Khaksari Dep.] at 7. When she came to the U.S., she intended to practice law and earned a master's degree in criminology from Coppin State University, but she has not yet passed a bar exam.  *Id.* at 8-10.  Plaintiff has no formal training in journalism or broadcasting.  *Id.* at 14-15.

In November 2003, Plaintiff came to work at the Agency's Persian Service of the Voice of America as an independent contractor or purchase order vendor (POV).  First Amended Complaint at ¶6; *see also* Ex. 1 [Khaksari Dep.] at 37-38.  The Persian Service was one of the language services housed in Voice of America's West and South Asia Division.  Ex. 2 [Gandji Dep.] at 8.  During her tenure as an independent contractor with the Persian Service, Plaintiff worked for both the web team and the radio team, primarily as a translator.  *See* Ex. 1 [Khaksari Dep.] at 40-41, 45, 54. Specifically, Plaintiff used her knowledge of the Farsi language to translate stories from English to Farsi for either radio broadcast or posting on the Service's internet site.  Ex. 1 [Khaksari Dep.] at 38, 59.  Plaintiff was paid every two weeks for assignments performed under a purchase order, initially at the rate of $65 for each completed assignment, and later at a rate of $75 per order.  Ex. 1 [Khaksari Dep.] at 50, 73.  As a contractor, Plaintiff did not accrue leave, did not receive performance evaluations, did not participate in the federal retirement system, and was responsible for paying her own income taxes.  Ex. 1 [Khaksari Dep.] at 40; Ex. 2 [Gandji Dep.] at 33-34.  Independent contractors working at the Voice of America such as Plaintiff possess specialized knowledge – in

Plaintiff's case, her Farsi language skills – and require minimal supervision.  Ex. 1 [Khaksari Dep.] at 94; *see also Zhengxing v. Nathanson*, 215 F.Supp. at 117-19.

**A.      Plaintiff Is Not Selected for GS-12 Programming Research Coordination Position.**

In October 2004, Plaintiff applied for a GS-12 Programming Research Coordinator position in the Persian Service of the Voice of America, advertised under vacancy announcement number M/P-04-107.  Ex. 1 [Khaksari Dep.] at 119-20.  The selecting official for the programming research coordinator position was Ms. Sheila Gandji, the director of Voice of America's West and South Asia Division.  Ex. 2 [Gandji Dep.] at 8; Ex. 1, [Khaksari Dep.] at 126.[2]  Ms. Gandji selected Mr. Avi Davidi, a Jewish male and a non-U.S. citizen, for the position.  Ex. 1 [Khaksari Dep.] at 122; Ex.3 [Cobb Dep.] at 31.  Mr. Davidi was already serving a temporary one-year appointment as the Persian Service programming research coordinator at the time of the selection.  Ex. 1 [Khaksari Dep.] at 128; Ex. 3 [Cobb Dep.] at 14; Ex. 2 [Gandj Dep.] at 56-57.

Before Mr. Davidi came to work at the Agency, Ms. Gandji had attended a presentation he gave at VOA on U.S. foreign relations with Iran, and been impressed with his research.  Ex. 2 [Gandji Dep.] at 61-62.  While Mr. Davidi was working in the temporary research coordinator position, Ms. Gandji had contact with him and utilized research Mr. Davidi provided.  *See* Ex. 2 [Gandji Dep.] at 62-65.

As evidenced by Ms. Gandji's memorandum explaining the reasons for selecting Mr. Davidi instead of Plaintiff, Ms. Gandji found that his qualifications were vastly superior to those of Ms.

_____

[2]Ms. Gandji was born in 1957 in the United States, but grew up and spent most of her life in Iran.  Ex. 1 [Gandji Dep.] at 15-17.

Khaksari.  *See* Ex. 9 [11/20/04 Justification Memo.]; Ex. 2 [Gandji Dep.] at 58-59.[3]  Ms. Gandji

concluded that Mr. Davidi's experience was both more relevant and more recent than Ms.

Khaksari's.  *See id.*  For example, in response to a KSA (i.e., knowledge, skills and abilities)

question that asked applicants to demonstrate experience in TV broadcasting principles and the

ability to anchor a live television program, Mr. Davidi pointed to a live, two hour television program

that he anchored for the Persian Service while working as a temporary employee.  *Id.* at 2.

Responding to the same KSA, Plaintiff addressed her legal experience while working for National

Television of Iran in the 1970's and her hosting of a children's television show for one year in the

1970's.  *Id.*; Ex. 11 [Khaksari Application] at bates 409 (response to KSA 2).

     In response to a KSA question about the applicant's knowledge of international broadcasting

and the ability to apply this knowledge in compiling research information, Mr. Davidi provided

nearly two pages documenting his experiences in radio programming consulting and database

management.  Ex. 9 [Justification Memo] at 2; Ex. 7 [Davidi Application] at 5-6 (bates 441-442).

Plaintiff, by contrast, provided five short bullet points concerning her experience as an attorney in

Iran in the 1970's.  Ex. 11 [Khaksari Application] at bates 409(response to KSA 3).  Not only was

her experience dated and her research not related to Iranian politics, but Plaintiff's truncated KSA

response did not tie the research skills she presumably gleaned in the 1970's to her knowledge of

international broadcasting.  Ex. 9 [Justification Memo] at 2; Ex. 11 [Khaksari Application] at bates

409.  Ms. Gandji determined that Mr. Davidi had far superior skills and abilities necessary for the

---

[3]A justification memorandum explaining a selection is prepared by a selecting official
when a non-citizen is selected over one or more U.S. citizens.  Ex. 1 [Gandji Dep.] at 84.

position.  Ex. 2 [Gandji Dep.] at 72-73.  Plaintiff learned that she had not been selected for the position in January 2005.  Ex. 1 [Khaksari Dep.] at 119.

**B.      Plaintiff Is Not Selected for GS-11 International Broadcaster Position Because She Had Not Passed A Required Language Test.**

Also in January 2005, Plaintiff learned she had not been selected for a GS-11 International Broadcaster position advertised under recruitment bulletin no. BBG-04-001, an open continuous announcement used to fill language service positions at the GS-9 and GS-11 levels as they occur.  Ex. 1 [Khaksari Dep.] at 119; Ex. 5 [Declaration of Carol Ellis Cobb ("Cobb Dec.")] ¶ 7.  Applicants who apply for these positions and meet the minimum requirements for the positions are then required to take a written journalism test and a voice test.  *See* Ex. 5 [Cobb Dec.] ¶ 8.  If an applicant passes these tests, he or she is then placed on a register for that particular language.  *See* Ex. 5 [Cobb Dec.] ¶ 9.  When a vacancy occurs in a service at those grade levels, the selecting official will request a certificate of eligibles, and those who are currently on the register are placed on the certificate by order of their test score.  *See* Ex. 5 [Cobb Dec.] ¶ 10.  Applicants are not placed on the register or on a certificate of eligibles until they have passed the test; however, once they pass, applicants are automatically added to the register.  *See id.* ¶ 11.

The selecting official for the GS-11 International Broadcaster position was also Ms. Sheila Gandji.  Ex. 1 [Khaksari Dep.] at 126.  Ms. Gandji selected two Muslim females, Ms. Hamideh Aramideh and Ms. Guita Misraeedi.  Ex. 5 [Cobb Dec.] ¶ 6; Ex. 1 [Khaksari Dep.] at 143-45.[4]  At the time these vacancies occurred, Plaintiff had failed the most recent administration of the language test.  Ex. 1 [Khaksari Dep.] at 139-40; *see also* Ex. 6 [August 19, 2004 letter]; Ex. 5 [Cobb Dec.]

---

[4]Ms. Misraeedi and Ms. Aramideh were both non-U.S. citizens at the time of their selection.  Ex. 1 [Gandji Dep.] at 140.

¶ 13.  Accordingly, she was not eligible for selection, and her name did not appear on the certificate of eligibles that the Office of Human Resources issued to Ms. Gandji.  *See* Ex. 10 [Certificate of Eligibles for International Broadcaster (Persian)].  Because Plaintiff's name was not before her on the certificate of eligibles, Ms. Gandji was not aware that Plaintiff had applied for the position.  Ex. 4 [Gandji Dec.] ¶ 14.

**C.     No Applicants Are Selected for a GS-12 International Broadcaster Position.**

In April 2005, Plaintiff applied for a GS-12 International Broadcaster position advertised under vacancy announcement M/P-05-59.  *See* Ex. 17 [Certificate of Eligibles for International Broadcaster (Persian)].  Ms. Gandji was also the selecting official for this announcement.  Ex. 1 [Khaksari Dep.] at 136.  Plaintiff's name was listed fifth on the certificate of eligibles with a score of "86"; accordingly, she could have not been selected because a selection must be made from the highest three eligible candidates on the certificate.  Ex. 17 [Certificate of Eligibles]; Ex. 5 [Cobb Dec.] ¶ 18.  All applicants, including Plaintiff, were informed by letter dated July 26, 2005 that vacancy announcement M/P-05-59 would not be filled as advertised.  *See* Ex. 19 [July 26, 2005 letter from C. Cobb to B. Khaksari]; *see also* Ex. 1 [Khaksari Dep.] at 131.  The position was rewritten and re-posted in order to better define the qualifications that the Agency was seeking in prospective applicants.  *See* Ex. 20 [7/26/05 email from S. Gandji to J. Welch Re: GS-12 IB Persian Positions]; Ex. 2 [Gandji Dep.] at 71-74, 77-83.  Specifically, the original announcement did not request samples of on-air television work or published articles.  Ex. 20 [7/26/05 email]; Ex. 2 [Gandji Dep.] at 115.  Ms. Gandji considered the samples critical because they are the best way for the selecting official to assess an applicant's abilities as a broadcast journalist.  Ex. 20 [7/26/05 email]; Ex. 2 [Gandji Dep.] at 92-94.

Plaintiff admits that she failed to apply for any re-advertised GS-12 international broadcaster (Persian) positions subsequent to her application under vacancy announcement M/P-05-59.  Ex. 1 [Khaksari Dep.] at 134.  As such, she was not available for selection.

**D.      Plaintiff's Purchase Order Is Not Renewed.**

During Plaintiff's tenure as a contractor, Plaintiff translated stories from English to Farsi. (Khaksari Dep. at 58.)  Plaintiff's work, just like the work of other contractors performing translation services, would undergo editing before broadcast.  Ex. 1 [Khaksari Dep.] at 58-59.  Editors in the Persian Service are responsible for making news stories ready for broadcast by checking the syntax, clarity, and facts contained in a translated piece.  Ex. 2 [Gandji Dep.] at 35.  Over the course of her time with the Persian Service, editors and managers noticed that Plaintiff was resistant to her work being edited by the Persian Service editors.  Ex. 2 [Gandji Dep.] at 34- 36.  Plaintiff's disagreements with the editors and her reluctance to accept their edits while on deadline disrupted the operations of the newsroom.  Ex. 2 [Gandji Dep.] at 36-39, 42, 46.  Plaintiff also experienced workplace disagreements and friction with other co-workers with whom she did not work directly.  Ex. 1 [Khaksari Dep.] at 82-83, 86-87.  According to Plaintiff, one of the women, Ms. Amini, was another independent contractor, and another female, Hamideh Aramideh, was a BBG non-supervisory employee.  (*Id.* at 86.)[5]  In an effort to improve the newsroom environment and to give Plaintiff more opportunities to succeed, Plaintiff was moved from assignments with the web to the radio, and then back again to the web group.  Ex.14 [4/4/05 email from A. Nazemi to S. Gandji Re: Batool Khaksari's complaint].  However, BBG  continued to have difficulty finding a spot where Plaintiff

_____

[5]Like Plaintiff, both Ms. Aramideh and Ms. Amini are Muslim women born in Iran.  *Id.* at 89-90.  Ms. Aramideh is younger than Plaintiff, while Ms. Amini is older.  *Id.* at 90.

fit comfortably into the operation, and in the spring of 2005, the Agency decided not to renew Plaintiff's purchase order, which had expired on March 31, 2005. Ex.1 [Khaksari Dep.] at 107-108; Ex. 2 [Gandji Dep.] at 61; *see also* Ex. 15 [4/5/05 letter from M. Brooks to B. Khaksari]. Persian Service Chief Akbar Nazemi recommended the non-renewal of Plaintiff's purchase order to Ms. Gandji. Ex. 2, [Gandji Dep.] at 26-27, 40. Mr. Nazemi summarized the disagreements Plaintiff was having with her colleagues in an email to Ms. Gandji. Ex. 14 [4/4/05 email from A. Nazemi to S. Gandji]; *see also* Ex. 2 [Gandji Dep.] at 47-48, 61. Plaintiff was advised of the non-renewal via letter on her last day at the Agency, April 5, 2005. Ex. 15 [4/5/05 Letter from M. Brooks to B. Khaksari]; Ex. 1 [Khaksari Dep.] at 107-08.

## E.     Plaintiff Files An EEO Complaint With the Agency's Office of Civil Rights.

Plaintiff first contacted the Agency's Office of Civil Rights about the matters raised in this lawsuit by a letter dated January 19, 2005. Ex. 12 [1/19/05 letter from B. Khaksari to D. Johnson]; Ex. 1 [Khaksari Dep.] at 117-18.[6] On July 5, 2005, Plaintiff filed a formal complaint with the Agency. Ex.18 [7/5/2005 Complaint of Discrimination]. The Agency accepted for investigation Plaintiff's complaints regarding the non-selections for the GS-12 Programming Research Coordinator position advertised under vacancy announcement M/P-04-107, and the GS-12 International Broadcaster position advertised under vacancy announcement number M/P-05-59. Ex. 21 [8/18/05 Letter from D. Johnson to B. Khaksari Re: Complaint NO. OCR-05-26]. Plaintiff attributed her non-selections for these positions to discrimination based upon sex (female), age (50), religion (Muslim), and reprisal. *See id.*

---

[6] Plaintiff had contacted the EEO Office previously to complain about a delay in an increase in the compensation she received for each assignment, and she received a ten dollar increase shortly after contacting the EEO Office. *See* Ex. 1 [Khaksari Dep.] at 113-15.

10

Plaintiff claimed that she was subjected to a hostile work environment when her co-workers

berated and harassed her, and that she was retaliated against after she complained of harassment

when management terminated her POV contract.  *Id.*   The Agency's Office of Civil Rights did not

accept for investigation Plaintiff's claims of a hostile work environment and retaliatory contract

termination. Ex. 21 [8/18/05 Letter from D. Johnson to B. Khaksari].  The hostile work environment

and retaliatory termination claims were not accepted because Plaintiff was not a federal government

employee, but an independent contractor, and therefore did not have standing under Title VII, the

ADEA, and EEOC regulations.  *Id.* at 2.  The Agency's Office of Civil Rights also did not accept

Plaintiff's complaint regarding her non-selection for the GS-11 International Broadcaster position

advertised under recruitment bulletin no. BBG-04-001 because it was untimely; however, this non-

selection was later accepted by the EEOC administrative judge assigned to Plaintiff's case.  *Id.* at

2; *see also* Ex. 22 [4/11/06 Order issued by EEOC Administrative Judge Kelly Davis].

## LEGAL STANDARDS

### A.      Legal Standard for Summary Judgment

Fed. R. Civ. P. 56 mandates that summary judgment be entered whenever "the pleadings,

depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,

show there is no genuine issue as to any material facts and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those "that might affect the

outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  "[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out

to the district court – that there is an absence of evidence to support the nonmoving party's case."

*Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986).  "The mere existence of a scintilla of evidence

11

in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Devera v. Adams*, 874 F. Supp. 17, 21 (D.D.C. 1995) ("Evidence of discrimination that is merely colorable, or not significantly probative cannot prevent the issuance of summary judgment."). "[P]laintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment …as long as plaintiff has had a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 257. Plaintiff has had that opportunity here.

Rule 56(c) dictates that the "mere existence of some alleged factual dispute between the parties shall not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247-48. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Moreover, Rule 56(c) does not require the moving party to negate the nonmovant's claim or to show the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Rather, when the movant files a properly supported summary judgment motion, the burden shifts to the nonmoving party to show "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Further, the nonmovant cannot manufacture genuine issues of material fact with "some metaphysical doubt as to the material facts," *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or with "conclusory allegations …unsubstantiated reasons, …or a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

Specifically, in cases like this one that allege discrimination, it is important to note that such an "absence of supporting evidence" encompasses the factual issue of discriminatory pretext. Plaintiff cannot create a factual issue of pretext based merely on personal speculation of

12

discriminatory intent.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (claims cannot rest "entirely upon a conclusory representation" by plaintiff); *Slaughter v. Allstate Ins. Co.*, 803 F.2d 857, 860-61 (5th Cir. 1986); *Johnson v. Digital Equipment Corporation*, 836 F. Supp. 14, 15 (D.D.C. 1993) ("Mere allegations or denials of the adverse party's pleading are not enough to prevent the issuance of summary judgment.").

**B.   Legal Standards for Plaintiff's Title VII Discrimination and Retaliation Claims**

Where, as here, the record contains no direct evidence of discrimination or retaliation, courts have examined Title VII claims of discrimination and retaliation under the three-step burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-04 (1973). Under that framework:  (1) the plaintiff has the initial burden of proving a prima facie case of discrimination or retaliation; (2) if the plaintiff succeeds in proving a *prima facie* case, then the burden shifts to the employer to articulate a legitimate, non-discriminatory/non-retaliatory reason for its action; and (3) if the employer meets its burden, then the plaintiff must prove that the employer's stated reason is a mere pretext for discrimination or retaliation.  *Brantley v. Kempthorne*, No. 06-1137, 2008 U.S. Dist. LEXIS 38406, *12 (D.D.C. May 13, 2008).

The D.C. Circuit has recently clarified that in considering an employer's motion for summary judgment "[i]n a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and [the] employer has asserted a legitimate, non-discriminatory[/non-retaliatory] reason for the decision, the district court need not-and should not-decide whether the plaintiff actually made out a *prima facie* case under *McDonnell Douglas*."  *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see Pardo-Kronemann*, 541 F. Supp. 2d at 215-16 (stating that the *Brady* principle applies to retaliation claims).  Instead, the district court should

13

resolve only one question:  Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory/non-retaliatory reason is a pretext for discrimination/retaliation.  *See Brady*, 520 F.3d at 494; *Pardo-Kronemann*, 541 F. Supp. 2d at 215-16.

In the instant case, Defendant has asserted legitimate, non-discriminatory/non-retaliatory reasons for each of the challenged actions.  Thus, under *Brady*, this Court must, as an initial matter, determine whether each asserted claim of discrimination and retaliation involves an adverse action.  *See Brady*, 520 F.3d at 494 (making clear that the *Brady* rule applies only "where an employee has suffered an adverse employment action"); *Brantley*,2008 U.S. Dist. LEXIS 38406, at *13 ("[T]he Court must first determine whether any of the conduct underlying the claims constituted an adverse action.").  If a particular claim does not involve an adverse action, then it fails as a matter of law.  *See Brantley*, 2008 U.S. Dist. LEXIS 38406, at *13-16 (finding that certain of the plaintiff's discrimination claims fail because they do not involve adverse actions).  If, on the other hand, a particular claim does involve an adverse action, then the *Brady* principle applies, and this Court should – as a general rule – determine whether Plaintiff has produced sufficient evidence for a reasonable jury to find that Defendant's asserted non-discriminatory/non-retaliatory reason for the action is a pretext for discrimination or retaliation.  *See id.* at *5.  In making that determination, this Court must consider whether a jury could infer discrimination or retaliation from:  (1) Plaintiff's *prima facie* case; (2) any evidence that Plaintiff may present to attack Defendant's stated non-discriminatory/non-retaliatory reason for the action; and (3) any further evidence of discrimination or retaliation that may be available to Plaintiff.  *Short v. Chertoff*, 555 F. Supp. 2d

14

166, 172 (D.C. Cir. 2008)(*citing Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C.

Cir. 2002); *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998)).

Importantly, even after *Brady*, where it is clear that a plaintiff cannot present evidence

sufficient to justify an inference of discrimination or retaliation as to a particular claim, it is still

appropriate to reject the claim on that basis. *See Von Muhlenbrock v. Billington*, 579 F. Supp. 2d

39 (D.D.C. 2008); *Williams v. Dodaro*, 576 F. Supp. 2d 72 (D.D.C. 2008).  Before turning to the

merits, a brief word is in order concerning the scope of review in employment discrimination cases.

Though Plaintiff might wish it otherwise, the employment discrimination statutes did not transform

federal courts into review boards for local employment decisions.  "Title VII, it bears repeating, does

not authorize a federal court to become 'a super-personnel department that reexamines an entity's

business decisions.'"  *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v.

Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)).  To the contrary, a court "may not

'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'"

Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996)

(quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).

**ARGUMENT**

I.     **Plaintiff's Claims Based  42 U.S.C. §§ 1981 and 1983, 5 U.S.C. § 2302(b) and District
       of Columbia Law Should All Be Dismissed for Lack of Jurisdiction.**

Plaintiff claims that the Agency retaliated against her "in failing to select her for GS-11 and

12 positions, terminating her purchase order vendor contract, as well as in assignments, shifts, and

imposing unreasonable terms and conditions of employment and in harassing her."  1ˢᵗ Am.

Complaint,  ¶ 38.  Plaintiff claims that these acts were "in violation of the 29.U.S.C. 623 *et seq*.,

Title VII, 42 U.S.C. sections 1981 and 1983, 5 U.S.C. section 2302(b) and District of Columbia

law." *Id.* ¶ 39; *see also* Complaint (Count III).[7]  Plaintiff is suing the Chair of the BBG exclusively

in his official capacity. *See* 1ˢᵗ Am. Complaint, preamble.  Therefore, Plaintiff's claims are deemed

to be against the United States, and she must demonstrate a valid statutory waiver of immunity for

her claims to proceed.[8]

The Age Discrimination in Employment Act, 29 U.S.C. § 623, is one, but for the same reason

Plaintiff is not covered by Title VII, she is likewise not covered by the ADEA.  *Zhengxing v.*

*Nathanson*, 215 F.Supp. at 120.  Accordingly, Plaintiff may not assert a claim of age discrimination

based on BBG's decision not to renew her contract.

Moreover, even were she covered by the ADEA, Plaintiff's age played no role in the decision

to terminate her contract and no reasonable inference could be drawn that it did because Plaintiff

aged only about a year and a half while she was a purchase order vendor.  Notably, the Supreme

Court has noted that "Congress' promulgation of the ADEA was prompted by its concern that older

workers were being deprived employment on the basis of inaccurate and stigmatizing stereotypes."

*See Hazen Paper Company v. Biggens*, 507 U.S. 604, 610 (1993).  No such concern exists where

Plaintiff was given a two-year opportunity to demonstrate how her skills could benefit BBG, and the

---

[7]Plaintiff fails to state any specific provision of District of Columbia law she alleges
Defendant violated.  As such, the Court could simply find that she fails to state a claim on which
relief could be granted, even if jurisdiction existed, which it does not.  Fed. R. Civ. P. 12(b)(6);
*see Bell Atlantic Corp. v. Twombly*, — U.S. —, 127 S. Ct. 1955, 1964-65 (2007); *Kowal v. MCI*
*Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *Kivanc v. Ramsey*, 407 F. Supp. 2d
270, 277 (D.D.C. 2006).

[8]  It is well established that sovereign immunity bars all suits against the United States
except in accordance with the explicit terms of the statutory waiver of such immunity. *Cox v.*
*Sec'y of Labor*, 739 F.Supp. 29, 30 (D.D.C. 1990); *see also United States v. Testan*, 424 U.S.
392, 399 (1976); *United States v. Mitchell*, 445 U.S. 535, 538 (1980); *Kline v. Republic of El*
*Salvador*, 603 F.Supp. 1313, 1316 (D.D.C. 1985).  The mere naming of a federal employee as a
defendant in his official capacity does not operate to waive the immunity of the sovereign.

same group of people both recommended entering the contract and declining to renew it. *See Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 12 (D.D.C. 2000), *aff'd*, 298 F.3d 989 (D.C. Cir. 2002) ("the Court finds persuasive the fact that the same group of management officials who fired plaintiff also hired her only a short time before, thereby raising a presumption or inference of non-discrimination.") (citing cases); *see also Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir. 1995), *cert. denied*, 516 U.S. 1078 (1996) ("An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class. This general principle applies regardless of whether the class is age, race, sex, or some other protected classification."). Plaintiff's claim amounts to one of disappointed expectation, and that is not actionable. *Broderick v. Donaldson*, 437 F.3d 1226, 1232-34 (D.C. Cir. 2006) ("While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition).

Plaintiff cannot demonstrate a waiver of sovereign immunity for her claim based upon a violation of District of Columbia law. *See Benham v. Rice*, 2005 WL 691871 *3 & n.5 (D.D.C. March 24, 2005) (plaintiff failed to meet her burden of establishing subject matter jurisdiction for her claim charging discrimination pursuant to the District of Columbia Human Rights Act because Title VII provides the exclusive remedy for claims of discrimination in federal employment). Similarly, Plaintiff's Section 1981 and 1983 violations must also be dismissed. This Circuit has held that, in a Title VII action, "[t]here is no avenue through which a plaintiff can assert claims under 42 U.S.C. § 1981 . . . ." *Richardson v. Wiley*, 569 F.2d 140, 141 (D.C. Cir.1977) (precluding § 1981 discrimination action by federal employee covered by Title VII). In addition, "[t]o state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution

17

and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

Here, Plaintiff has not alleged the violation of a right secured by the Constitution. *See Burrell v. Oklahoma Dept. of Transp.*, 28 F.3d 112(10th Cir. 1994)(unpublished opinion), *citing Doyle v. Oklahoma Bar Ass'n*, 998 F.2d 1559, 1567 (10th Cir.1993). Further, the Defendant named here was not acting "under color of state law," but under the authority of federal law. *See Abramson v. Bennett*, 707 F. Supp. 13, 16 (D.D.C. 1989), *aff'd*, 889 F. 2d 291 (D.C. Cir. 1989) ("Section 1983 only applies to state officials acting under color of state law" not federal officials acting under color of federal law); *Heck v. Humphrey*, 512 U.S. 477 (1994) (stating that Section 1983 provides access to a federal forum for claims of unconstitutional treatment at the hands of state officials). Finally, Plaintiff's section 1981 and 1983 claims fail, ultimately, because they are not based on race.

Plaintiff's citation to 5 U.S.C. § 2302(b) is to a portion of the Civil Service Reform Act, Pub.L. No. 95-454, 92 Stat. 1111, as amended (codified at various sections of Title 5 of the U.S. Code).[9] As an applicant for a position at BBG, Plaintiff's non-selection for positions is certainly a personnel action falling squarely within the ambit of the CSRA. 5 U.S.C. § 2302(a)(2)(A)(i-ii)

---

[9] 5 U.S.C. § 2302(b)(6) & (12) provide, in relevant part, that:
Any employee who has the authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority - - -
(6)      grant any preference or advantage not authorized by law, rule, or regulation to any employee or applicant for employment (including defining the scope or manner of competition or the requirements for any position) for the purpose of improving or injuring the prospects of any particular person for employment . . . [or]
(12)      take or fail to take any other personnel action if the taking of or failure to take such action violates any law, rule, regulation, implementing or directly concerning, the merit systems principles contained in section 2301 of this title.

(appointment of an applicant).  However, the Court lacks jurisdiction over Plaintiff's purported

CSRA claim because she may not file an action directly in this Court under the CSRA without first

exhausting the required administrative remedies.  A fundamental "structural element" of the CSRA's

scheme of review "is the primacy of the MSPB for administrative resolution" of personnel disputes,

and the "primacy of the United States Court of Appeals for the Federal Circuit for judicial review."

*United States v. Fausto*, 484 U.S. 439, 449 (1988); *see LeBlanc v. United States*, 50 F.3d 1025, 1029

(Fed. Cir. 1995) ("The Civil Service Reform Act ... created a comprehensive system of procedural

protections for civil service employees faced with adverse personnel actions. This framework for

review of certain types of personnel actions essentially preempted the field, superseding the

haphazard arrangement of administrative and judicial avenues for appeals of adverse actions to the

Civil Service Commission, the district courts, and the Court of Claims.").

Consequently, Plaintiff's CSRA claim, which appears to be that BBG violated 22 U.S.C. §

1474(1) when it selected non-citizens for positions for which she applied, alleges a prohibited

personnel practice because it accuses BBG of violating the merit system principle set out at 5 U.S.C.

§ 2302(b)(6).  The plain language of the CSRA requires Plaintiff to present her claim first to the

Office of Special Counsel and, then, if she remains dissatisfied, to the Merit Systems Protection

Board prior to any judicial review.  Federal law requires the MSPB to respond to any request for

corrective action from the Office of Special Counsel, and the MSPB may order the Agency to

implement any corrective action the Board deems appropriate.  The process for addressing plaintiff's

claims through the required administrative mechanisms is outlined in the CSRA:

1.       5 U.S.C. § 1214(a)(1)(A) provides in relevant part:  "The Special Counsel shall

receive any allegation of a prohibited personnel practice and shall investigate the allegation[;]"

19

2.      5 U.S.C. § 1214 (a)(3) states: "Except [in circumstances not applicable here] . . . any such employee . . . shall seek corrective action from the Special Counsel before seeking corrective action from the Board[;]"

3.      5 U.S.C. § 1214(b)(2)(C) requires: "If, after a reasonable period of time, the agency does not act to correct the prohibited personnel practice, the Special Counsel may petition the Board for corrective action[;]"

4.      Finally, 5 U.S.C. § 1214(b)(4)(A) states: "The Board shall order such corrective action as the Board considers appropriate if the Board determines that a prohibited personnel practice . . . has occurred, exists, or is to be taken."

All references to the "Board" are to the Merit Systems Protection Board, and the "corrective action" is the "action" referred to in 5 C.F.R. § 2301.2 which controls the MSPB's original jurisdiction.

Judicial review of alleged prohibited personnel practices is limited by statute to actions of the MSPB, and the preclusive effect on other statutes is well-established. *United States v. Fausto*, 484 U.S. 389, 448 (1988) (holding that the right to judicial review of determinations of the MSPB is limited to the terms of the CSRA); *Spagnola v. Mathis*, 859 F.2d 223, 228-29 (D.C. Cir. 1988) (CSRA precludes *Bivens* action premised on conduct amounting to prohibited personnel practice); *Orsay v. United States Dep't of Justice*, 289 F.3d 1125, 1128 (9th Cir. 2002) ("If the conduct that Appellants challenge in this action falls within the scope of the CSRA's 'prohibited personnel practices,' then the CSRA's administrative procedures are Appellants' only remedy, and the federal courts cannot resolve Appellants' claims."); *Wills v. Office of Personnel Management*, 16 F.3d 414, 1994 WL 22349 at *2 (4th Cir.1994) (table) ("Both the United States Supreme Court and this Court have held that the CSRA is the vehicle through which federal employees may challenge adverse

20

employment actions.") (citing *Lindhal v. Office of Personnel Management*, 470 U.S. 768, 784-85 (1985)); *McAuliffe v. Rice*, 966 F.2d 979, 981 (5th Cir.1992) (CSRA furnishes the exclusive set of remedies available to federal employees of all types)

Accordingly, plaintiff's claims under District of Columbia law, 5 U.S.C. section 2302(b), Sections 1981 and 1983 must be dismissed for failure to state a claim as a matter of law upon which relief may be granted.

## II.     Plaintiff's Hostile Work Environment Claim Is Barred.

Although none of the Counts in the First Amended Complaint are directed squarely at a hostile work environment theory, Plaintiff generally alleges that she was subjected to "harassment and abusive conduct on BBG premises" without specifying any facts.   1st Am. Complaint ¶ 11; *see also id.* ¶ 25 ("Plaintiff complained to BBG of harassment and hostile work environment in connection with her tenure at BBG as a purchase order vendor.").   When asked about the substance of her harassment allegations in her deposition, Plaintiff testified that two female co-workers "used false language, started rumoring", gossiping and using improper language.  Ex. 1 [Khaksari Dep.] at 82-83.   According to Plaintiff, both women gossiped about her within earshot, and Ms. Amini would occasionally prevent Plaintiff from using the printer or fax machine.  *Id*. at 94-95.  Plaintiff's claims fall well short of the legal standard for a hostile work environment and instead fall generally into the category of workplace annoyances and petty slights.   However, Plaintiff's claims initially fail because she was never employed by Defendant and because her harassment claims are untimely.

21

### A.    Plaintiff Has No Standing to Bring A Hostile Work Environment Claim.

Plaintiff was never an employee of Defendant and therefore has no standing to bring a harassment claim. *Zhengxing*, 215 F.Supp.2d at 120. Title VII, by its terms, applies only to employees. 42 U.S.C. § 2000e(f). Independent contractors are not protected under Title VII. *Spirides v. Reinhardt*, 613 F.2d 826, 829 (D.C. Cir. 1979). In *Nationwide Mutual Insurance Company v. Darden*, 503 U.S. 318 (1992), the Supreme Court held that the definitions of "employee," "employer," and "employment" are to be determined under the common law of agency. *Id*. at 323; *see also Bryant v. Orkand Corp.*, 407 F. Supp.2d 29 (D.C. Cir. 2005); *Spirides,* 613 F.2d at 831; *O'Connor v. Davis*, 126 F.3d 112, 115 (2d Cir. 1997*)*. Whether a person is an "employee" under the common law of agency depends on the "economic realities" of the work relationship, with the most important factor being "the extent of the employer's right to control the 'means and manner' of the worker's performance. *Spirides*, 613 F.2d at 831 (quotation omitted). In addition, the court must also weigh factors such as (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" . . . furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties. *Spirides*, 613 F.2d

at 832.  Once a plaintiff is found to be an independent contractor and not an employee, her Title VII

claim must fail.

The majority of the factors clearly show that Plaintiff at all times worked for the BBG as an

independent contractor.  As noted above, Plaintiff did not receive benefits such as medical insurance

or annual/sick leave days, and the Agency treated her as an independent contractor for tax purposes,

not deducting or withholding taxes from her wages.  Ex. 1 [Khaksari Dep.] at 40.  Although she

performed her translation work on BBG premises, as a contractor with specialized skills, Plaintiff

was not closely supervised while performing her work.  Ex. 1 [Khaksari Dep.] at 94.  Plaintiff was

hired for her specialized Farsi language skill (taking a qualifying Farsi language test prior to

commencing work), and this is the skill she used while performing translation from English into

Farsi.  Ex. 1 [Khaksari Dep.] at 36.  The high level of English and Farsi language skills necessary

to perform translations of news items for broadcast strongly favor characterizing Plaintiff as a

contractor.  *See Aymes v. Bonelli*, 980 F.2d 857, 862 (2nd Cir. 1992) ("level of skill" involved in a

computer programmer's work suggested that he was an independent contractor because "his

programming demanded that he use skills developed while a graduate student . . . and through his

[work] experience"); *see also Zhehgxing v. Nathanson, Chrmn., BBG*, 215 F.Supp.2d 114 (D.D.C.

2002) (holding that independent contractor providing translation and other broadcasting duties for

BBG's Mandarin Service was not an employee and thus not covered by Title VII; court has no

subject matter jurisdiction for sex harassment claim).  Plaintiff put it best herself: "...let me put it this

way, as POV, we are considered independent workers, in other words, we should not be closely

supervised because we come as experts."  Ex. 1 [Khaksari Dep.] at 94.

The tenure of Plaintiff's time at the BBG was less than a year and a half. First Amended Complaint at ¶ 6; Ex. 1 [Khaksari Dep.] at 108. Plaintiff was paid by assignment at a rate of $75 (initially $65) per assignment, by submitting a detailed invoice for completed assignments each month. *See* Ex.16 [Invoices submitted by B. Khaksari]. Moreover, Plaintiff's contract documents clearly indicate that the continuation of the contract was contingent upon the availability of funds in future fiscal years. Ex.8 [10/25/2004 Order for Supplies or Services] at 2. The Agency did not provide Plaintiff with any prior notice when it decided not to renew her contract in April 2005. This further underscores Plaintiff's status as an independent contractor. *See Zhengxing*, 215 F.Supp.2d at 119 (fact that plaintiff's contract was terminated without notice weighed in favor of her status as contractor). Finally, Plaintiff understood herself to be an independent contractor and not a federal government employee. Ex. 1 [Khaksari Dep.] at 40. In sum, the scale tips decisively toward the conclusion that Plaintiff worked as an independent contractor for the Persian Service and, as such, she may not bring any claims based on a hostile work environment. *Zhengxing*, 215 F.Supp.2d at 120.

### B.   Even if Plaintiff Has Standing, She Failed to Timely Exhaust Her Administrative Remedies.

Even if Plaintiff were able to bring a hostile work environment claim, her failure to raise her claims promptly would bar it.

An employee of the federal government who believes that she has been the subject of unlawful discrimination must "initiate contact" with an EEO Counselor in her agency "within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1); *see Weber v. Battista*, 494 F.3d 179, 182-83 (D.C. Cir. 2007); *see also* 42 U.S.C. § 2000e-16. "Because timely

24

exhaustion of administrative remedies is a prerequisite to a Title VII action against the federal government," a court may not consider a discrimination claim that has not been exhausted in this manner absent a basis for equitable tolling. *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003); *see Greer v. Paulson*, 505 F.3d 1306, 1316-17 (D.C. Cir. 2007).

Plaintiff alleges that the hostile work environment "began when Aramideh came to the division back in 2003 and then elevated through 2004 and then continued to 2005." Ex. 1 [Khaksari Dep.] at 105.  She first initiated contact with the BBG's Office of Civil Rights via letter dated January 19, 2005.  Ex. 12 [1/19/05 Letter].  However, in her letter, Plaintiff made no mention of a hostile work environment.  *See id.*  Although Plaintiff was represented by counsel at least as of March 7, 2005, it was not until her formal complaint in July 5, 2005 that Plaintiff first notified the Office of Civil Rights that she was "subject to a hostile environment when [she] was berated and harassed by [her] coworkers."  Ex. 18 [7/5/05 Complaint]; Ex. 13 [3/7/05 Letter from J. Williams to S. Gandji.].  Although the alleged harassment began in 2003, Plaintiff never initiated contact with the Office of Civil Rights regarding this claim until July of 2005 – after she was no longer on site.

Giving Plaintiff the benefit of the doubt, the last day on which Plaintiff could have even been subjected to hostile environment was April 5, 2005, her last day at work.  After April 5th, Plaintiff was no longer at the Agency; therefore, she was no longer in a work environment, let alone a hostile one.  Because she first filed a hostile work environment complaint on July 5, 2005 – two months after her last day at the Agency and outside of the 45-day time limitation –  her harassment claim is untimely.  *See, e.g. Currier v. Radio Free Europe/Radio Liberty*, 159 F.3d 1363, 1368 (D.C. Cir.

1998) (hostile work environment claim untimely filed, assuming that the last hostile act happened on plaintiff's last day at work).[10]

C.     **Plaintiff Cannot Show Any Pervasive Pattern of Offensive Conduct to Make Out A Hostile Work Environment Claim.**

To establish the existence of a hostile work environment violation under Title VII, Plaintiff must demonstrate that: "(1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on race, gender, or national origin; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Laurent v. Bureau of Rehabilitation, Inc., et al*, 544 F. Supp. 2d 17, 24 (D.D.C. 2008), *citing Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 120 (D.D.C. 2004)(granting summary judgment on plaintiff's non-selection, termination, and hostile work environment claims).

To be actionable, the harassment must be "sufficiently severe and pervasive to alter the conditions of complainant's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  Although Title VII gives Plaintiff the "right to be free from harassment due to her age, religion, race or national origin, [] it does not protect her from the harsh rudeness that can be a non-discriminatory aspect of a less-than-ideal workplace." *Laurent*, 544 F. Supp. 2d at 24, *citing Burton v. Batista*, 339 F. Supp. 2d 97, 111 (D.D.C. 2004)(granting summary judgment on plaintiff's hostile work environment claim, among others).

---

[10]   Moreover, because the alleged harassment is from co-workers, Defendant is not liable for a hostile work environment unless Plaintiff notified it of the harassment and it failed to take appropriate corrective action.  *See Farragher v. City of Boca Raton*, 524 U.S. 775 (1998).  However, because Plaintiff failed to notify Defendant until after her contract had expired, defendant could no longer take any action.  *See* Ex. 12 (omitting any mention of harassment).

"To determine whether a workplace is sufficiently hostile to be actionable under Title VII, the Court must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Brady v. Livingood*, 456 F. Supp. 2d 1, 10 (D.D.C. 2006), *quoting Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998). Moreover, it must be clear that the hostile work environment was the result of discrimination based on a protected status. *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 107 (D.D.C. 2005). Indeed, "[e]veryone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." *Id.*, *quoting Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002). That is, "anti-discrimination laws do not prohibit all workplace harassment, only harassment motivated by a discriminatory criterion." *Elam v. Board of Trustees of Univ. of D.C.*, 530 F. Supp. 2d 4, 23 (D.D.C. 2007) (granting summary judgment on plaintiff's hostile work environment claim). Quite simply, Title VII is not a "general civility code," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998), and "[n]ormal petty slights, minor annoyances, and simple lack of good manners are not actionable under Title VII[.]" *Prince v. Rice*, 453 F. Supp. 2d 14, 29 (D.D.C. 2006).

It is apparent that Plaintiff fundamentally misunderstands the nature of a hostile work environment claim. Through her own deposition testimony, Plaintiff herself concedes that she was not subjected to a pervasive pattern of offensive conduct, and that the conduct she found harassing was not based upon her sex, religion, age or national origin. Plaintiff alleges a laundry list of

behavior that she alleges constitutes harassment.  First, Plaintiff states that Ms. Aramideh and Ms.

Amini were jealous that she was given more responsibility and talked amongst themselves about how

Plaintiff was "here to change everything in the radio" and that Plaintiff was "planning to take over

all the works."  Ex. 1 [Khaksari Dep.] at 83, 85.  However, Plaintiff alleges that these kind of

comments were said "*not in a negative way, it was positive to me...*"  Ex. 1 [Khaksari Dep.] at 83

(emphasis added).  The two women would say that Plaintiff did not "know how to work" or "how

to act," and gossiped that she was "not a decent person" and "not a right person."  *Id.*  Plaintiff also

observed the two women "gathering together and laughing" about her and "used very faulty words"

such as "prostitute" and "Khomeni's ass" and said that Plaintiff had "a dirty mind."  *Id.* at 84.

Finally, Ms. Amini  would sometimes try to block Plaintiff from using the computer, fax machine,

or printer.  *Id.* at 94-95.  When this would happen, Plaintiff simply "waited for [Amini] to do her

work, print whatever she wants and to leave, and then [Plaintiff] started working."  *Id.* at 95-96.

Plaintiff did not directly interact with Ms. Aramideh and Ms. Amini and did not find that

their conduct was "to the point [that she] couldn't perform [her] work."  *Id.* at 86-87.  When asked

to what did she attribute the two women's motives, Plaintiff answered that they were "very

elementary, low-level motive.  The motivation was the fact that I was given more responsibility.  I

was given [a] more serious program.  I was praised for my work and I was acting very professional,

respectful to other people, and I received respect from other people, and they couldn't handle it."  *Id.*

at 85.  Plaintiff never confronted either of the women or asked them to stop.  *Id.* at 86.

Plaintiff also briefly identifies a number of co-workers besides Ms. Aramideh and Ms. Amini

who subjected her to "persistent personal taunts and verbal harassment..."  Ex. 23 [Plaintiff's

Interrogatory Answers] at 2.  The other colleagues identified are Faraj Ardalon, Ramesh Rasekh,

Parviz Bahador, Homayoun Majd, and "to some degree Said Rahmaini." *Id.*  Plaintiff identifies the harassing conduct as "simple office gossip at first [which] then grew to frequent bitter and destructive taunts..." *Id.*  Plaintiff's interrogatory answers identifying these individuals make no further explanation of how the gossip and taunts were affecting a term or condition of her employment or how they were related to her age, sex, national origin, or religion.  In her deposition, Plaintiff admitted that she only had direct interactions with one of these colleagues, Mr. Ramesh. Ex. 1 [Khaksari Dep.] at 103.  Mr. Rasekh was an editor, and Plaintiff alleges that he began "putting lines over all my words and then says -- saying that these are not good, has no value..." *Id.* 102. An editor's job, of course, includes "putting lines" through words while he is editing.  *See* Ex. 2 [Gandji Dep.] at 35.  Not only that, Plaintiff admits that the Persian Service chief Mr. Nazemi could overrule the decisions of the editors and reinstate Plaintiff's translations and that he did that on "many occasions." Ex. 1 [Khaksari Dep.] at 104-05.  Again here, Plaintiff does not explain what specific adverse action she alleges as a result of this "harassment," and makes no mention about how this treatment was related to her age, sex, national origin, or age.

In sum, Plaintiff cannot make out a *prima facie* harassment claim.  First, Plaintiff cannot establish that Mr. Rasekh, Ms. Amini or Ms. Aramideh's conduct was objectively offensive or sufficiently severe and pervasive to rise to the level of illegal harassment.  At most, the allegations are minor annoyances and childish and unprofessional workplace behavior, which Plaintiff herself identifies as such.   These are precisely the kind of workplace tribulations that do not fall within the protections of Title VII.  *See Amiri v. Stoladi Prop. Group*, 407 F. Supp. 2d 119, 126 (D.D.C. 2005) (There is no Title VII liability for the ordinary tribulations of the workplace, such as sporadic use of abusive language, occasional teasing, and isolated incidents.).  Second, Plaintiff cannot demonstrate,

as she is required to, that the alleged conduct is related to any protected category.  In her Amended Complaint, Interrogatory Answers, and deposition, Plaintiff does not even allege that the series of annoyances in her work environment were motivated by a discriminatory animus based on a protected category.  Not only does Plaintiff attribute Ms. Amini and Ms. Aramideh's motives to jealousy for Plaintiff being given more responsibility and praise for her work, but both Ms. Amini and Ms. Aramideh are of Plaintiff's same religion, gender, and national origin.  One of the women is older and one younger than Plaintiff.  One, like Plaintiff, worked as a contractor, the other as a non-supervisory employee.  Third, it is not at all clear what term, condition, or privilege of "employment" was affected by the alleged harassment at the hands of Plaintiff's colleagues.  In fact, Plaintiff testified that the gossip and name-calling by the two female colleagues did not rise to the point that she could not successfully perform her work.

Not only do Plaintiff's allegations, if true, not amount to a hostile work environment, Plaintiff also cannot establish that the Agency knew or should have known of the harassment.  In a letter dated March 7, 2005, Plaintiff's attorney wrote to Sheila Gandji complaining about the results of his client's language test.  *See* Ex. 13 [3/7/05 Letter from J. Williams to S. Gandji Re: Batool Khaksari].  The letter also named several colleagues of Ms. Khaksari, including Mr. Rasekh, Ms. Aramideh and Ms. Amini, who Ms. Khaksari alleged were "making defamatory, false statements against her."  *Id.*  The letter did not contain any allegations of harassment or a hostile work environment.  *See id.*  Nevertheless, because the letter made mention of issues with Plaintiff's co-workers, Ms. Gandji investigated the allegations by discussing them with Mr. Nazemi and each of the employees or contractors named in the letter.  Ex. 2 [Gandji Dep.] at 51-53.  After interviewing

each of the co-workers, Ms. Gandji was satisfied that the allegations cited by Plaintiff were professional disagreements that happen in a newsroom environment. *Id.* at 53.

In sum, Plaintiff has not shown what term or condition of her work as a contractor was affected by the alleged harassment, and no record evidence shows a linkage or correlation between the hostile work environment and any of Plaintiff's protected categories, be it religion, gender, national origin, or age.

## III.   RETALIATION

### A.   The Court Has No Subject Matter Jurisdiction for Plaintiff's Untimely Retaliation Claim.

Next, Plaintiff alleges retaliatory termination of her contract in violation of Title VII because of her complaints of discrimination and harassment.  This Court has no subject matter jurisdiction for Plaintiff's retaliatory contract "termination" claim for the same reasons that there is no jurisdiction for the hostile work environment claim.  Specifically, Plaintiff at all times worked as an independent contractor at BBG and is not entitled to Title VII protection.  See *Zhengxing*, 215 F.Supp.2d at 120.

Plaintiff's retaliatory contract termination claim is also untimely.  Although Plaintiff was informed that her purchase order was not being renewed on April 5, 2005, she first filed a complaint regarding what she calls the termination of her contract with the Agency's Office of Civil Rights on July 5, 2005.  Accordingly, like her hostile work environment claim, the retaliatory contract termination claim is outside of the 45-day window and is therefore time barred. *National Passenger R.R. v. Morgan*, 536 U.S. 101 (2002); *Brown v. General Servs. Admin.*, 425 U.S. 820, 835 (1976).

**B.    Even if Plaintiff's Retaliation Claim is Proper, There Is No Adverse Personnel Action or Causal Connection Between Plaintiff's Protected Activity and the Non-Renewal of Her Purchase Order.**

To establish a *prima facie* case of retaliation, a plaintiff must show that:  (1) she engaged in statutorily protected activity; (2) the employer took an adverse personnel action; and (3) a causal connection existed between the two.  *Pardo-Kronemann v. Jackson*, 541 F. Supp. 2d 210, 214 (D.D.C. 2008); *see Brantley*, 2008 U.S. Dist. LEXIS 38406, at *19.  In the retaliation context, an adverse action is one "that a reasonable employee would have found . . . materially adverse" and that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation marks omitted); *Brantley*, 2008 U.S. Dist. LEXIS 38406, at *21.  To establish a causal connection between protected activity and an adverse action, a plaintiff may show that the employer had knowledge of the protected activity and that the adverse action occurred shortly after that knowledge was acquired.  *See Baker v. Potter*, 294 F. Supp. 2d 33, 41 (D.D.C. 2003).  "[T]he temporal proximity between the employer's knowledge of the protected activity and the adverse personnel action must be very close."  *Id.* (holding that a "two-month gap is not sufficient to establish the temporal proximity necessary to show a causal connection").

Plaintiff cannot make out a *prima facie* retaliation case.  Although the Agency's decision not to renew a POV's purchase order arguably may be an adverse action, *Than v. Radio Free Asia*, 496 F.Supp.2d 38, 49 (D.D.C. 2007), Plaintiff cannot demonstrate a causal connection between the contract non-renewal and her protected activity.  First, Plaintiff's very first contact with the EEO Office in 2004 resulted in exactly what she asked for: a ten dollar raise in compensation per assignment.  *See* Ex. 1 [Khaksari Dep.] at 114-16.  That positive response negates an inference of

32

a retaliatory motive.   Second, Plaintiff's next contact with the Agency's Office of Civil Rights was in January 2005, when she complained about Mr. Davidi's selection, failing the voice test for the GS-11 international broadcaster position, and her belief that the Agency hired people with substandard language skills.   *See* Ex. 12.   Plaintiff's contract was not renewed almost four months after she raised these matters, and that is too long to create an inference of retaliation under all of the circumstances here.   *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 270, 273-74 (2001) (per curiam) (citing with approval circuit cases rejecting temporal proximity of three and four months as evidence of causation); *Gustave-Schmidt v. Chao*, 360 F.Supp.2d 105, 118-19 (D.D.C.) (three months is the "outer limit" of temporal proximity in retaliation case), *aff'd*, 2004 WL 2348142 (D.C. Cir. 2004); *see also Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) (reading *Breeden* as requiring events to be "very close" together in time for retaliation, and accepting less than one month as potentially qualifying); *accord McFadden v. Ballard, Spahr, Andrews & Ingersoll, LLP*, 580 F.Supp.2d 99, 110-11 n.16 (D.D.C. 2008) (citing *Gustave-Schmidt* as establishing three months as outer limit).

In her Amended Complaint, Interrogatory Answers, and deposition, Plaintiff alleges that she complained about the taunting and rumors by her co-workers to Mr. Nazemi on various occasions; however, not once does she describe conduct based on her protected characteristics or cite any dates of these complaints, except for one complaint dated April 4, 2005.   *See* Amended Complaint; *see also* Ex. 1 [Khaksari Dep.] at 84-85; Ex. 23 [Interrogatory Answers] at 3.   In a letter dated March 7, 2005, Plaintiff's attorney wrote to Ms. Gandji complaining that the results of a language test taken by Ms. Khaksari were "falsely calculated."   Ex. 13 [3/7/05 Letter from J. Williams to S. Gandji Re: Batool Khaksari].   Although the letter named four colleagues of Ms. Khaksari who Ms. Khaksari

33

alleged were "making defamatory, false statements against her," the letter did not contain any allegations of harassment or a hostile work environment. *See id.* This letter does not constitute protected activity because it cannot be read as complaining about any harassment or violation of Title VII or the ADEA. Plaintiff also alleges that she hand-delivered a memorandum to Ms. Gandji and the Office of Human Resources on April 4, 2005, one day prior to her last day at BBG. Ex. 23 [Interrogatory Answers] at 3. Again, by this point, the problems with Plaintiff had been long-standing and Mr. Nazemi had already made the decision to not give Plaintiff any further assignments, which Ms. Gandji concurred with. Ex. 2 [Gandji Dep.] at 61. Plaintiff has presented no evidence to the contrary. *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (proceeding along previously contemplated though not definitively determined is no evidence of causality whatever); *Riggiladez v. Harvey*, 510 F.Supp.2d 106 (D.D.C. 2007) (same); *Trawick v. Hantman*, 151 F. Supp. 2d 54, 63 (D.D.C. 2001) (finding that no reasonable juror could conclude that a termination was retaliatory where the termination was proposed before the EEO activity), *aff'd*, No. 01-5309, 2002 WL 449777 (D.C. Cir. Feb. 21, 2002). Accordingly, her retaliation claims fail.

### C. The Agency has a Legitimate, NonDiscriminatory Reason for the Non-Renewal of Plaintiff's Contract.

As evidenced by the April 4, 2005 email from Mr. Nazemi, Plaintiff had difficulty getting along with her colleagues in both the radio and web sections of the newsroom. Ex. 14 [4/4/05 email from A. Nazemi to S. Gandji]. Plaintiff was resistant to her work being edited by the Persian Service editors, often arguing with their edits while on deadline and causing a disruption to the operations and efficient programming of the Service. Ex.2 [Gandji Dep.] at 34-39, 42, 46. Although Mr. Nazemi moved Plaintiff from the web team to radio and then back to the web, upon assuming her

new assignments, Plaintiff once again had new disagreements with her colleagues.  Ex. 14 [4/4/05 email].  Ms. Khaksari complained about almost every single one of her colleagues as uneducated and incompetent.  *Id.*  Mr. Nazemi met with Plaintiff on several occasions about her work and her performance in the Service, and Ms. Gandji looked into the issues Plaintiff was having with her editors.  Ex. 2 [Gandji Dep.] at 49-50.  However, Plaintiff's disagreements with her colleagues and her reluctance to accept the edits of her editors did not improve, and the Agency decided not to renew Plaintiff's purchase order.

### D.      Plaintiff Cannot Show the Reason for the Non-Renewal is Pretextual.

Plaintiff has not produced sufficient evidence for a reasonable jury to find that Defendant's asserted non-retaliatory reason for the non-renewal of the purchase order is a pretext for retaliation.  Plaintiff denies not getting along with her colleagues "except one," Mr. Saeed Rahmani, who Plaintiff states was "offended that I came over and took over the work as translator and Web sponsor."  Ex. 1 [Khaksari Dep.] at 47-48.  When asked whether the editor of the day ever disagreed with Plaintiff's translations, Plaintiff answered: "No.  Basically what I did was praised by them.  It is wonderful.  Nice selection, always."  Ex. 1 [Khaksari Dep.] at 62; *see also id.* at 64 ("Q: Any of them, those individuals, have any kind of problem with your translation?  A.  No, no..").  Plaintiff describes her Farsi language skills as "My Farsi, as very modern, very fluent," and states that "[m]ost of the [other] people working there are working there for 20, 25 years using classic language of Farsi, so in that sense it could be different idea of words, using words."  Ex. 1 [Khaksari Dep.] at 68.  Plaintiff denies ever challenging the editors' changes to her work.  *Id.* at 68-69.

To survive summary judgment, Plaintiff must show that a reasonable jury could conclude from all the evidence that the adverse employment decision was made for a discriminatory (or

35

retaliatory) reason. *Latham v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003). The Agency prevails unless the plaintiff succeeds in discrediting its explanation. *See Samii v. Billington*, 195 F.3d 1, 7 (D.C. Cir. 1999) (*citing Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1288-89 (D.C. Cir. 1998) (en banc)). "A reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis supplied). The plaintiff cannot create a factual issue of pretext based merely on personal speculation of discriminatory motive or retaliatory intent. *See Greene*, 164 F.3d at 675. Moreover, "as courts are not free to second guess an employer's business judgment, a plaintiff's mere speculations are insufficient to create a genuine issue of fact regarding [an employer's] articulated reasons for [its decisions] and avoid summary judgment." *Brown v. Brody*, 199 F.3d 446, 458-59 (*quoting Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988)).

Plaintiff's self-serving statements of her translation skills and her flat denials of having any problems with accepting the edits of her editors is not evidence of pretext and insufficient to avoid summary judgment for Defendant. *See Fischbach*, 86 F.3d at 1183. The precise question before the Court is whether the Agency's reasons for the non-renewal of Plaintiff's purchase order are for reasons other than her protected activity. Plaintiff is unable to produce objective evidence that the asserted reason is mere pretext and that, as a result, the Agency's actions were the product of discriminatory intent.

## IV.    Plaintiff's Non-Selections For Three Positions Were Not Unlawfully Discriminatory

In *Fogg v. Gonzales*, 492 F.3d 447 (D.C. Cir. 2007), the D.C. Circuit held, *inter alia*, that the 1991 amendments to Title VII codified two alternative ways of establishing liability for

intentional discrimination: (1) a single motive theory requiring that the plaintiff establish that discrimination was the "sole" or "but for" reason for the challenged employment action; and (2) a "mixed-motive" theory requiring only that the plaintiff demonstrate that discrimination played a "motivating part" or was a "substantial factor" in the employment decision. *Id.* at 451.[11] Under either theory, plaintiff must demonstrate discrimination by a preponderance of the evidence and may rely on direct or circumstantial evidence to meet that burden. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92-102 (2003).

Regardless of the theory, in the absence of direct evidence, Plaintiff's circumstantial evidence is analyzed using the scheme first set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that scheme, the plaintiff must first, by a preponderance of the evidence, establish a prima facie case of discrimination. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993). If the employee succeeds:

> [T]he employer must articulate a legitimate, non-discriminatory reason for its action. The employer need not persuade the court that it was actually motivated by the proffered reasons. Rather, the defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.

*Short*, 555 F. Supp. 2d at 166 (internal quotation marks omitted), *citing Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981), *and St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

---

[11] *See also Ginger v. District of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008) ("There are two ways of establishing liability in a Title VII case. A plaintiff may pursue a "single-motive case," in which he argues race (or another prohibited criterion) was the sole reason for an adverse employment action and the employer's seemingly legitimate justifications are in fact pretextual. Alternatively, he may bring a "mixed-motive case," in which he does not contest the bona fides of the employer's justifications but rather argues race was also a factor motivating the adverse action.") (internal quotation marks and citations omitted).

After the employer articulates a legitimate non-discriminatory reason, in a single-motive or

"pretext" case:

> the McDonnell Douglas framework -- with its presumptions and burdens --
> disappears, and the sole remaining issue is discrimination *vel non.* [That is,] [t]he
> district court need resolve only one question: Has the employee produced sufficient
> evidence for a reasonable jury to find that the employer's asserted non-discriminatory
> reason was not the actual reason and that the employer intentionally discriminated
> against the employee on the basis of race, color, religion, sex, or national origin?

*Short*, 555 F. Supp. 2d at 166 (internal quotation marks and other citations omitted), *citing Brady*

*v. Office of the Sergeant at Arms, U.S. House of Representatives*, 520 F.3d 490, 494 (D.C. Cir.

2008).

Similarly, in a mixed-motive case, Plaintiff must show that, notwithstanding the employer's

legitimate non-discriminatory reasons, "'discrimination or retaliation played a "motivating part" or

was a "substantial factor" in the employment decision,' 'without proving that the impermissible

consideration was the sole or but-for motive for the employment action.'" *Fogg*, 492 F.3d at 451,

*quoting Porter v. Natsios*, 414 F.3d 13, 18-19 (D.C. Cir. 2005).  In a mixed-motive case, however,

42 U.S.C. § 2000e-5(g)(2)(B) provides the employer with a "limited affirmative defense," that

restricts a plaintiff's remedies.  *See Fogg*, 492 F.3d at 451.  That is, if a "defendant 'demonstrates

that [it] would have taken the same action in the absence of the impermissible motivating factor,'

then the district court may grant declaratory or injunctive relief and attorney's fees, but 'shall not

award damages or issue an order requiring any . . . reinstatement, hiring, promotion, or payment.'"

*Id.*, *quoting* 42 U.S.C. § 2000e-5(g)(2)(B).

Whichever standard is applied to this case, Plaintiff fails to meet her burden of coming

forward with evidence to create a triable issue on her non-selection for three positions for which she

applied with the Agency.  Quite simply, Plaintiff has failed to establish that her age, race, gender,

national origin, or religion were a motivating factor (much less the sole factor) in her non-selections.

## A.    GS-12 Programming Research Coordinator

As noted above, Ms. Gandji selected Mr. Davidi instead of Plaintiff for the Research Coordinator position because she determined that his application demonstrated that his qualifications were vastly superior to those of Ms. Khaksari's. *See* Ex. 9 [11/20/04 Justification Memo.]; Ex. 2 [Gandji Dep.] at 58-59.  Mr. Davidi was performing the same or a similar job on a temporary basis, and his selection for the permanent position when it was advertised is hardly surprising.  Mr. Davidi had anchored live TV broadcasts for the Persian Service, while Ms. Khaksari's on-camera TV experience was limited to hosting of a children's television show for one year in the 1970's. *Id.*; Ex. 11 [Khaksari Application] at bates 409 (response to KSA 2).  Likewise, Mr. Davidi's application demonstrated superior knowledge of compiling relevant research information based on his experiences in radio programming consulting and database management. Ex. 9 [Justification Memo] at 2; Ex. 7 [Davidi Application] at 5-6 [bates 441-442].  Plaintiff, by contrast, provided five short bullet points concerning her experience as an attorney in Iran in the 1970's.  Ex. 11 [Khaksari Application] at bates 409 (response to KSA 3).  Not only was her experience dated and her research not related to Iranian politics, but Plaintiff's truncated KSA response did not tie the research skills she presumably gleaned in the 1970's to her knowledge of international broadcasting.  Ex. 9, [Justification Memo] at 2; Ex. 11 [Khaksari Application] at bates 409.  Ms. Gandji determined that Mr. Davidi had far superior skills and abilities necessary for the position. Ex. 2 [Gandji Dep.] at 72-73.  "[I]n order to justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative of discrimination." *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007).  That plainly does not exist here.

Plaintiff has no evidence that her age, religion, sex, or national origin impacted Ms. Gandji's decision. Her challenges to Mr. Davidi's qualifications amount to quibbling about qualifications that the courts have rejected time and again. *Cf. Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2007). But "[t]itle VII. . . does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions." *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458 (7th Cir. 1986). Moreover, even if the Court suspects that a job applicant "was victimized by . . . poor selection procedures," it may not "second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982). Thus, "[o]nce the employer has articulated a non-discriminatory explanation for its action, the issue is not 'the correctness or desirability of [the] reasons offered. . . [but] whether the employer honestly believes in the reasons it offers.'" *Fischbach*, 86 F.3d at 1883.

## B.    GS-11 International Broadcaster

Ms. Gandji also did not select Plaintiff as a GS-11 International Broadcaster because her name did not appear on the list of applicants. The two people ultimately selected, Ms. Aramideh and Ms. Misraeedi, are so demographically similar to Plaintiff that it refutes any reasonable inference that Plaintiff's sex, race, national origin or religion had anything to do with the selections. Both of the selectees were female, Muslim, and from Iran. Ex. 1 [Khaksari Dep.] at 144-46. Although both happen to be younger than Plaintiff, Plaintiff's belief is that they were favored not because of their age, but because they had personal connections to people involved in the selection process. *Id.* at 146-48. However, favortism and personal preference are not the same as illegal discrimination. *See*

*Benzies v. Illinois Dep't of Mental Health & Develop. Disabilities*, 810 F.2d 146, 148 (7th Cir. 1987).

Moreover, the Agency's legitimate, non-discriminatory reason for not selecting Plaintiff for a permanent position is the disruption she engendered in the course of her temporary work as a contractor. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *Harding v. Gray*, 9 F.3d 150, 152 (D.C. Cir. 1993). Notably, the agency is not required to prove that it made the wisest choice, but only to articulate reasons for the decision that were non-discriminatory. *See Davis v. State Univ. of New York*, 802 F.2d 638, 641 (2d Cir. 1986) (citing *Burdine*, 450 U.S. at 258-59). In fact, the defendant "need not prove that the tendered reason actually motivated her behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994); *accord St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (holding that a complainant "at all times bears the ultimate burden of persuasion") (internal quotation marks and citations omitted). Moreover, "the determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment." *St. Mary's Honor Ctr.*, 509 U.S. at 509. Here, Plaintiff admits to discord with one of the editors with whom she worked, and Ms. Gandji believed the problems were not confined to only one member of the staff. *See* Ex. 1 [Khaksari Dep.] at 97-104; Ex. 2 [Gandji Dep.] at 30-42; Ex. 4 [Gandji Dec.] ¶ 16.

In the alternative, Plaintiff's claims for compensatory damages and equitable relief for this non-selection claim should be dismissed. Even if Plaintiff could somehow show that one or more of her protected characteristics was a motivating factor in her non-selection (which as noted above,

41

she cannot), Plaintiff has conceded that the Agency would have taken the same action regardless of Plaintiff's race or national origin.  That is, Plaintiff has consistently maintained that Ms. Hamideh Aramideh and Ms. Misraeedi were preselected and the selection process was just a sham.

Although Defendant maintains that there is no genuine issue of material fact that (a) Plaintiff's age, race, sex, national origin and religion were not factors, and (b) Ms. Aramideh and Ms. Misraeedi were not preselected, if Plaintiff could establish that there was any unlawfully motivating factor (which she cannot), BBG would have nonetheless selected Ms. Aramideh and Ms. Misraeedi for the position.  *See* Ex.4 [Gandji Dec.] ¶ 16.   Accordingly, pursuant to 42 U.S.C. § 2000e-5(g)(2)(B), summary judgment should be entered in Defendant's favor on Plaintiff's claims to the extent she seeks equitable relief and/or compensatory damages.

### C.      GS-12 International Broadcaster

For the GS-12 International Broadcaster position, Plaintiff only applied in response to a vacancy announcement that was canceled with no selection being made.  Ms. Gandji decided to re-post the announcement so she could solicit on-air tape samples from applicants and better define the knowledge and skills she was seeking.  Ex. 4 [Gandji Dec.] ¶¶ 18-20.  Even if a selection had been made from the list for vacancy announcement M/P-05-59, for which Plaintiff applied, however, she was not eligible for selection because she was not among the top three candidates on the certificate of eligibles, and thus outside of reach for selection.  Ex. 5 [Cobb Dec.] ¶ 18.

Once again, Plaintiff cannot show either that her age, sex, race, national origin or religion played any role in the selection or that the Agency's reasons for its actions were pretextual.  Ms. Gandji's opinion that Plaintiff was a disruptive influence in the newsroom at BBG and had

difficulty getting along with coworkers, at least a portion of which is undisputed, fully explains why she would look more favorably on other qualified candidates. *See Holcomb v. Powell,* 433 F.3d 889, 895-98 (D.C. Cir. 2006)*; Ware v. Billington*, 344 F.Supp.2d 63, 73 n.3 (D.D.C. 2004) (court need not address plaintiff's "quibble about the candidates' relative qualifications" because discrimination can be inferred only where there is a showing that the non-selected person's are far superior to the selectee's). Plaintiff cannot show that any of Ms. Gandji's reasons for canceling the initial vacancy announcement and altering it was motivated by any improper consideration and there is nothing inherently discriminatory about either updating the statement of qualifications or requesting samples of the same kind of work the Agency is hiring applicants to perform. *See Moncada v. Peters*, 579 F.Supp.2d 46 (D.D.C. 2008); *Black v. Tomlinson*, 425 F.Supp.2d 101, 119-20 (D.D.C. 2006) (fact that agency considered a former employee a "troublemaker" was insufficient to infer improper motive for non-selections). Plaintiff failed to apply for the position when it was re-posted, so she cannot prevail on this claim. *See Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) (without proof that application had been received by agency, would-be applicant could not rebut legitimacy of reason for his non-selection). Because Plaintiff is unable to come forward with any evidence that suggests any improper motivations for canceling the job announcement, summary judgment is warranted. *See Lester v. Natsios*, 290 F.Supp.2d 11, 26 (D.D.C. 2003) (decision to cancel vacancy announcement because of desire to change job functions was legitimate and no evidence suggested unlawful discrimination).

## Conclusion

For all these reasons, as well as those set forth in Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment and Memorandum in Support of Defendant's Cross-Motion to Dismiss, the Court should grant defendant's motion for summary judgment and enter final judgment in favor of defendant.

Dated: March 31, 2009.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

/s/_____
JANE M. LYONS, D.C. Bar # 451737
Assistant United States Attorney
555 4th Street, N.W. - Room E4822
Washington, D.C. 20530
(202) 514-7161 (phone)
(202) 514-8780 (fax)
jane.lyons@usdoj.gov

Of Counsel:
Elizabeth A. Parish, Esq.
Kataryna Baldwin, Esq.
Office of General Counsel
Broadcasting Board of Governors