United States District Court
For the District of Columbia

| | | |
|---|---|---|
| Batool Khaksari, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CA No. 06-1990 (RJL) |
| James K. Glassman, | ) | |
| Chairman, | ) | |
| Broadcasting Board of Governors, | ) | |
| Defendant. | ) | |

**Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's
Motions to Dismiss or, in the Alternative, for Summary Judgment**

### I.  Introduction

Plaintiff respectfully opposes Defendant's Motions to Dismiss or, in the
Alternative, for Summary Judgment ("Defendant's Motion") and the Memorandum of
Points and Authorities in Support ("BBG Memorandum").

This is an action for monetary, equitable and declaratory relief brought by
plaintiff Batool Khaksari against defendant James K. Glassman in his official capacity as
Chairman of the Broadcasting Board of Governors ("BBG") to redress discrimination
based on age, sex, race, national origin, religion and retaliation and to obtain review of
unauthorized agency action. These actions of BBG have violated plaintiff's rights under
the Age Discrimination in Employment Act, 29 U.S.C. Section 623 *et seq*., Title VII of
the Civil Rights Act, 42 U.S.C. section 2000e *et seq.* ("Title VII"), 42 U.S.C. sections
1981 *et seq.*, the BBG governing law and charter, the Administrative Procedure Act, 5
U.S.C. section 706, the Declaratory Judgment Act, 28 U.S.C. section 2201, 5 U.S.C.
section 2302(b) and the law of the District of Columbia.

1

Genuine issues of material fact require that this case be heard by the trier of fact to resolve the factual conflicts. Summary judgment is therefore not appropriate.

Plaintiff, a female Muslim United States citizen of Persian descent over the age of 50, was employed by the defendant agency the Voice of America (" VOA") Persian news service under a purchase order vendor ("POV") contract between 2003 and 2005 when her services were abruptly terminated as a result of a complaint of persistent harassment in the workplace. Plaintiff was terminated the day after she distributed a written complaint of harassment to her two supervisors and the agency civil rights officer. Although managers now try to justify the termination with a claim that Plaintiff was uncooperative with her editors, Plaintiff denies this as do her editors. Two colleagues also confirm that the Persian service manager who made the claim acknowledged that the claim was falsified in response to a request from his supervisor to find a reason to fire Plaintiff.   Just eight days before Plaintiff was terminated, Persian service managers actually signed an approval for a six-month extension of Plaintiff's contract with an addition of $23,400 budgeted toward the contract. In addition, Ms. Khaksari demonstrates that her non-selections for competitive vacancy selections were rooted in discriminatory departures from agency rules.

Earlier this year Plaintiff moved for partial summary judgment and for a declaratory order on her challenge to the BBG policy applied to her and still in effect permitting the hiring of aliens over well qualified United States citizens. In that motion Plaintiff demonstrated that the BBG policy, as stated, is *ultra vires* and in direct contravention of BBG's governing statute. Plaintiff's motion for partial summary

judgment is a challenge to the face of the policy of the agency, as opposed to a challenge to the agency policy as applied, as BBG seeks to characterize it. [1]

In support of her opposition, Plaintiff is submitting her declaration, together with a collection of declarations and exhibits. She also is submitting a counterstatement of material facts and response to the statement of material facts submitted by Defendant.

## II. Counterstatement of Material Facts

Plaintiff submits her declaration together with a collection of declarations and exhibits in support of her Counterstatement of Material Facts and Statement of Material Facts in Dispute ("CMF").

Ms. Khaksari grew up in Iran. After finishing secondary school she earned a degree in economics and successfully competed for a coveted position in the National University of Iran School of Law. In order to gain entrance to law school in Iran she had to take a rigorous test in Farsi and other Persian cultural issues such as history, literature, philosophy, and culture. Out of over one hundred and twenty thousand test takers in her college year only three females were accepted and she passed with one of the top five scores and thereby qualified for the few positions for admission to law school available to women. Plaintiff is steeped in Farsi language and Persian culture. Counterstatement of Material Facts ("CMF") at paragraphs 1-2 (henceforth "CMF at #").

After completing her studies, she was awarded a law degree in Iran in 1979. She practiced law there for several years as one of a handful of women attorneys in the

---

[1] Well established law permits *ultra vires* challenges to agency authority even in the face of regimes otherwise limiting review. See *Aid Association for Lutherans v. USPS*, 321 F.3d 1166, 1168 (D.C. Cir. 2003), reh. den.; reh. *en banc* denied 2003 U.S. App. LEXIS 9181 (D.C. Cir. 2003). ("Appellees' principal claim here is that the challenged regulations emanated from an *ultra vires* action by the Postal Service. We agree. Therefore, *it does not matter whether 39 U.S.C. § 410(a) precludes traditional APA review*.") (emphasis added).

country. Included among her clients was the National Broadcasting Company of Iran. For a period of about one year she hosted a television show in Iran geared to children. After immigrating to the United States in the early 1980's she became a naturalized U.S. citizen in 1989.  Throughout her time in the United States she has remained actively involved with other immigrants from Iran and the personal and political issues surrounding her native country and its people. CMF at 3.

After working as a parole officer in Maryland and copyright specialist at the Library of Congress, she applied and was accepted for work under a purchase order vendor ("POV") services contract at the defendant BBG that extended from the summer of 2003 to early April 2005. Her duties were primarily web casting news, translating and writing articles for Farsi news and voicing radio programs for Farsi language news.  CMF at 5.

From the summer of 2003 Plaintiff worked six days a week on the night shift; then her time began to be split with the day shift so that, by the end of 2003 her hours were split between day and night, but mainly night work. In March 2004 she began working five days on the day shift and one to two days on the night shift or weekends. CMF at 6.

Ms. Khaksari was required to be on BBG premises for all her work time. BBG supervisors specified her schedule which required her to work particular shifts day and night. Her work product was used for regular BBG Persian news broadcasts. BBG furnished all of the facilities and equipment for the work performed by Plaintiff including computer facilities, recording equipment, and news feeds. BBG exercised the right to assign work to Plaintiff, to set deadlines for completion and to review her work product

on a daily basis. Her work was reviewed by editors every day just as the work done by regular Federal BBG employees in the same office. The work performed by Plaintiff was part of the regular work of BBG and was essentially indistinguishable from that performed by BBG's Federal full time equivalent employees. BBG controlled the means and manner of performance of her work on a daily basis and the kind of work she did was an integral part of the business of BBG. Ms. Khaksari provided no equipment of her own for the work. She had worked for the agency for about one and one half years. There were many individuals who worked at the Persian service as POV's for more than three years and some as many as eight years. She was therefore an employee for purposes of the antidiscrimination and anti-retaliation provisions of Title VII and AEDA. The Department of State Office of Inspector General, which has purview over the BBG, in a careful management evaluation report dated March 2009, made a number of findings on the Persian operation that "[a]fter discussions with FTE's [full time equivalent employees] and POV's and review of document, the OIG team determined that for many FTE's and POV's there is no functional difference in the work they perform."  Exhibit 21, IOG Report at 29; CMF at 7 -9.

In October 2004, Ms. Khaksari applied for a GS 12 Program Research Coordinator position in the Farsi service advertised under vacancy announcement No. M/P 04-107 and was the only United States citizen whose name was referred to the selecting official as eligible for selection for the position. The selectee, a male of Jewish ethnicity, Mr. Davidi was the beneficiary of favoritism from senior management when he was originally hired in early 2004. CMF at 11. Managers made it clear to the staff that they wanted Mr. Davidi selected for the Program Research Coordinator position. Mr.

Welsh, the personnel officer, has acknowledged in writing "Davidi had been identified prior to vac. annmt. [vacancy announcement] as someone VOA was interested in hiring. Seth's [Seth Cropsey the VOA Director] office was involved in assisting him in getting a visa at our request and in providing funds for the division to provide an award" to Mr. Davidi. CMF at 13. In early 2004 BBG pulled strings at the Department of State to get Davidi's immigration status adjusted when Mr. Davidi's visa was about to expire. A senior Department of State officer contacted by the BBG personnel officer emailed the BBG personnel officer that the "the DCM [Deputy Chief of Mission at the U.S. Embassy] e-mailed me this morning to say he would personally be keeping an eye on" the Davidi application. In this effort Mr. Welsh obtained the assistance of this individual to "pull the right strings in this case" on behalf of Mr. Davidi.  Indeed, within five minutes of the very time that Mr. Davidi received his visa in Toronto, the fact was emailed to senior BBG and State officials. CMF at 12, 13.

Mr. Davidi's Farsi language skills, which were never tested, and were shown to be limited soon after his arrival in early 2004. Ms. Khaksari was assigned to do the translations that Davidi proved unable to do. Mr. Davidi's knowledge of Persian culture was limited as well. On the first day he appeared for work in early 2003 a manager involved in the selection asked Davidi, "Do you speak Farsi?" The position required fluent Farsi so the question should have been unnecessary. The manager has admitted that he had been forced to select Davidi by higher management. CMF at 14 -17. For example, when a Persian service employee circulated a list of potential interviewees, each of whom was well known, Mr. Davidi did not appreciate that it was a practical joke because they

were all long since dead. Mr. Davidi responded with an email that he wanted to seek out these individuals for interviews. CMF at 18.

Ms. Khaksari's supervisor, Mr. Nazemi, specifically told her not to apply for M/P 04-107 expressly for the reason the VOA director, Mr. Cropsey, wanted Mr. Davidi in the job. Others on the BBG staff were told that Mr. Davidi was the individual for whom the position was created and whom Mr. Cropsey wanted appointed.  CMF at 15.

The OIG report noted that "some PNN employees and contractors felt that PNN hired at the GS 12 level to avoid testing candidates that it favored. Language and skill tests are generally required at the GS- 11 level and below. Some PNN employees and contactors felt that candidates were hired at the GS –12 level because it could be done faster without testing." CMF at 50, OIG Report at 30.

**Harassment Campaign**. For a period of months Plaintiff has been the victim of a notorious campaign of office harassment directed at her by a group of Persian service employees and contractors to drive her out of the office. On a daily basis from 2004, Ms. Khaksari was faced with open, persistent heckling and taunts at her desk in the cubicles that were open to the Persian service employees calling her "trash", "prostitute", "illiterate" and expressing the intention to put her "into the ass of  Khomeini" by the group of Persians. The group refused to work with Ms. Khaksari and made a show of not cooperating with her. Colleagues in the office were well aware of the behavior described it as poisonous and the worst they had ever seen in any office they had ever been in. Oddly, Plaintiff's supervisor Mr. Nazemi, who was well aware of the campaign, did nothing to stop it, discouraged her from complaining about it to higher managers and sometimes cooperated with the group. CMF at 19.

**Applications Denied.** Candidates who wish to qualify for positions as international broadcasters from GS 9 to GS 11 must take tests for oral and written skills. Agency personnel review those tests under a system that nominally seeks to mask the names of the test takers with the use of numbers for names. Plaintiff had taken and passed the test for broadcaster in Farsi when she entered the service. She retook the test later in an effort to improve her score. When she retook the test she was deliberately failed by two raters who were part of the group that were trying to harass and drive her out of the service. After they had collaborated to fail her test, they sought to bring the third rater, Dr. BiParva, into their scheme and he refused. The supervisor Mr. Nazemi cooperated with the scheme. Collaboration on the raters of Ms. Khaksari's test and the request to unfairly rate her test as failing were blatant violations of agency rules requiring the independent rating of tests and the fairness of the rating. The two failing scores were enough to make Plaintiff's test graded as failing. When Plaintiff appealed the result and requested that it be sent to an outside independent evaluator the evaluation by a prestigious firm not only graded Plaintiff's test as passing but with a high score.  CMF at 23- 25.

By the time that Plaintiff's test has been reviewed, however, the international broadcaster positions in the continuous vacancy announcement for broadcasters, BBG 04 -001, had been selected. Each of the two selectees in BBG 04 -001, Ms. Hamideh Aramideh and Ms. Guita Misreedi, were aliens who were markedly younger that Ms. Khaksari. Ms. Aramideh was one of the group of employees who were seeking to drive Ms. Khaksari out of the service so the efforts of this group were rewarded. In fact, the score achieved by Ms Khaksari on the test was higher than that achieved by Ms.

Misreedi, so Ms. Khaksari should have been selected for the position if she had not been victimized by the group of harassers with the indulgence of management. CMF at 25 -27.

Plaintiff applied for the broadcaster position in announcement MP 05 – 59 and was determined to be qualified for the position and so was on the list of candidate found qualified for the job. On May 16, 2005 the human resources office emailed the selecting official, Ms. Shiela Gandji that it had a list of eligibles with more than three U.S. citizens and that a draft crediting plan would be needed to rank the candidates. On May 27 the staffing specialist provided the draft crediting plan, criteria used to rate a group of applicants based on the requirements of the job, noting that it was intended to describe the experience that the division chief, Ms. Gandji, was looking for "so you can get the person you want." The crediting plan created by Ms. Gandji put a premium on experience outside VOA so that inside VOA applicants like Ms. Khaksari were irrationally disadvantaged. After the certificate of eligible candidates was prepared, including Plaintiff, Ms. Gandji cancelled the certificate in MP 05 – 59. On July 26, the staffing specialist wrote to Gandji seeking a statement as to why the certificate was not used "in case there are any questions." Exhibit 8.

**Termination.** Before the beginning of the work day on the morning of Monday, April 4, 2005 Plaintiff distributed by hand a written complaint, entitled "Harassment and Intimidation," seeking relief from workplace harassment, obscenities and inflammatory fighting words from coworkers. She delivered copies to her supervisor Mr. Nazemi and her second level supervisor, Ms. Gandji, with copies hand delivered to Ms. Johnson, the head of the BBG Civil Rights office, Mr. Welsh, the director of Human Resources, and the Inspector General. Her memorandum described persistent problems since 2004 with

name-calling and defamatory conduct directed at her (calling her "trash", "prostitute", "illiterate" and put her "into the ass of Khomeini") by the group of Persians service employees to make her leave the Persian service. The memorandum complained that "I was blocked from gainful employment … when they stated that if this 'trash' (referring to [Plaintiff]) was to enter the studio to work then they would refuse to return to the studio." The plan of the conspirators was "to get management to fire me." The memorandum stated "making untrue defamatory comments, using obscenities and inflammatory fighting words is conduct unbecoming a professional employee. Moreover, when such conduct is combined with conspiring, under false pretenses, to jeopardize a person's career, it reaches the level of illegality." She requested managers to correct the insufferable situation by requiring decency and humane treatment in the office toward her.

The next afternoon, April 5, 2005, Ms. Khaksari was terminated by order of Ms. Gandji. After a brief meeting with Ms. Gandji in which she claimed that budgetary issues caused the termination, Ms. Khaksari was ordered to empty out her personal belongings in a matter of a few moments and escorted out of the building by a building security officer who put his hand on her back to expedite her exit. CMF at 30 -32.

Plaintiff's termination was a direct retaliation arising out her memorandum to Ms. Gandji, the HR office and the Civil Rights office of the day before appealing for relief from office harassment. CMF at 30 -32.

The nature of the action and the rationale for the action provided by Ms. Gandji has been inconsistent. Ms. Gandji and BBG claimed variously: that the Plaintiff's contract was not renewed owing to Plaintiff's pattern of resistance to revisions to her

work by her editors; and that her services were no longer required because that "you have completed assignments for the Persians service on April 1st and April 4th". CMF at 34, 35.

The explanations of the reasons for the termination are directly contradicted by testimony and documentary evidence. In late March 2005 Ms. Khaksari's supervisor, Mr. Nazemi, had told Ms. Khaksari that her contract had been renewed. Indeed, on March 25, 2005 Debora Simms of the Persian service initiated a requisition to extend Ms. Khaksari's contract with $23,400 in additional funds for services for Ms. Khaksari for a period of six months from April 1, 2005 to September 30, 2005. Exhibit 10; CMF at 36. Ms. Khaksari's supervisor, Mr. Nazemi, signed the requisition. This requisition for Ms. Khaksari'd services was approved and signed by Ms. Gandji on March 28, 2005 that everything was acceptable for a six-month extension with an additional budget for Ms. Khaksari. This was just eight days before Khaksari was terminated. CMF at 37-41.

Ms. Khaksari denies that she was uncooperative with her editors. Her two main editors, Dr. Fekrat for the night shift and Dr. BiParva for the day shift, affirm that her Farsi translations were consistently good and that she was receptive to any editorial changes they made. CMF at 42.

Mr. Nazemi admitted to two PNN colleagues, Dr. Kay and Dr. BiParva, that Plaintiff never resisted editorial recommendations and that her work was good. He also acknowledged that the claim that Ms. Khaksari was uncooperative with her editors was falsified to satisfy Gandji's specific request to him that he find something to say  to support a  termination. CMF at 44; Exhibit 23, Kay Declaration at 12 and Exhibit 22, BiParva Declaration at 13.

Employees and contractors were well aware of Ms. Gandji intolerance of any individual who voiced any complaints no matter how small. Ms. Gandji has a well-earned reputation for retaliation against any individual who complains about office practices, inequity or discrimination. Ms. Khaksari's supervisor Mr. Nazemi told her on more than one occasion that she should not complain about the harassment in the office because Ms. Gandji would fire her. CMF at 45.

BBG considered POV's to be contractors outside the scope of Title VII and the age discrimination laws applicable to employees. POV's, including Plaintiff, were so advised. The agency EEO / Civil Rights office advised Khaksari "you were not an employee of the Agency. You performed services as an independent contractor, and as such, you do not have standing to file an employment complaint under Title VII, the ADEA and the EEOC regulations."  CMF at 46.

The Department of State Office of Inspector General concluded that: "The main problem that PNN faces is its atmosphere of discontent. The OIG inspection team heard about perceptions of unfairness, charges of political bias, the operation of cliques, and the hiring and rewarding of unqualified people." Exhibit 21, OIG Report at 6. "The daily working environment at PNN at [sic] needs serious attention. The OIG team discussed the problem with BBG and VOA senior staff members as well as with the many workers who were interviewed. Virtually everybody brought up the subject of disgruntled employees and destructive rumors. Some said it was the most unpleasant place they had ever worked, citing raised voices and the lack of civil, professional conduct when disagreements arise." Exhibit 21, OIG Report at 35.

### III.        Argument

### A.        Legal Framework

In the absence of direct evidence of discrimination, disparate treatment claims of discrimination are analyzed under the burden shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). The burden of demonstrating a *prima facie* case is expressly "not onerous." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The *McDonnell Douglas* model of *prima facie* case is not intended to be "rigid, mechanized or ritualistic" because the requirements can vary depending on the facts. *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512 (2002).

Under the standard formulation, the plaintiff must show that (i) he belongs to a protected class; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iii) that after his rejection the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications. *McDonnell Douglass Corp. v. Green*, *supra* at 802. The fourth prong of the test is revised for cases where the position is filled with another applicant.

In *Stella v. Minetta*, 284 F. 3d 135, 145 (D.C. Cir. 2002), the Court "made it clear that 'a plaintiff in a discrimination case need not demonstrate that she was replaced by a person outside her protected class in order to carry her burden of establishing a *prima facie* case under *McDonnell Douglas.*'" *George v. Leavitt*, 407 F.2d 405, 412- 413 (D.C. Cir. 2005). Consistent with *McDonnell Douglas*, the District of Columbia Circuit has declared that the selection of another member of plaintiff's protected class is not prejudicial to a *prima facie* case. "It bears noting, however, that even in failure-to-hire

cases we impose no requirement that the employer filled the sought-after position with a person outside the plaintiff's protected class" to make a *prima facie* case. *Chappel-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006) See also, *Brown v. Henderson*, 257 F.3d 246, 252 (2nd Cir. 2001) ("discrimination against one employee cannot be cured, or disproven, solely by favorable or equitable, treatment of other employees of the same race or sex") citing *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158 (7th Cir. 1996).

"The factfinder's disbelief of the reasons put forward by the defendant (particularly if the disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination. " *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 113, 120 (2000). Certainly, "evidence of discriminatory statements or attitudes on the part of the employer" may support a verdict for a title VII plaintiff. *Aka v. Washington Hospital Center*, 156 F3d. 1284, 1289 (D.C. Cir. 1998) (en banc).  In *Stella v. Minetta*, *supra,* plaintiff's proffer of evidence of satisfactory performance was held to create a genuine issue sufficient to meet her burden of proof as to intent.

Preselection of a job candidate, in violation of procedures requiring fair consideration of qualified applicants, is "undeniably relevant to the question of discriminatory intent" and is relevant to determination that employer's nondiscriminatory explanation unworthy of belief. *Krodel v. Young*, 748 F.2d 701, 709 (D.C. Cir. 1984).

A demonstration that the employer departed from common sense or its selection procedures is a classic basis for inference of intent to discriminate. *Lathram v. Snow*, 336 F. 2d 1085, 1093-1094 (D.C. Cir. 2003) (holding that a jury could draw an inference of discrimination where the agency departed from its normal personnel process). In *Salazar v. WMATA*, 401 F 3d 504, (D.C. Cir. 2005) the court reversed a dismissal of a discrimination complaint based on irregularities in the interview process. Even though the scores given to the plaintiff by the alleged discriminating official "differed little" from those given by the other panelists, the fact that the alleged discriminator had chaired the panel and drafted the questions was considered sufficient to permit the case to go to a jury. *Id.* at 507.

A motion for summary judgment gives the judge an initial opportunity to assess the need for a trial. Without weighing the evidence or determining credibility, the court grants summary judgment when no genuine issue of material fact exists and judgment can be entered for the movant as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).The basic inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251 -252. An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Id*. at 248. An issue of fact is "material" if proof of it might affect the outcome of the lawsuit. *Id.* at 249. Factual inferences are drawn to favor the existence of triable issues, and where reasonable minds could ultimately reach different conclusions, summary judgment is inappropriate.

The movant's initial burden under Fed. R. Civ. P. 56 is to show the absence of evidence to support the nonmoving party's position. The movant must specify those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits if any, which demonstrate the absence of a genuine issue of fact. See Fed. R. Civ. P. 56(c). It may be sufficient for the movant to establish that the alleged factual issues are without legal significance. *Anderson* at 250.

In reviewing the evidence,

> the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

*Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000) (citations and internal quotations omitted). In that case the *prima facie* showing of plaintiff together with evidence of age based animus was sufficient to have the claim submitted to the jury.

Finally, because it is difficult for a plaintiff to establish proof of discrimination, the district courts should view summary judgment motions in such cases with special caution. *See Aka v. Wash. Hosp. Ctr.,* 116 F.3d 876, 879-80 (D.C. Cir. 1997*)*, reversed on other grounds, 156 F.3d 1284 (D.C. Cir. 1998*) (en banc*).

Plaintiff's testimony alone will suffice to establish genuine issues of fact:

> In addition, George has maintained that her work was satisfactory and that her co-workers were at fault for the confrontations she had with them. There is nothing to indicate that her assessment is either incredible or fanciful. Indeed, her performance evaluation and

some of the statements from other employees support George. Therefore, there is a genuine issue as to George's performance and conduct. *See Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990) ("There is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion.").

*George v. Leavitt, supra* at 414.

**B.**  **Plaintiff's Retaliation Claim is Properly before this Court and is Supported by Specific Evidence of Pretext**

**1.  The Title VII and AEDA Claims By  Contract Employees are Well Recognized and No Failure to Exhaust has been Demonstrated**

**Title VII and AEDA Claims by Contractor Employees are Well Recognized**

The BBG claim that Plaintiff is not entitled Title VII or AEDA protection against retaliation, discrimination or harassment in the BBG workplace because she worked as a POV contractor cannot be granted as a matter of law. Title VII and AEDA coverage must be liberally construed and, at a minimum, the test of control of the means and manner of production is a factual question that must be submitted to the trier of fact.

Purchase order contractors working on the premises of government agencies constitute employees for purposes of Title VII and AEDA. *Than v. Radio Free Asia*, 496 F. Supp. 38, 49 ( D.D.C. 2007) (upholding Title VII claim arising out of a failure to renew plaintiff's  POV contract for work at BBG's radio affiliate Radio Free Asia). The EEOC has also recognized that POV's at BBG are entitled to protection from unlawful retaliation and discrimination under Title VII. *Alark v. Tomlinson*, 2007 EEOCPUB Lexis 3178 (EEOC 2007); reconsideration denied 207 EEOPUB LEXIS 4265 (EEOC 2007). In

that case, the plaintiff POV complained of unwelcome sexual advances and threats not to renew her POV contract.  The EEOC concluded that BBG exercised sufficient control over her work and the work environment that complainant constituted an employee for purposes of Title VII.

Similarly, *Harris v. Gonzales*, 488 F.3d 422 (D.C. Cir. 2007) sustained the availability of Title VII relief to a contract employee working on the premises of the Department of Justice who complained of harassment and sex discrimination in her termination from her job attributable to the actions of Department of Justice employees. The proper question is not whether the complainant is "an employee under the civil service laws, but whether she may in any respect be deemed an employee under Title VII as amended…. Furthermore, because the Act is remedial in character, it should be liberally construed, and ambiguities should be resolved in favor of the complaining party." *Spirides v. Reinhardt,* 613 F.2d 826, 831 (D.C. Cir. 1979) (citations omitted). The contract language is not controlling and may not be used to waive protections granted to an individual under Title VII; rather,

> the extent of the employer's right to control the "means and manner" of the worker's performance is the most important factor to review here, as it is at common law and in the context of several other federal statutes. If an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist

*Id.* at 831, 832 (footnotes omitted). Since the question was fact bound the District Court's "virtually exclusive reliance on the contract language as indicative of appellant's employment status [to support a finding of no coverage under Title VII] was error." *Id.* at 833.

The BBG discussion of the common law test for employee set out in the BBG Memorandum at page 22 principally relies on the terms of the employment contract and is not supported by any subsidiary findings of fact with respect to the means and manner of control of Plaintiff and her work. Compare Defendant's Statement of Material Facts Not in Genuine Dispute.

BBG controlled the means and manner of performance of Plaintiff's work on a daily basis. Plaintiff was required to work on BBG's premises to perform her work; managers set her hours and she was required to sign in and out; she did the work under the direction of a supervisor; the kind of work she did was just like that performed by full time Federal employees; BBG furnished all the computer, film, recording and news feeds that were essential to the performance of the work; Plaintiff provided no equipment of her own for the work; Plaintiff had worked for the agency for over one and one half years; that there were many individuals who worked at PNN as POV's for more than five years; and the work was an integral part of the business of BBG. The Office of Inspector General of the Department of State determined in its management evaluation report that "[a]fter discussions with FTE's [full time equivalents] and POV's and review of documents, the OIG team determined that for many FTE's and POV's there is no functional difference in the work they perform." Exhibit 21, IOG Report at 29; CMF at 7, 8.

Plaintiff has demonstrated that BBC controlled the means and manner of her work and hence the question of Plaintiff's coverage under Title VII is, at a minimum, fact

bound. BBG has provided no subsidiary factual propositions to support findings on this matter. [2]

Accordingly, factual disputes preclude summary judgment as to the whether BBG exercised such control of the workplace as to make Plaintiff an employee protected from harassment and retaliation.

### The Prerequisites of Affirmative Defense of Untimeliness have Not been Demonstrated

The BBG claim of failure to exhaust is particularly inapt because BBG expressly refused to investigate EEO claims by POV's based on the view that its POV contractors were considered to be altogether outside Title VII and AEDA protections.  The same refusal was fact was communicated to Ms. Khaksari when she contacted the BBG EEO officer after her termination. CMF at 46. A lengthy formulaic legal discussion in the BBG investigation file in response to her complaint set out the policy. Exhibit 17; CMF at 46. The BBG Memorandum at 11 repeats the same proposition. ("The hostile work environment and retaliatory termination claims were not accepted because plaintiff was not a Federal government employee, but an independent contractor, and therefore did not have standing under title VII, the ADEA, and EEOC regulations.")

"But a plaintiff's failure to meet the § 2000e-16(c) deadline is an affirmative defense, *Harris*, 126 F.3d at 341, and the burden of proof is on the party claiming the deadline was missed." *Woodruff v. Peters*, 482 F.3d 521, 525 (D.C. Cir. 2007).

---

[2] Plaintiff in *Zhengxing v. Tomlinson*, 215 F. Supp. 2d 114, 120 (D.D.C.  2002), which held the plaintiff POV to be an independent contractor, acted  *pro se* so little weight can be accorded the finding in that case of no protection from discrimination.

Notice of the availability of the EEO counseling process is a prerequisite to a claim of failure to exhaust. In *Harris v. Gonzales*, *supra,* the notices posted by the Department of Justice in that case addressing agency "employees" said nothing about agency contractors. The applicable EEOC rules, 29 C.F.R. § 1614.105(a)(2,), *require* grant of extensions of time "when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them." As the court noted:

> Given *subsection (a)(2)*'s mandatory language--"the agency . . . *shall* extend the 45-day time limit"--we agree with Harris that the agency must grant an extension if the employee shows that she "was not notified" or "otherwise aware" of the time limit. *29 C.F.R. § 1614.105(a)(2)*.

*Id.* at 444. (emphasis in the original). The court concluded that there was a genuine issue of material fact as to whether the plaintiff could have apprehended that the time limits for employees might apply to contractors as well.

Here, BBG has made no showing of notice of an opportunity or obligation to seek counseling by agency POV contractors. Plaintiff's attempted contacts with the EEO officer were rejected because she was described as an outsider not covered by the law so she got no notice of her opportunity to resort to EEO counseling. See CMF at 46. BBG cannot hold Ms. Khaksari to exhaust a process for which she got no notice of the mandate and, indeed, that when she inquired the agency expressly refused to make available to POV's like her. Therefore, the prerequisite factual foundation for a BBG affirmative defense of failure to exhaust as to the Title VII and AEDA claims, including the claims or harassment and retaliation claims arising out of her termination, have not been made. The motion to dismiss Plaintiff's claims of discrimination and retaliation as untimely must fail.

### 2.    The Direct Evidence of Pretext for the Termination of the POV Contract Must be Weighed by a Jury

"Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses. ..  Interpreting the anti-retaliation provision to provide broad protection from retaliation helps assure the cooperation upon which accomplishment of the Act's primary objective depends." *Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53, 62 (2006). "This standard does not require the reviewing court or jury to consider the nature of the discrimination that led to the filing of the charge." *Id.* at 69. Title VII and the ADEA prohibit retaliation against those who complain of employment discrimination. *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008); *Gomez-Perez v. Potter*, 128 S. Ct. 1931, 1943 (2008). Ordinarily, a plaintiff must first establish a prima facie case of retaliation by showing (1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007); *Woodruff v Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007). No magic words are required to trigger the protection, but a memorandum noting the embarrassment, humiliation and insult suffered by complainant with a copy sent to the agency EEO office is sufficient. *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). "Yet because Title VII and the ADEA protect employees who engage in any protected activity, we have repeatedly held that an adverse action following closely on

the heels of protected activity may in appropriate cases support an inference of retaliation even when occurring years after the initial filing of charges." *Jones v. Bernanke*, 557 F.3d 670, 680 (D.C. Cir. 2009).

It is not necessary that complainant have stated a proper claim of harassment or discrimination to sustain her claim of retaliation. The severity of the conduct complained of is not material to a retaliation complaint.  "Indeed, *Burlington* expressly forecloses such considerations." *Steele v. Schafer,* 535 F.3d 689, 696 (D.C. Cir. 2008).

According to BBG, Ms. Khaksari's contract was terminated by Ms. Gandji because for some extended period she proved to be resistant to editorial comments and changes made by her supervising editors. BBG Memorandum at 34; Defendant's Statement of Material Facts not in Genuine Dispute at para. 34.

This claim of lack of cooperation is directly contradicted by Plaintiff and her main editors, Dr. Fekrat and Dr. BiParva who confirm that her work was of consistently high quality, that she was receptive to their comments and recommendations and that she was respectful and cooperative with them and with other editors and colleagues. CMF at 44. Dr. Kay and Dr. BiParva delare that the author of the charge of non-cooperation, Mr. Nazemi, acknowledged that claim was falsified to provide an excuse for Ms. Gandji to fire Ms. Kahksari. CMF at 44.

These misrepresentations by these managers are sufficient to provide evidence of pretext but there is more. In late March 2005 Ms. Khaksari's supervisor, Mr. Nazemi, had told Ms. Khaksari that her contract had been renewed. CMF at 36. On March 25, 2005 Debora Simms of the Persian service initiated a requisition to extend Ms. Khaksari's contract with $23,400 in new services for Ms. Khaksari for a period of six months from

April 1, 2005 to September 30, 2005. Exhibit 10. Ms. Khaksari's supervisor, Mr. Nazemi, signed the requisition. CMF at 37, 38; Exhibit 27, Belinfonte Dep. at 19-22. The requisition for Khaksari services was approved and signed by Ms. Gandji on March 28, 2005 that everything was acceptable for a six-month extension with an additional budget of $23,400 for Ms. Khaksari. This was just eight days before Khaksari was terminated. CMF at 39. The signature of the service chief, Gandji, on the requisition was the last step in the decision making for the contracting for services. CMF at 38, 39; Exhibit 27, Belinfonte Dep. at 19-22. The claim of a pattern of resistance to editorial direction by Plaintiff certainly is contradicted by the execution by the relevant managers of this contract extension request just days before Ms. Khaksari's abrupt termination.

The BBG claim that Khaksari's contract had not been extended is contradicted. She worked and was paid for three days work in April after the term of her contract had expired on March 31, 2005.  Exhibit 19; CMF at 41.

Finally, there is ample evidence of an atmosphere of intolerance and retaliation in the Persian service from a number of individuals. Prominent among the evidence is the investigation of the Department of State office of Inspector General. See Exhibit 21, OIG Report at 6. ("The daily working environment at PNN at [sic] needs serious attention. The OIG team discussed the problem with BBG and VOA senior staff members as well as with the many workers who were interviewed. Virtually everybody brought up the subject of disgruntled employees and destructive rumors. Some said it was the most unpleasant place they had ever worked …. ). CMF at 48 -50.

**C.** **Hostile Work Environment Showing is Manifestly Sufficient**

**1. Open Hostility over Months to Insult and Drive Plaintiff out of the Service Meets the Terms of a Hostile Work Environment**

On a daily basis from 2004, Ms. Khaksari was faced with open, persistent heckling and taunts at her desk in the cubicles that were open by a group of Persian service employees and POV's who called her "trash", "prostitute", "illiterate" and expressing the intention to put her "into the ass of  Khomeini." See CMF at 19, 30; Exhibit 19. The group refused to work with Khaksari and made a show of not cooperating with her. Colleagues in the office were well aware of the behavior described it as poisonous and the worst they had ever seen in any office they had ever been in.  Her requests for assistance from the supervisor Mr. Nazemi had been met with no response and with Nazemi actually discouraging her from complaining about it. CMF at 19, 30. Mr. Nazemi also encouraged colleagues like Dr. Kay from associating with Plaintiff and cooperated with efforts to assign an improper grade to Plaintiff's test score. CMF at 23; Exhibit 22, BiParva Declaration at 12; Exhibit 23, Kay Declaration at 6 -10; Khaksari Declaration at 19, 20.

Plaintiff's April 4, 2005 written complaint, entitled "Harassment and Intimidation," appealed for help with workplace harassment, obscenities and

inflammatory fighting words from coworkers. Her memorandum described persistent problems since 2004 with name-calling and defamatory conduct directed at her by the group of Persians service employees to make her leave the Persian service. The memorandum complained that "I was blocked from gainful employment … when they stated that if this 'trash' (referring to [Plaintiff]) was to enter the studio to work then they would refuse to return to the studio." The plan of the conspirators was "to get management to fire me."   The memorandum stated,"[m]aking untrue defamatory comments, using obscenities and inflammatory fighting words is conduct unbecoming a professional employee.   Moreover, when such conduct is combined with conspiring, under false pretenses, to jeopardize a person's career, it reaches the level of illegality." She requested managers to correct the insufferable situation by requiring decency and humane treatment in the office toward her. See Exhibit 18. In violation of agency rules, members of this group conspired to fail Plaintiff's Farsi language test when she retook the test and one of the group was selected for one of the positions. Even though Plaintiff's test was rated highly by an outside evaluator, the damage was done when Plaintiff was omitted from the certificate for the position. CMF at 19 -23.

"To establish hostile work environment, plaintiffs … must show harassing behavior 'sufficiently severe or pervasive to alter the conditions of [their] employment.' *Meritor Savings Bank, FSB* v. *Vinson,* 477 U.S. 57, 67 (1986) (internal quotation marks omitted); see *Harris* v. *Forklift Systems, Inc.,* 510 U.S. 17, 22, (1993) ("[T]he very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their . . . gender . . . offends Title VII's

broad rule of workplace equality."); *Pennsylvania State Police v. Suders,* 542 U.S. 129, 133,134 (2004).

Certainly, the confrontational language, the demeaning, sexually oriented name calling ("prostitute" and other insulting names for women), the successful conspiracy to fail Plaintiff's language test, refusing to work with Plaintiff and the conspiring to have Ms. Khaksari fired over a period of months is more than enough to be severe and pervasive. The head of the Persian service, Mr. Nazemi, knew of the conduct, discouraged her from complaining about it and actually discouraged colleagues, like Dr. Kay, from association with Plaintiff. CMF at 19, 20, 24.

The BBG Memorandum suggests that this activity falls short because: it was not known to management; Plaintiff never made a scene in the office to resist the behavior; and it was not expressly related to Plaintiff's age, sex, national origin or age.

Plaintiff has affirmed that she notified her supervisor Mr. Nazemi of the activity and Dr. Kay and Dr. BiParva have confirmed that too. See CMF at 19, 20, and 24. It was injurious to her emotionally and professionally. See Khaksari Declaration at 17, 29, and 32. And, of course, the notorious nature of the behavior was such that it could not escape notice of managers anyway. Her complaints to managers were sufficient. If Plaintiff struggled to ignore the behavior, she cannot be faulted for not making a scene in the office and, indeed, should be complimented for it. See Exhibit 23, Kay Declaration at 6 - 10.

It is enough that sexual language and sexual tropes were used to vilify, offend and isolate Plaintiff and to remove her from her job. The object of getting her removed from her job and failing her tests certainly qualified as an alteration of her employment terms.

This conduct amply satisfies the standard for a hostile work environment. See *Broderick v. Donaldson, supra.*

        **2.**      **Plaintiff is an Employee within the Meaning of Title VII and the AEDA with standing to bring a Hostile Work Environment claim**

The contention that no conduct in the Persian service offices no matter how egregious could constitute a hostile work environment claim, because POV contractors had no standing to be protected from open hostility or harassment, was rejected in *Than* v. *Radio Free Asia, supra*, *Alark v. Tomlinson*, *supra*, and *Harris v. Gonzales, supra*.

BBG contention that the majority of factors clearly show the plaintiff at all times worked for BBG as an independent contractor essentially tracks the flawed logic rejected by the court in *Spirides. v. Reinhardt, supra* as it was dependent on contractual recitations and utterly removed from the office realities. At a minimum, there is a factual dispute as to material facts bear on the control of the means and methods of the work. See CMF at 7.

Ms. Khaksari was required to perform all her work in the BBG offices. The contention that she and any POV like her were entirely unprotected from daily workplace harassment would contravene the dictate that "because the Act is remedial in character, it should be liberally construed, and ambiguities should be resolved in favor of the complaining party." *Spirides v. Reinhardt,* supra at 831.

**D.     Material Issues of Fact Foreclose Grant of Summary Judgment on Plaintiff's Claims for Non-Selection on Three Positions**

Material issues of fact foreclose the BBG contention that Plaintiff has failed to meet her burden of coming forward with evidence to create a triable issue on her non-selection for three positions.

**1.     GS 12 Programming Research Coordinator Position**

Plaintiff applied for the GS 12 programming research coordinator position in M/P 04-107, was found to be eligible and was passed over for the position for Mr. Davidi, a younger, male non-Muslim who had been selected for the temporary position in late 2003.

BBG contends that Mr. Dividi's allegedly superior qualifications constitute a rational non-discriminatory basis for the selection, pointing to a memorandum by the selecting official, Ms. Gandji, as justification.

The claim of Mr. Davidi's proficiency is specifically contradicted by direct evidence from Plaintiff and from other editors in the office.  From his first arrival at BBG in early 2004 management discovered that Davidi lacked the requisite proficiency in Farsi and in Persian culture required for the job. Because he could not perform the translations assigned to him, Plaintiff was assigned to perform those translations. CMF at 17, 18. In fact, the very first day that he arrived in the BBG offices in early 2004 he was

asked by the manager involved in the hiring, "Do you speak Farsi?" Since the job required fluent Farsi, the question confirmed that normal employment standards were not applied to him. The manager involved in the selection for the temporary position admitted to Dr. BiParva that he had been forced by management to select Davidi. CMF at 14.

Second, it was well-known that Davidi was the favored candidate of the political appointee who was the head of VOA, Mr. Cropsey.  For that reason, Mr. Nazemi expressly discouraged Ms. Khaksari from applying for the job.  Other potential applicants got the same message so they did not apply.   CMF at 17.

Mr. Dividi was the beneficiary of a remarkable amount of attention from senior management from the very beginning.  BBG has admitted that the agency determined that he was somebody that they want to hire before the job was posted in 2003.  Then, in early 2004 when his visa was about to expire, the agency pulled strings with the Department of State to send him to the embassy in Canada to get a new visa.  Within five minutes the issuance of the new visa, of that information was emailed to the very highest levels of Department of State and BBG. This amount of fawning from high level agency employees relating to a GS 12 employee does not happened in a vacuum. Certainly, when Mr. Dividi applied for the programming research or position in late 2004 his deficiencies in Farsi were manifest as were the political favoritism accorded to him. CMF at 12, 13.

Accordingly, the basic justification for the selection embraced by Ms. Gandji, proficiency in Farsi and knowledge of Persian culture, is contradicted by the evidence of poor Farsi, a history of undue favoritism for Mr. Davidi and avoidance of normal

employment standards for Mr. Davidi. This direct challenge to the claimed rational basis for the employment decision suffices to constitute a basis for pretext.

Thus, genuine issues as to the stated rationale for the decision, qualifications, and management preselection of him foreclose summary judgment as to this vacancy selection.

### 2.    GS 11 International Broadcaster

BBG contends that the reason for not selecting plaintiff or the permanent position was "the disruption she engendered" in resisting editorial direction and further the plaintiff was not on the certificate presented to the selecting official.  Opposition at 41. Each of the two selectees was younger than Plaintiff.

This selection was marked with radical departures from agency rules and rationalizations that are directly contradicted.

As discussed above, the claim of a failure to cooperate with editorial direction on the part of Plaintiff is contradicted by Plaintiff and her main editors. CMF at 42 -44.

Plaintiff who had passed her proficiency test administered for GS 11 broadcaster positions, decided to retake the test to improve her score. Two of the individuals who were trying to drive her out to the office, conspired to wrongly fail her test in direct violation of BBG testing rules. When these individuals tried to bring the third tester, Dr. BiParva, into the scheme, he refused and advised the supervisor, Mr. Nazemi, of the violation. Khaksari's test was rescored later by an outside expert and was passed with a high score. This collaboration and wrongful grading was a blatant violation of agency rules. CMF at 22 -24. In the meantime, however, the failing grade assigned to Plaintiff's

test by the two conspiring raters made her ineligible to be selected for the GS 11 position. When Ms. Gandji selected one of the group of individuals who were harassing Plaintiff, the pattern of harassment tolerated by Mr. Nazemi and other managers yielded one victory for the group – selection of one of their own over Plaintiff. The violation of the rules was important because the test score of one of the selectees was lower than that obtained by Ms. Khaksari. CMF at 25 -27. If Ms. Khaksari had her proper rating she would have been given the position because agency rules forbade selection of better qualified U.S. Citizens over aliens. CMF at 27.

Again, the claim of superior qualifications in filling BBG 04 -001 is contradicted by Plaintiff's higher score on the test over that of one of the selectees Ms. Misreedi. Passing over Plaintiff was based on the wrongful collaboration of reviewers with the cooperation of Mr. Nazemi to fail Plaintiff's test.

### 3.  Non-Selection on GS 12 International Broadcaster Position

In April 2005 plaintiff applied for the GS 12 International Broadcaster position for which she was determined to be qualified and was listed on the certificate.  On May 13, 2005 the staffing specialist sent an e-mail to Ms. Gandji advising her that they would have to have a panel for the position because they hand more than three qualified candidates who are U.S. citizens and the staffing specialists would need to develop crediting plan to rank the citizen applicants noting. The crediting plan is the criteria that the staffing specialist created at the direction of the selecting official to be used by a panel to rank candidates. The crediting plan for this vacancy created by Ms. Gandji set a

premium on experience outside of Voice of America, see Exhibit 12 (assigning maximum points for a "minimum of 3 years journalism experience outside the Voice of America") thus confirming an unjustified bias against applicants from inside the agency who were actually doing the work, like Plaintiff. After the certificate of eligible candidates was prepared, including Plaintiff, Ms. Gandji cancelled the certificate.   The staffing specialist requested from Ms. Gandji a statement "to explain why we readvertised the Persian positions and didn't use the original" in case there are any questions. See Exhibit 8. Instead, the vacancy was filled with a certificate from another announcement posted at essentially the same time.

In sum, genuine issues of material fact foreclose grant of summary judgment on the issues relating to the termination of Plaintiff's work and the filling of the three vacancy announcements. Basically, the claim that Plaintiff was terminated owing to conflicts with her editors is contradicted by declarations of Plaintiff and her main editors and by the execution of the requisition for Plaintiff's services by Mr. Nazemi and Ms. Gandji days before Plaintiff's termination. The claim that Mr. Davidi had better qualifications than Plaintiff is contradicted by evidence that his Farsi was known to be so poor others were assigned the work and that the VOA director was known to be his patron so he was preselected for the position. Certainly the conspiracy to fail Plaintiff's test that upon objective review was graded higher than one of the selectees is direct evidence of misconduct. Pretext may be inferred from these showings.  See *George v. Leavitt*, *supra* at 414. ("Pretext may usually be established by demonstrating that the

employer's proffered reason is simply false." citing 1 LEX K. LARSON, EMPLOYMENT DISCRIMINATION § 8.04.)

 

**E.     Plaintiff's Claims under 42 U.S.C. 1981 *et seq.* of Discrimination and Retaliation are Properly before the Court**

BBG seeks dismissal of plaintiff's claims under District of Columbia law and 42 U.S.C. § 1981 *et seq.* for failure to state a claim as a matter of law.  With respect to section 1981 in particular BBG urges that Plaintiff is not alleged a violation of rights secured by the Constitution and the Plaintiff is not asserting injury from Federal actors acting under the color of federal law.  See BBG Memorandum at 18.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The prohibition "applies to all phases and incidents of the contractual relationship, including discriminatory contract termination." *Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 302 (1994). The burdens of production and persuasion under § 1981 are identical to those for a claim alleging discrimination under Title VII. *Mungin v. Katten Muchin & Zavis, 116* F.3d 1549, 1553 (D.C. Cir. 1997). Thus, in order to demonstrate a claim under Title VII or under § 1981, a plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) and the adverse action gives rise to an inference of discrimination. *Texas Dep't of Community. Affairs v. Burdine, supra*; *Brown v. Brody, 339,* 199 F.3d 446, 452 (D.C. Cir. 1999). A plaintiff can prove a § 1981 claim through

direct evidence or through indirect evidence under the burden-shifting standard established in *McDonnell Douglas Corp. v. Green, supra; Carter v. George Washington University,* 387 F.3d 872, 878 (D.C. Cir. 2004).

The Supreme Court has made clear that recognition of retaliation claims under § 1981 and 1982 is "well embedded in the law" notwithstanding an absence of exhaustion of administrative remedies. See *CBOCS West, Inc. v. Humphries,* 128 S. Ct. 1951, 1954 (2008) ("The basic question before us is whether the provision encompasses a complaint of retaliation against a person who has complained about a violation of another person's contract-related 'right.'  We conclude that it does."). The Court rejected the employer claim that § 1981 was purely status based and directly embraced the principle that conduct unrelated to status – retaliation for complaints of discrimination -- supported a claim. *Id.* at 1960. The Court also brushed aside the employer's claim that construction of 1981 so as to permit retaliation claims could create some overlap with employment related remedies under Title VII including its exhaustion requirements noting:

> Precisely the same kind of Title VII/§ 1981 "overlap" and potential circumvention exists in respect to employment-related direct discrimination. Yet Congress explicitly created the overlap in respect to direct employment discrimination. Nor is it obvious how we can interpret § 1981 to avoid *employment*-related overlap without eviscerating § 1981 in respect to *non*-employment contracts where no such overlap exists.

*Id.* at 1960 (emphasis in original).

Thus, the discussion above of pretext relating to retaliatory termination of Plaintiff's contract applies with equal force here. Even if the Plaintiff were to be found to have been not covered by Title VII or the AEDA as an employee for these purposes –

which Plaintiff resists of course --  she is protected from retaliatory or "discriminatory contract termination" under § 1981. *Id.*; *Rivers v. Roadway Express, Inc., supra* at 302.

Accordingly, the factual assertions set out above relating to Plaintiff's claims for retaliation under Title VII and AEDA apply with equal force to her § 1981 claims.

**Conclusion**

Defendant's legal contentions that contract employees at BBG have no protection from discrimination, harassment and retaliation are unsupported and misconstrue the law. Retaliation claims under § 1981 are settled. Material issues of fact prevent grant of summary judgment on the Title VII and AEDA claims.

Respectfully submitted,

/s/

Timothy B. Shea
DC Bar No. 234005
Nemirow Hu & Shea
1629 K Street, NW Suite 500
Washington, DC  20006
Tel. 202 835 0300
Fax 202 835 0306

Attorney for Plaintiff Batool Khaksari

Dated: May 19, 2009

Certificate of Service

I hereby certify that I have caused a copy of the foregoing Opposition and the accompanying submissions to be served on counsel for the agency

Jane Lyons, Assistant US Attorney

by the ECF this May 19, 2009.


/s/
Timothy B. Shea